**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MAYO INOUE a/k/a MAIO INOUE,
individually and on behalf of all others
similarly situated,

                Plaintiff,

      v.

FTD, LLC,

                Defendant.

Case No. 1:25-cv-01016

## CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

**Page No.**

I.      INTRODUCTION ................................................................................................. 1

II.     PARTIES ............................................................................................................. 3

III.    JURISDICTION .................................................................................................. 3

IV.     VENUE ................................................................................................................ 4

V.      FACTUAL BACKGROUND ............................................................................... 4

      A.      Companies Use Bait-and-Switch "Drip Pricing" to Manipulate Consumers ........ 4

      B.      Defendant's Bait-and-Switch Tactics ....................................................11

            1.      The Browsing Stage:............................................................... 12

            2.      The Product Evaluation Stage:................................................ 12

            3.      Purchase Initiation Stage: ....................................................... 14

            4.      Delivery Information Stage: .................................................... 14

            5.      Payment Information Stage: .................................................... 16

      C.      Other Companies Do Not Rely on Drip Pricing to Drive Their Sales................. 21

      D.      Defendant's Drip Pricing Runs Afoul of Federal and State Law.......................... 21

      E.      California Prohibits Bait-and-Switch Pricing and Drip Pricing Schemes ........... 23

      F.      Many Other States Prohibit Bait and Switch Advertising and Drip Pricing
           Schemes ...................................................................................... 25

      G.      Plaintiff's Claims .................................................................... 26

VI.     CLASS ALLEGATIONS .................................................................................. 28

VII.    CLAIMS FOR RELIEF .................................................................................... 32

      COUNT I ..................................................................................................... 32

      COUNT II .................................................................................................... 38

      COUNT III................................................................................................... 40

      COUNT IV................................................................................................... 41

          "Unfair" Prong ................................................................. 41

"Fraudulent" Prong ........................................................................................ 42

"Unlawful" Prong .......................................................................................... 43

VIII.   PRAYER FOR RELIEF ................................................................................. 45

IX.   JURY TRIAL DEMANDED ......................................................................... 46

CLASS ACTION COMPLAINT

## I.    <u>INTRODUCTION</u>

1.    Defendant FTD, LLC ("Defendant") systematically cheats consumers out of millions of dollars annually by employing a deceptive and illegal bait-and-switch pricing scheme.

2.    Rather than transparently disclosing the full cost of the floral arrangement and/or gift item delivery offered through its e-commerce platform, Defendant instead adds on a previously undisclosed "Surprise Fee" of $19.99 to every product purchased, regardless of order size and recipient location. Defendant springs the consumer with the Surprise Fee of $19.99 per floral arrangement right before the buyer finalizes the transaction. This Surprise Fee, labeled as a "delivery fee," is a junk fee that Defendant does not disclose to consumers at any point prior to the final stage of the transaction and that is actually a hidden part of the total price a consumer must pay for its floral delivery service.

3.    Defendant lures consumers into purchasing the delivery of floral arrangements and/or other gift items from Defendant's website by advertising artificially low prices for their service while hiding the $19.99 of Surprise Fee that Defendant charges for each floral arrangement. Specifically, Defendant advertises misleadingly low prices that do not include the added $19.99 surcharge. Only at the latest point in checkout does Defendant, for the first time, list a total amount that includes the Surprise Fee of $19.99, after consumers have already engaged in a lengthy, multi-step process, requiring numerous decisions and inputs from the consumer, including: (a) selecting a particular arrangement at its advertised price (that does not include fees); (b) evaluating the intended arrangement and determining whether they would prefer the Standard, Deluxe, Deluxe with Chocolate, Premium, Exquisite, or Deluxe with Chocolate and Candle version; (c) entering the recipient's zip code; (d) selecting a delivery date from a pop-up menu and considering whether they would like to have the item delivered on a "high traffic" day for an added charge; (e) considering whether they would like to include an optional add-on in their order, such as a mylar balloon, greeting card, plush bear, or box of chocolates; (f) considering whether they would like to create an FTD account to associate with the order, and if so, selecting their password; (g) entering the recipient's information, such as their first and last name and address; (h) inputting a

phone number for the order; (i) selecting a note type for inclusion in the order; (j) inputting who the note should be from; (k) inputting a custom message for the note; (l) indicating whether they would like an automated reminder email of this purchase next year; (m) entering payment details for the order, and (n) adding any special promotion to the order, such as a discount code.

4.      Defendant's pricing scheme is designed to burn through consumer time and hassle them into acquiescing to the Surprise Fee. Even when a consumer does not ultimately consent to the Surprise Fee and instead abandons their cart, Defendant has still harvested their personal data which it will use to further enrich itself in future applications unrelated to the transaction in question.

5.      The goal of Defendant's false advertising is to convince consumers shopping for flower delivery that Defendant's goods and services are $19.99 cheaper than they really are, and trick them into paying a higher price.

6.      These Surprise Fees—also commonly called "Junk Fees," including by the Federal Trade Commission ("FTC")[1]—have recently been the subject of national media attention, including during President Biden's 2023 State of the Union Address.

7.      As President Biden explained, "too many companies" are charging "hidden surcharges … to make you pay more. [J]unk fees may not matter to the very wealthy, but they matter to most other folks in homes like the one I grew up in, like many of you did. They add up to hundreds of dollars a month. They make it harder for you to pay your bills[.]"[2]

8.      Junk Fee practices—like Defendant's $19.99—are not just deceptive. They are illegal.

---

[1] As defined by the FTC, "Junk Fees" are "unfair or deceptive fees that are charged for goods or services that have little or no added value to the consumer" or fees that are "hidden," such as those disclosed only at a later stage in the consumer's purchasing process or not at all. *Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011*, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (to be codified at 16 C.F.R. pt. 464), *available at* https://www.federalregister.gov/documents/2022/11/08/2022-24326/unfair-or-deceptive-feestrade-regulation-rule-commission-matter-no-r207011 (cleaned up).

[2] *President Biden's State of the Union Address,* White House, https://www.whitehouse.gov/stateof-the-union-2023/ (last visited Jan. 4, 2025).

CLASS ACTION COMPLAINT

9. As a result of Defendant's false advertising, Plaintiff and the proposed class have suffered damages. They purchased floral arrangements they would not otherwise have bought and paid $19.99 more than they would not otherwise have paid had they not been drawn in by Defendant's deceptively low prices. Consumers have also had their data collected for commercial purposes, under the guise of a falsely listed price that Defendant has no intention of honoring.

10. Junk Fees violate FTC Rules and Guidance, as well as state consumer protection statutes, which require businesses to sell goods and services for their advertised prices. Defendant's misleading advertised floral delivery prices, a bait-and-switch scheme, constitutes false and misleading advertising in violation of the Consumer Protection Acts of the 50 states, including California's Unfair Competition Law (the "UCL") (Cal. Bus. & Prof. Code § 17200); California's False Advertising Law (the "FAL") (Cal. Bus & Prof. Code § 17500); and California's Consumer Legal Remedies Act (the "CLRA") (Cal. Civ. Code §§ 1750 et seq.).

11. Plaintiff brings this action under the CLRA, UCL, and FAL, to stop Defendant from falsely advertising the price of its floral arrangements as $19.99 less than they actually cost throughout 50 states and to residents of the United States and force Defendant to pay back the tens of millions of dollars in unlawful Surprise Fee revenues it has taken from consumers together with statutory penalties and punitive damages.

## II.  PARTIES

12. **Plaintiff Mayo Inoue** a/k/a Maio Inoue is a resident of Los Angeles, California.

13. **Defendant FTD** is a limited liability company incorporated in Illinois, with its principal place of business at 200 N. LaSalle Street, Suite 2550, Chicago, Illinois 60601. Defendant is a citizen of Illinois.

## III.  JURISDICTION

14. This court has original jurisdiction over the action pursuant the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and

minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

IV.   **VENUE**

15.   Venue is proper in this District under 28 U.S.C. § 1391 because some or all of the events giving rise to this action occurred in this District, and because Defendant is headquartered in the Northern District of Illinois. Additionally, jurisdiction is proper as Defendant has marketed, advertised, and sold the Products within this District.

V.    **FACTUAL BACKGROUND**

    A.   **Companies Use Bait-and-Switch "Drip Pricing" to Manipulate Consumers**

16.   Large, sophisticated corporations—like Defendant— with their large, sophisticated marketing teams, know that "drip pricing" is an effective method of tricking price-sensitive consumers into paying higher prices.

17.   Drip pricing is a tactic employed by e-commerce corporations to psychologically manipulate consumers into paying more than they otherwise would. It is a form of "partitioned pricing," a pricing technique that divides the price of a product into multiple components, such as a base price and additional fees.

18.   The FTC informally defines "drip pricing" as a "technique in which firms advertise only part of a product's price and reveal other charges later as the customer goes through the buying process. The additional charges can be mandatory charges [] or fees for optional upgrades and add-ons."[3]

19.   The drip pricing process starts with a seller (or, the "drip pricer") listing an item at an attractively low, "bait" price. The bait price will look to the consumer to be the full price of the item.

20.   Lured in, the consumer will then manifest their intent to transact at the advertised price. With a click, the consumer will initiate the multi-step, multi-page online check-out process.

---

[3] *The Economics of Drip Pricing*, FED. TRADE COMM'N (May 21, 2012), https://www.ftc.gov/news-events/events/2012/05/economics-drip-pricing.

CLASS ACTION COMPLAINT

The consumer will be directed through a series of pages, being presented with various add-on items, then prompted to enter information relevant to the transaction, such as the shipping address for the item, whether the item is a gift and whether the consumer would like to include an optional gift message to the recipient, the consumer's billing address, and their credit card information.

21.     Only after the consumer has directed significant time and attention to completing the transaction at the initial bait price will they then be confronted with a secondary drip price, a mandatory surcharge that they must pay to secure the item. The drip price, often labeled as a "service fee," "convenience fee," "handling fee," or "delivery fee," will surprise the consumer, as it appears only after the consumer has spent their time and energy attempting to secure the item at the initially advertised price, and at the last possible point in the check-out process.

22.     At this point, the seller has the consumer in hand. The consumer is "locked in"[4] and will thus acquiesce to the "switch" price, (the sum of the bait price plus the drip price).

23.     When purchasing any product online, consumers will experience a "Purchase Flow," i.e., the multi-step process by which a consumer completes all the tasks needed to make a purchase, such as browsing, adding items to cart, adding payment information, and ultimately buying the items. Sellers can design straightforward Purchase Flows that make pricing and fees transparent throughout and that uses web design that centers the shopper's experience. For example, sellers can transparently post their shipping cost policy in easy-to-see locations early on during the consumer's navigation through the Purchase Flow. On the other hand, online sellers can manipulate reasonable consumers through the design of a Purchase Flow that induces them to pay more for products than they would otherwise. Successful drip-pricing campaigns depend on confusing and lengthy Purchase Flows that confuse and exhaust consumers through the following mechanisms and psychological tactics:

---

[4] "Customer Lock In" is an economic scenario, where a consumer is dependent on a particular vendor for products, unable to use another vendor without being saddled with substantial switching costs.

CLASS ACTION COMPLAINT

24. **Usurping Consumer Time**: Drip pricers develop a lengthy Purchase Flow process, from browsing through check-out, which bait the consumer to click through a series of pages that prompt the user to expend significant time filling out information related to the purchase. By sequentially partitioning the check-out process, and only confronting the consumer with the full price after the consumer has spent time and energy inputting information, the drip pricer burns through the consumer's time.[5] This has the effect of "locking in" the consumer, who does not want to continue burning through their time reserves in order to evaluate alternative products and sellers. When consumers are buying time-sensitive items, such as gifts for important occasions, consumers may not even have the time to start the process anew.

25. **Sunken Cost Fallacy**. Drip pricers weaponize the psychological phenomenon of "sunken cost fallacy," depending on consumers to display this irrational "tendency to continue an endeavor once an investment in money, effort, or time has been made," rooted in the maladaptive "desire not to appear wasteful."[6] Drip pricers structure the lengthy check-out process to feel to the consumer like an expenditure of energy that they will be loath to "undo" by restarting the search for a different item after being presented with the mandatory surcharge.

26. **Mistaken Assumptions That Switching Will Be Futile**. The drip pricer relies on the consumer's mistaken assumption that competing sellers all engage in similar tactics. Because the drip pricer is frequently a large, highly profitable e-commerce corporation, the consumer will perceive the corporation as engaging in, or perhaps even setting the standard for, industry-wide pricing tactics. Thus, the consumer will mistakenly assume that all other competitors are also engaging in this deception, and that transacting with a competitor will not spare them from paying an inflated "switch" price.[7] A 2020 Marketing Science study confirms this: after being exposed to "drip pricing," the participants in the study cited seeing "little value" in returning to the search

---

[5] David Adam Friedman, *Regulating Drip Pricing*, 31 STAN. L. & POL'Y REV. 51, 76 (2020).

[6] Hal R. Arkes & Catherine Blumer, *The Psychology of Sunk Cost,* 35 ORG. BEHAV. & HUM. DECISION PROCESSES 124, 124–25 (1985).

[7] Shelle Santana et al., *Consumer Reactions to Drip Pricing*, 39 MKTG. SCI. 188, 197 (2020), https://doi.org/10.1287/mksc.2019.1207.

CLASS ACTION COMPLAINT

process after being confronted with the dripped surcharge because they believed that "all [corporations] charge similar extra fees."[8]

27. **Anchoring and Adjustment Heuristic**. Trailblazing psychologists Amos Taversky and Daniel Kaneman coined the "anchoring and adjustment heuristic," which refers to a cognitive bias where people make decisions by using an initial piece of information as a starting point ("anchor"). People use this anchor as a mental benchmark, or starting point, for estimating value. In the case of drip pricing, the consumer "anchors on the piece of information he or she considers 'most important,' (e.g., the [bait] price), and then adjusts insufficiently for one or more items (e.g., the surcharge), thus underestimating the total price."[9] This cognitive bias has a very real effect on the consumer: those exposed to drip pricing tend to ultimately transact for an item with a lower listed bait price but a higher total switch price due to distortions caused by "anchoring" and resultant mistakes in calculating the item's actual, overall cost.[10] Said another way, consumers underestimate the total price when presented with drip or partition pricing, as they often entirely disregard the Junk Fee because of the cognitive costs and effort involved in adding the partitioned prices. Due to "anchoring", as companies that engage in Junk Fee practices are well aware, consumers choose a product or service based on the advertised bait price, and not based on the drip price or partitioned price, especially when the Junk Fee is not adequately disclosed.[11]

28. **Decision Fatigue**. E-commerce platforms that engage in drip pricing present the Surprise Fee at the latest possible moment during the check-out process, after the consumer has purposefully been steered through a series of cognitively taxing decisions. These decisions may

---

[8] *Id.*

[9] *See* Gorkan Ahmetoglu et al*., Pricing Practices: A Critical Review of their Effects on Consumer Perceptions and Behavior,* 21 J. RETAILING & CONSUMER SERV. 696, 696 (2014), https://doi.org/10.1016/j.jretconser.2014.04.013.

[10] Shelle Santana et al., *Consumer Reactions to Drip Pricing*, 39 MKTG. SCI. 188, 188 (2020), https://doi.org/10.1287/mksc.2019.1207.

[11] Alexander Rasch et al., *Drip Pricing and its Regulation: Experimental Evidence*, 176 J. ECON. BEHAVIOR & ORG. 353 (2020), https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189 ("buyers [] based their purchase decision exclusively on the base price").

include: what model, color, and size of a particular item the consumer may want; how and when they consumer may wish to have the item delivered to them; whether or not the consumer would like to upgrade to a premium version of the product; and whether the consumer would like to add on accessories to the purchase for an additional fee. "Making decisions over extended periods of time is cognitively taxing and can lead to decision fatigue, which is linked to a preference for the 'default' option, namely whatever decision involves relatively little cognitive effort."[12] "Such effects have been demonstrated across a number of applied settings, including forensic and clinical contexts."[13] E-commerce platforms purposefully cognitively tax consumers before presenting them with dripped prices, knowing that the consumer is more likely to succumb to the drip price because stomaching it will involve less cognitive effort than restarting their search for a suitable good in the online marketplace.

29.     **Difficulty in Price Comparison**. When a Junk Fee is hidden and/or partitioned, consumers cannot reasonably compare the cost of a product or service across available options within a company or across companies. Consumers might have to follow multi-step Purchase Flow on multiple sellers' websites to figure out the true price of the products. Further complicating price comparisons is the way in which Google search displays obscure the true cost of some products. Many consumers will often run searches on Google as an initial first step in buying a product, and in response, Google often displays an assortment of products and their associated sellers and prices. Typically only the base price is displayed, so sellers can entice consumers to visit their website by artificially reducing the base price by partitioning more of it into mandatory fees that get disclosed later in the process.

---

[12] Tobias Baer & Simone Schnall, *Quantifying the Cost of Decision Fatigue: Suboptimal Risk Decisions In Finance*, 8 Royal Soc'y Open Sci. 5, 5 (2020) https://pmc.ncbi.nlm.nih.gov/articles/PMC8097195/.

[13] Tobias Baer & Simone Schnall, *Quantifying the Cost of Decision Fatigue: Suboptimal Risk Decisions In Finance*, 8 Royal Soc'y Open Sci. 5, 5 (2020) https://pmc.ncbi.nlm.nih.gov/articles/PMC8097195/.

CLASS ACTION COMPLAINT

30.     In 2021, the University of California, Berkeley, ran an experiment on StubHub Users to better understand the mechanics of drip pricing.[14] The large-scale field experiment involved tracking individual-level click-stream behavior of millions of consumers: with roughly 50% of them being exposed to dripped prices, and 50% of them being presented the full price, up front.[15] The users that were presented dripped prices more frequently left the check-out process to revisit other listings.[16] They often repeated this behavior multiple times, before purchasing more expensive and higher quality tickets.[17] From this, the study extrapolated that these users struggled with price comparison—misinformation driving them to purchase more expensive goods in higher quantities.[18] Said another way: consumers strongly and systematically underestimate the total price under drip pricing and make mistakes when searching for the best deal, leading them to make purchasing decisions that benefit the seller.[19]

31.     Law Professor David Adam Friedman puts it best: "Serious deception concerns emerge where sellers advertise a price for an offering, but buyers cannot attain the offering after starting the transaction without paying a secondary charge."[20] And this serious deception has very real consequences for consumers and for competition in the market. Accordingly, "buyers may be hurt" because "[w]hen there is uncertainty over possible drip sizes . . . consumers more frequently fail to identify the cheapest offer."[21] This outcome is inevitable because consumers exposed to drip pricing "are significantly more likely to 1) initially select the option with the lower base price, 2)

---

[14] Tom Blake et al., *Price Salience and Product Choice*, 40 MKTG. SCI. 619, 619(2021), https://doi.org/10.1287/mksc.2020.1261.

[15] *Id.* at 620.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] Alexander Rasch et al., *Drip Pricing and its Regulation: Experimental Evidence*, 176 J. ECON. BEHAVIOR & ORG. 353 (2020), https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189.

[20] David Adam Friedman, *Regulating Drip Pricing*, 31 STAN. L. & POL'Y REV. 51, 53 (2020).

[21] Rasch et al. *Drip Pricing and its Regulation: Experimental Evidence*, supra note 11.

CLASS ACTION COMPLAINT

make a financial mistake by ultimately selecting the option that has a higher total price than the alternative option, given the add-ons chosen, and 3) be relatively dissatisfied with their choice."[22]

32.     Drip pricing results in the following consequences, among others:

a)  "'[Consumers] end up making purchases that in hindsight they would not have made;'"[23]

b)  Consumers typically spend more than they would have otherwise (one study estimated 21% more);[24]

c)  Consumers feel deceived by those they transact with;[25]

d)  Large e-commerce platforms unjustly enrich themselves by charging consumers fees that do not give consumers additional value. For example, in 2017 alone, the Junk Fee revenue of the U.S. airline and U.S hotel industries was approximately $57 billion and $2.7 billion, respectively;[26]

e)  As FTC Chair Lina Kahn puts it: "Firms that are clear with customers about the total price upfront tend to lose out to deceptive firms that initially show a low price but then charge a much higher one[;]"[27]

f)  Consumer data is gathered under false pretenses and used to later enrich the drip pricer. Under the false pretense of a sale at the bait price, the seller can collect valuable data from the consumer, to build out their lead database and

---

[22] Santana et al., *Consumer Reactions to Drip Pricing*, supra note 7, at 188.

[23] Morgan Foy, *Buyer Beware: Massive Experiment Shows Why Ticket Sellers Hit You With Last-Second Fees,* Berkeley Haas News (Feb. 9, 2021), https://newsroom.haas.berkeley.edu/research/buyer-beware-massive-experiment-shows-why-ticket-sellers-hit-you-with-hidden-fees-drip-pricing/.

[24] *Id.*

[25] Thomas Robbert, *Feeling Nickeled and Dimed - Consequence of Drip Pricing,* 25 J. Service Theory & Practice 621, 623 (2015).

[26] Shelle Santana et al., *Consumer Reactions to Drip Pricing*, 39 Mktg. Sci. 188, 189 (2020), https://doi.org/10.1287/mksc.2019.1207.

[27] *Remarks of Chair Lina M. Khan Regarding the White House Announcement of New Actions to Protect Consumers from Hidden Junk Fees,* Fed. Trade Comm'n (Oct. 10, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/khan-remarks-regarding-junk-fees.pdf.

drive future business from consumers even when they did not complete the ultimate purchase. For instance, mere hours after a consumer has abandoned their cart, they will begin to receive marketing content from the drip pricer.

**B.** **Defendant's Bait-and-Switch Tactics**

33. Defendant is also known at Florists' Transworld Delivery, and is a privately held floral wire service, retailer, and wholesaler.

34. Defendant was founded as Florists' Telegraph Delivery in 1910.[28]

35. Defendant is one of the largest privately held floral wire services in the world.

36. Defendant's website boasts that "FTD has been a leader in the floral industry for over a century. We are a private equity-backed company with one of the largest florist networks in the world, supported by the iconic Mercury Man© logo displayed in over 30,000 floral shops in more than 125 countries."[29]

37. A significant portion of Defendant's revenue is driven by Defendant's employment of drip pricing,[30] a deceptive bait-and-switch tactic meant to trick users into purchasing products at a higher price point than they otherwise would have. Using this method, Defendant systematically hassles its customers out of their hard-earned money using a complicated Purchase Flow process that hides an extra $19.99 fee associated with each of the products (regardless of size or recipient location) until after a consumer has invested significant amount of time in the purchase.

38. Screenshots of the entire FTD Purchase Flow are attached as Exhibit A. A consumer who makes a purchase on Defendant's website and navigates that Purchase Flow will experience the drip-pricing scheme as follows:

---

[28] *FTD Celebrates 100th Anniversary in 2010*, FTD MERCURY MESSENGER (Oct. 2009) at 9, https://www.ftdi.com/newsletter/October2009.pdf.

[29] *Our History*, FTD, https://www.ftdcompanies.com/ (last accessed Jan. 28, 2025).

[30] The discovery process will illuminate the exact dollar figure Defendant annually derives from its drip pricing scheme.

CLASS ACTION COMPLAINT

### 1. The Browsing Stage:

39. The Browsing Stage is the part of the process where the consumer compares products and makes their selections. When the consumer visits www.ftd.com, there are two general things the consumer does to find a suitable floral arrangement to purchase.

40. First, as can be seen in Figure 1A, Exhibit A, when visiting www.ftd.com, consumers can browse Defendant's website to select a category of arrangement "occasions" from the menu toward the top of the homepage. For instance, the consumer may select "Birthday."

41. Second, as can be seen in Figure 1B, Exhibit A, once the consumer is on the landing page for a particular category of arrangements (here, "Birthday Flowers"), the consumer is presented with an array of floral arrangements, where Defendant advertises a price for each one. For instance, after browsing, a consumer will select the "You're Precious Bouquet", lured in by its advertised price of $55- $116. This price is misleading to consumers, who at this stage in the Purchase Flow receive no notice nor indication that this price range does not reflect the static $19.99 Surprise Fee that will be added to each arrangement purchased.

42. During the Browsing Stage of the process, when consumers are on Defendant's home page and any of the landing pages for the various themes and occasions, Defendant omits any information to alert a consumer that an additional charge of $19.99 will  be added to the price of the product. Nor does Defendant include on these pages any easy-to-locate links where a consumer can learn more about the shipping costs or other fees.

### 2. The Product Evaluation Stage:

43. During the "Product Evaluation Stage," the consumer will click on the image of a particular arrangement that appeals to them, to evaluate the item for potential purchase. For instance, as can be seen in Figure 2, Exhibit A, in this example, the consumer has selected "You're So Precious" arrangement.

44. While on the "You're So Precious" Product Page, the consumer can first investigate the specifications of the arrangement, by: (a) reading the arrangement description; (b) reading the arrangement "DETAILS" and "BLOOM DETAILS"; (c) viewing and comparing the available

CLASS ACTION COMPLAINT

arrangement size: Standard ($55), Deluxe ($70), Deluxe with Chocolate ($95), Premium ($95), Exquisite ($115), and Deluxe with Chocolate and Candle ($116).

45.     During the "Product Evaluation" stage, the consumer will be prompted to select the size of the arrangement by clicking the square associated with the desired size. On this page, the "Deluxe" size ($70) will be pre-selected for the consumer. Thus, the consumer will need to change their selection back to "Standard" to attempt to transact at the item's lowest initially listed price of $55.

46.     The user will then be prompted to select a delivery date from a pop-up calendar window. Certain delivery dates will require an additional fee, as pictured below.

47.     Once the consumer has clicked "CONFIRM DELIVERY DATE," they will then click "ADD TO CART" and enter the next phase in the Purchase Flow.

48.     On this product listing page, again Defendant does not include any information about shipping costs or other fees, nor any links to refer a consumer to those policies. Nowhere during this stage of the Purchase Flow does Defendant disclose that a $19.99 Surprise Fee will be added to each floral arrangement purchased by the consumer.

CLASS ACTION COMPLAINT

### 3. Purchase Initiation Stage:

49. Once the consumer has made the decision of which size bouquet they desire, entered the recipient's zip code, and selected the desired delivery date, the consumer will click "ADD TO CART" entering the "Purchase Initiation Stage," as pictured in Figure 3, Exhibit A. At the point in the purchase flow, the consumer will receive a visual confirmation that their "item [was] added successfully" to their shopping cart. Just below this message, the consumer will be prompted to "Make [Their] Gift Extra Special" and consider adding optional merchandise to their order for an added fee. The consumer will be prompted to indicate whether they would like to add a "Festive Mylar Balloon" for $5.99; a "Greeting Card" for $6.99; an "Adorable Plush Bear" for $21.99; or a "Delicious Box of Chocolates" for $19.99.

50. Once the consumer has either accepted or declined these optional add-ons, they will click "CHECKOUT" at the bottom right of the page, as seen in Figure 3, Exhibit A.

51. During this stage of the process, Defendant omits any information to alert a consumer that additional charges may be added to the price of the product, nor does it include any links to its shipping and fee policies. Notably, this step in the Purchase Flow omits the $19.99 mandatory Surprise Fee that the user must pay to buy this floral arrangement.

### 4. Delivery Information Stage:

52. Next, the consumer will be brought to the "Delivery Information" Stage, as can be seen in Figure 4, Exhibit A, where they will be prompted to fill in a great deal of information and make several choices:

53. First, the consumer will be prompted to "sign in to access [their] account or sign up" for an FTD account to associate with their purchase.

54. Then, scrolling down, the consumer will be prompted to "DELIVERY INFORMATION" For the intended recipient of the floral delivery, the consumer must enter the location type, recipient first name, recipient last name, delivery address (including street address, apartment number, city, state, postal code, country), and a phone number for the order.

55.     Then, the consumer will be prompted to add a "MESSAGE & SIGNATURE." From a drop-down menu, the consumer will first select the occasion from the following 24 options: Valentine's Day, Birthday, Funeral/ Sympathy, Get Well, Galentine's Day, Winter, Lunar New Year, Love, Anniversary, Just Because, Thank You, Business & Corporate Gifts, Cheer Someone Up, Congratulations, Engagement/ Wedding, Good Luck, Housewarming, I'm Sorry, Miss You, New Baby, New Job, Retirement, Thinking of You, and Other. Then, the consumer may input an optional Gift Message & Signature. If they choose to do so, they must take care to keep the message within 230 characters.

56.     Just below the "MESSAGE & SIGNATURE" box, the consumer is given the option to click a checkbox to opt into an annual reminder email for this delivery.

57.     On the right-hand side of the Delivery Information Page, the consumer will be prompted to enter an optional Promo Code or Gift Card Number.

58.     Just below this, the consumer will be displayed an "ORDER SUMMARY." This summary includes three entries: (1) The Order Subtotal (which includes only the $55 base price of the merchandise and omits the Surprise Fee of $19.99); (2) Tax (which merely serves as a placeholder and reads: "Calculated at next step); and (3) Estimated Subtotal ($55, which again includes only the base price of the merchandise and omits the Surprise Fee of $19.99). Notably, there is no placeholder for the $19.99 Surprise Fee that will be added to each floral arrangement ordered and that will appear in the final stage of the Purchase Flow.

59.     Below this, under "CART," the page reads "You're So Precious Bouquet- Deluxe- $55: Florist Crafted and Delivered."

60.     At just this point in the Purchase Flow, the consumer has been displayed only the base price of the merchandise in their cart ($55)—in three places. Through repetition of the $55 base price, Defendant reinforces the anchoring heuristic, engraining in the consumer's mind that they are paying only the listed bait price of $55, and conditioning them to disregard the $19.99 Surprise Fee they will soon be confronted with when completing their purchase.

61.     Next, the consumer will continue through the Purchase Flow by clicking "CONTINUE TO PAYMENT."

### 5.     Payment Information Stage:

62.     Clicking "CONTINUE TO PAYMENT" will bring the consumer to the page pictured in Figure 5A, Exhibit A (if the consumer is accessing the site from a maximized browser), or Figure 5B, Exhibit A (if the consumer is accessing the site from a minimized browser, tablet, or smartphone).

63.     During this stage, the consumer will again be prompted to "sign in to access [their] account or sign up" for an FTD account to associate with their purchase.

64.     When reading from left-to-right, just below this, under the "PAYMENT INFORMATION" heading, the consumer will be prompted to enter their credit card number, expiration, and CVV.

65.     Alternatively, the consumer is given the choice to pay using PayPal.

66.     Next, the consumer will be prompted to fill in information under the "BILLING INFORMATION" heading, including: indicating whether the consumer would like to use the information as the shipping address, or whether they would like to use a different billing address. If the user would like to use a different address than the shipping address, they will then need to input the following information: the billing first and last name; the billing address; the billing apartment, floor, or suite; the billing city, state, zip code, and country; and the billing phone number. Just beneath "BILLING INFORMATION," the button "PLACE ORDER" appears, with Defendant betting that some consumers will not look at the right side of the page and notice the Surprise Fee of $19.99 before placing their order.

67.     If the consumer does look at the right-hand side of the Payment Information Page, they will again be prompted to enter a promo code or a gift card to the order.

68.     Just below this, an updated "ORDER SUMMARY" will appear, with four entries: (a) the order subtotal of $55; (b) the Surprise "Delivery Fee" of $19.99; (c) the tax total; and (d) the total for the order, this time including the tax and the Surprise Fee.

69.     This is the first stage in the significantly involved, five stage Purchase Flow that the consumer is confronted with the Surprise Fee of $19.99.

70.     Troublingly, if the consumer is viewing the Payment Information Page from a minimized window on their computer or accessing the page from a tablet or smart phone, as pictured in Figure 5B, Exhibit A, there is a significant chance that the consumer will never see the Surprise Fee of $19.99 and will unwittingly consent to it by clicking "PLACE ORDER." If viewing this way, the consumer will be prompted to enter their payment details before being displayed the Surprise Fee. The consumer would need to scroll to the bottom of the payment information, past the "PLACE ORDER" button, to see the Surprise Fee. It is quite likely that the consumer will overlook the Surprise Fee, as they will not know to look for it. Prior to this stage in the Purchase Flow, the consumer was given no indication that a Delivery Fee of $19.99 will be assessed on their order. The web page is designed in such a way that the user may not know to look for this charge and may instinctively hit the "PLACE ORDER" button prior to scrolling to the bottom of the page and catching this sudden, drip price.

71.     Only after clicking through a series of five pages and entering all the details associated with the order, will the consumer be presented with Defendant's drip-priced Surprise Fee—a static $19.99 "delivery fee"—and the true total cost of the product.

72.     Defendant's **"Surprise Fees"** are a hidden cost that surprises the consumer at the very last step of the check-out process, after they have spent significant time and energy attempting to transact at the "bait" price of $55. In the example in Exhibit A, Defendant charges the Surprise Fee of $19.99, ostensibly for "delivery," though at times during the Class Period, Defendant charged other rates. Defendant does not disclose this "delivery" fee, any sort of fee schedule, nor any other Surprise Fee, at any earlier stage.

73.     **Defendant does not disclose its fee policies in any conspicuous location.** Most retailers who assess shipping and delivery charges maintain a link on their home page where consumers can view the fees for shipping and delivery, to allow them to understand what they will be charged and what the circumstances are that will cause these costs to increase or decrease. In

the absence of any obvious information or disclosures about fees for shipping and delivery, consumers will reasonably understand any price to be inclusive of the cost of shipping and delivery. And that belief will be reinforced when presented mid-way through purchase, when consumers are given an option to pay an additional fee to expedite the shipping, without simultaneously being provided information about the base shipping cost.

74.     **The "delivery fee" is not truly a "delivery fee" or a shipping cost.** The Surprise Fee of $19.99 is the hidden cost of every listed item, a hidden portion of the charge the consumer must pay to purchase the product. The fee is for general service, not a pass-through delivery charge. In fact, Defendant's products are typically prepared and hand-delivered by Defendant's partners, who are paid both for preparing the floral arrangement and for delivering them. Thus, unlike many retail transactions, where the retailer stocks the product and uses a third-party shipper such as the Post Office or FedEx, and the consumer pays a pass-through shipping cost or some fee reasonably calibrated to align with the retailer's out of pocket costs, Defendant outsources everything – providing the product and delivering the product – to a single third party. Despite paying one entity to perform both services, Defendant partitions the consumer's cost into two parts. And while florists might vary in the price they charge to Defendant for both services, Defendant does not price the floral arrangements themselves off the location. Instead, Defendant applies a static $19.99 fee to each arrangement, regardless of arrangement size or recipient location. If a consumer orders two arrangements, the total Surprise Fee will be for $39.98. For three arrangements, a consumer will be charged a Surprise Fee of $59.97.

75.     In the example in Exhibit A, Defendant never intended to sell the flowers at the "bait" price of $55.00. Instead, Defendant intended to sell a product at the entirely different price of $74.99 (plus sales tax). Though the prices fluctuate between different floral arrangements listed on Defendant's e-commerce site, each involves a hidden surcharge of $19.99

76.     As detailed herein, this pricing scheme is an illegal bait-and-switch scheme designed to hassle the user into clicking "PLACE ORDER" rather than confront the alternative of losing more valuable time and energy searching for another option from a different competitor or

a differently priced listing from Defendant's offerings. Defendant bets on the consumer giving in the "sunken cost fallacy," as well as "anchoring" on the "bait" price of $55.00, knowing that its deceptive pricing tactic will hassle the consumer into clicking "PLACE ORDER." The consumer will be loath to undo the considerable time and effort they have expended thus far in the transaction.

77.    Moreover, the check-out process is designed such that it induces "decision fatigue" in the buyer, who has had to make a slew of approximately 13 decisions and perform various tasks during the purchase flow prior to being confronted with the Surprise Fee.

78.    Indeed, the risks of sunken cost fallacy and decision fatigue are high in the context of purchasing flowers. Many people who buy flowers from Defendant are doing so to send them to someone else as a gift or to send condolences. Given that, many consumers may need the product to arrive by a certain date and may not have time to continue shopping for cheaper options. And because many consumers are buying flowers to send to someone else, the Purchase Flow includes steps such as locating the recipient's address and writing an appropriate message, that add to the time it takes to place the order.

79.    After making the following series of choices, the buyer is likely to acquiesce to the charge, as this will require less cognitive effort than starting from scratch, which would require re-entering the marketplace, and initiating the purchase flow with a competitor:

(1) The buyer must select the desired arrangement from hundreds of listings;

(2) The buyer must select which size arrangement they would like to order: Standard ($55), Deluxe ($70), Deluxe with Chocolate ($95), Premium ($95), Exquisite ($115), or Deluxe with Chocolate and Candle ($116);

(3) The buyer must evaluate whether they would like to add-on a "Festive Mylar Balloon" to their purchase, for an additional charge of $5.99;

(4) The buyer must decide whether they would like to add-on a "Greeting Card" to their purchase, for an additional charge of $6.99;

CLASS ACTION COMPLAINT

(5) The buyer must consider whether they would like to add-on an "Adorable Plush Bear" to their purchase, for an additional charge of $21.99;

(6) The buyer must evaluate whether they would like to add-on a "Delicious Box of Chocolates" to their purchase, for an additional charge of $19.99;

(7) The buyer must decide which delivery address is most appropriate for their intended recipient, and have it on hand;

(8) The buyer must decide what date is best for the delivery;

(9) The buyer must decide whether they would like to associate this purchase with an existing FTD account, or if they would like to create a new account to accompany this transaction, and what their password should be;

(10)     The buyer must decide whether they would like the wire company to remind them to make a similar purchase next year;

(11)     The buyer must consider whether they would like to add a custom note to the delivery, and if so, what it should say; and they must take care to keep this note within the character limit;

(12)     The buyer must consider what method of payment they would like to bill the delivery to, whether via credit card or PayPal;

(13)     The buyer must consider whether they would like to input a promotional code or gift card number and apply this toward the purchase;

80.    In sum, Defendant confronts the consumer with the drip price of the amount of the Surprise Fee only after the user has: (a) anchored on the listed, lower "bait" price, (b) devoted considerable time, energy, and focus to the purchase flow which they will perceive as sunken cost, and (c) have accumulated "decision fatigue" such that they would rather acquiesce to the default "drip" price rather than seek a competitor's product or a cheaper FTD offering.

81.    In so doing, Defendant has misled class members around the country, tricking them into purchasing flowers using a low bait price, and then switching the price through drip pricing at the end.  In so doing, Defendant has been unjustly enriched by tens of millions (if not more)

annually. Discovery will uncover the definite amount of revenue Defendant clears using this bait-and-switch scheme.

### C. Other Companies Do Not Rely on Drip Pricing to Drive Their Sales

82.     It is commercially viable for Defendant to cease their drip pricing scheme, as their competitor 1-800-Flowers.com, Inc. does not engage in this tactic. As pictured below, the 1-800-Flowers.com, Inc. list price for each item on their website includes the service fee. This is disclosed up front, during the "Browsing Stage." Each list price includes the disclaimer that the price "Includes service fee & delivery by a local florist." 1-800-Flowers.com, Inc. does not spring a sudden, drip price on consumer at any point during the consumer purchase flow.

Floral Embrace™ with Happy Birthday Banner

4 options available

## From $72.98

Includes service fee & delivery by a local florist

*Screengrab of the 1-800-Flowers.com, Inc. website*

### D. Defendant's Drip Pricing Runs Afoul of Federal and State Law

83.     Defendant's drip pricing scheme is illegal as it is a form of bait-and-switch advertising, which has long been prohibited by the FTC and by many states through their statutory prohibitions on unfair and deceptive practices.

84.     **FTC's Prohibition on Bait-and-Switch Schemes**. With respect to bait-and-switch prohibitions, the FTC warns that "[n]o advertisement containing an offer to sell a product should be published when the offer is not a bona fide effort to sell the advertised product." 16 C.F.R. § 238.1 (2019). The FTC's guidance on bait-and-switch advertising states that "[n]o statement . . . should be used in any advertisement which creates a false impression of the . . . value . . . of the product offered, or which may otherwise misrepresent the product in such a manner that later, on

disclosure of the true facts, the purchaser may be switched from the advertised product to another." 16 C.F.R. § 238.2(a).

85.     If the first contact with a consumer is secured by the deceptive bait advertisement (or a "bait price"), it is a violation of law even if the true facts are subsequently made known to the buyer. 16 C.F.R. § 238.2(b). Through drip and/or partitioned pricing, companies induce consumers to choose a product or service based on an advertised price (i.e., the "bait"), despite ultimately charging a different and higher price than advertised (the "switch").

86.     In spite of FTC's long prohibition on bait-and-switch advertising, Defendant lures consumers with an initial "bait," an insincere initial offer that Defendant has no intention of actually selling the floral delivery for. Instead, only after the consumer expends time and energy, and manifests intent to contract for a floral delivery at the initial price, are they then confronted with the much higher, total cost (the "bait" price plus the "switch," or drip price.)

87.     **FTC Guidance on Online Advertising and Sales**. Additionally, Defendant's drip pricing scheme does not comport with FTC guidance on online advertising and sales, further demonstrating that Defendant's pricing practice is deceptive and unfair.

88.     In its 2013 publication ".com Disclosures: How to Make Effective Disclosures in Digital Advertising,"[31] the FTC makes clear that when advertising and selling are combined on a website or mobile application, and the consumer will be completing the transaction online, disclosures should be provided before the consumer makes the decision to buy—for example, before the consumer "add[s] to shopping cart."

89.     In Defendant's case, according to this guidance, the additional "service" fee should be disclosed before the customer has to click "Add to Cart." Instead, the fees are not disclosed until the very end of the transaction, after the customer has already provided his or her credit card information and made the decision to buy.

---

[31] *.com Disclosures: How to Make Effective Disclosures in Digital Advertising*, FED. TRADE COMM'N (March 2013), https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-staff-revises-online-advertising-disclosure-guidelines/130312dotcomdisclosures.pdf.

CLASS ACTION COMPLAINT

90.     The FTC also states that required disclosures must be clear and conspicuous. Defendant does not disclose its additional fees in a clear or conspicuous manner. Instead, it hides fees from consumers until the very end of the transaction, displaying them alongside the "BOUQUET(S)" and "TAX" entries.

**E.      California Prohibits Bait-and-Switch Pricing and Drip Pricing Schemes**

91.     California law has long prohibited bait-and-switch pricing. See, e.g., *Stearns v. Ticketmaster Corp.,* 655 F.3d 1013, 1021 n.13 (9th Cir. 2011) ("One might even say that, in effect, California has created what amounts to a conclusive presumption that when a defendant puts out tainted bait and a person sees it and bites, the defendant has caused an injury; restitution is the remedy."); *Veera v. Banana Republic*, LLC, 6 Cal. App. 5th 907, 918 (2016) (holding that California's Unfair Competition Law, False Advertising Law, and Consumer Legal Remedies Act "are designed in part to protect consumers such as plaintiffs by requiring businesses to disclose the actual prices of items offered for sale, and prohibiting businesses from using false and deceptive advertising to lure consumers to shop").

92.     In addition, California has recently gone one step further, adding additional express prohibitions on drip pricing to better protect consumers.  Specifically, on July 1, 2024, California Senate Bill 478 went into effect, prohibiting drip pricing. California Senate Bill No. 478, S.B. 478, 2023-2024 Leg., Reg. Sess. (Cal. 2023).

93.     The California legislature specified that SB 478 "is intended to specifically prohibit drip pricing, which involves advertising a price that is less than the actual price that a consumer will have to pay for a good or service." The legislature also clarified that this amendment is not meant to promulgate an entirely new rule, but instead that, "this practice [drip pricing], like other forms of bait and switch advertising, is prohibited by existing statutes, including the Unfair Competition Law (Chapter 5 (commencing with Section 17200) of Part 2 of Division 7 of the Business and Professions Code) and the False Advertising Law (Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code)." The language of

the Bill clarified that "drip pricing" is a form of "bait and switch" advertising, guiding the courts to consider this new pricing trend a violation of existing FTC rules.

94.     Amended by SB 478, Cal. Civ. Code § 1770 lists as unlawful: "Advertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges other than either of the following: (i) Taxes or fees imposed by a government on the transaction[;] (ii)  Postage or carriage charges that will be reasonably and actually incurred to ship the physical good to the consumer."

95.     When formulating the bill's parameters, and choosing to exclude postage or carriage fees, the legislature was presented the following opposition's concerns: "shipping costs vary based on the size of the item, expediency of the shipping options, and geographic locations. Shipping might technically be mandatory when purchasing an online product, and therefore would fall within the bill's scope, but the variability described does not lend itself to the 'all-in' advertised price mandate of SB 478."[32]

96.     For this reason, the legislature carved out an exception for these types of fees, as long as they are reasonably and actually incurred. As detailed in the legislative history for SB 478, "The qualifier 'will be reasonably and actually incurred' is critical to the functioning of this amendment." Assembly Committee on Privacy and Consumer Protection, Jesse Gabriel, Chair, SB 478 (Dodd)- As Amended May 18th, 2023 (Date of Hearing: July 11, 2023).The qualifier "will be reasonably and actually incurred" "is meant to ensure that later-disclosed shipping charges reflect the actual cost of shipping the product. Without this qualifier, this exemption might open a loophole for new junk fees. An online retailer might lure a shopper in (particularly if the shopper relies on third-party websites allowing price comparison) by showing a product at a price much lower than any of its competitors, and then, just before payment, display an inflated shipping charge that brings the total cost to buy the product in line with the retailer's competitors. This would be a new

---

[32] *Consumers Legal Remedies Act: Advertisements: SB 478 (Dodd) – As Amended May 18, 2023: Synopsis of Hearing Before the Comm. on Judiciary*, 2023-24 Ca. State Assembly (2023).

CLASS ACTION COMPLAINT

form of junk fee, but because of the phrase "will be reasonably and actually incurred," this practice would be prohibited under this amendment." *Id.*

97.     Though a business can exclude shipping charges from its advertised price, it cannot exclude "handling charges." "Like any other mandatory fee or charge, a handling charge must be included in the advertised price."[33] Additionally, a company may not exclude a "delivery fee" that is not "reasonably and actually incurred." Defendant's "Surprise Fee," often labeled as a "service fee," is notably not a postage or carriage fee, reasonably incurred. In is merely a secondary, junk fee payment. In fact, the Surprise Fee is a static fee of $19.99 per arrangement: it does not fluctuate with arrangement size nor with recipient location. Even if it were to be seen in the most generous of light, Defendant's "service fee" is a handling fee of $19.99. The California Legislature and Attorney General Rob Bonta are crystal clear in advising such mandatory fees must be disclosed up front.

### F.     Many Other States Prohibit Bait and Switch Advertising and Drip Pricing Schemes

98.     First, when considering whether a practice is deceptive or unfair, many states' statutes expressly require courts to look to the FTC for guidance on what constitutes deceptive and unfair conduct. *See, e.g.*, Mass. Ann. Laws ch. 93A, § 2(b); Fla. Stat. Ann. § 501.204(b); 815 Ill. Comp. Stat. Ann. 505/2. Thus, because the practice violates FTC rules, it also violates many state laws.

99.     In addition, many states' unfair and deceptive practices statutes have been interpreted to prohibit drip pricing and other forms of bait-and-switch advertising. See, e.g., *Luca v. Wyndham Worldwide Corp.*, No. 2:16-cv-00746, 2019 WL 211098 (W.D. Penn. Jan. 16, 2019); *Pecznick v. Amazon.com, Inc.*, No. 2:22-cv-00743-TL, No. 2:22-cv-00783-TL, 2022 WL 4483123 (W.D. Wash. Sept. 27, 2022).

---

[33] *SB 478, Hidden Fees,* Rob Bonta, Attorney General, https://oag.ca.gov/hiddenfees# (last accessed Jan. 5, 2025).

CLASS ACTION COMPLAINT

G.     **Plaintiff's Claims**

100.     **Plaintiff Maio Inoue** has used Defendant to purchase the delivery of a floral arrangement on at least one occasion.

101.     On Tuesday, October 15, 2024, Plaintiff searched online for a floral arrangement to deliver to her friend for their birthday. Plaintiff first browsed the 1-800-Flowers website but found that their initially advertised prices exceeded the list prices on Defendant's website. Concerned with making sure she secured a bargain, Plaintiff selected Defendant because it appeared cheaper than 1-800-Flowers when comparing the list price of similar arrangements.

102.     After scanning through Defendant's offerings using Defendant's website, Plaintiff selected Defendant's "Pastel Traditions- A Florist Original" ("Pastel Traditions") arrangement. The Pastel Traditions arrangement was listed at a price range of $45-$90 dollars. Plaintiff intended to secure the delivery of this bouquet at its lower listed price of $45, plus applicable tax.

103.     Plaintiff clicked on the item, which brought her to the Pastel Traditions Product Page. She selected the "Standard" size of the bouquet, once again listed at a price of $45.

104.     The Pastel Traditions Product Page did not indicate that the $45 was merely a base price and that Defendant would add any Surprise Fees, such as an additional, mandatory "delivery fee" to the purchase.

105.     Relying on the listed price, Plaintiff then entered her friend's zip code of 93933. She then selected the delivery date of October 16, 2024, taking care to select a date that did not incur an additional fee. Plaintiff was led to believe that by avoiding a delivery date that would be subject to an additional charge, that she would not incur a "delivery fee" on her order.

106.     After clicking "ADD TO CART," Plaintiff was brought to a page which confirmed that the Pastel Traditions arrangement had been "added successfully" to her cart. Just below this confirmation page, Plaintiff was prompted by Defendant to "Make [Her] Gift Extra Special" and to select an optional add on such as a "Festive Mylar Balloon," "Greeting Card," "Adorable Plush Bear," or "Delicious Box of Chocolates." Plaintiff abstained from adding any additional merchandise to her order. Plaintiff then clicked "CHECKOUT" at the bottom of this page.

107.    Plaintiff was then taken to the "Delivery Information" Stage in the Purchase Flow. This stage required that Plaintiff spend considerable time and energy. Here, Plaintiff was prompted to enter "DELIVERY INFORMATION" for her order, including location type; recipient's first name; recipient's last name; delivery address; apartment, floor, or suite number; city; state; zip code; country; and delivery phone number. Next, under "MESSAGE & SIGNATURE," Plaintiff was prompted to select an "Occasion" from a drop-down menu of 24 options. Next, she was prompted to add a "Gift Message & Signature." Just below this, Plaintiff was prompted to indicate if she would like Defendant to send her an annual reminder email for this purchase. Plaintiff declined to check this box.

108.    On the right side of the "Delivery Information" page, Plaintiff was given an order summary. Here, the "Order Subtotal" displayed a price of $45.00. Just below this, there was a placeholder for tax, which read: "Calculated at next step." Underneath these two entries was an "Estimated Subtotal," in larger, conspicuous text. The subtotal read $45.00.

109.    Just below this, under the subheading "CART," Plaintiff was shown an image and description of the item, "Pastel Traditions- A Florist Original- Standard $45.00." Having seen the advertised price of $45.00 on the "Delivery Information" page alone, Plaintiff was led to believe that her purchase would be $45.00 plus applicable tax. On this page, Plaintiff was shown a subtotal for her order, but this subtotal did not include tax nor the mandatory Surprise Fee that Plaintiff would need to pay to secure the delivery. Due to the omission on the "Delivery Info" page of the mandatory Surprise Fee, Plaintiff was not expecting to be charged an $19.99 Surprise Fee.

110.    Next, Plaintiff clicked "CONTINUE TO PAYMENT" at the bottom of this page and was next taken to the "Payment Info" Page. Here, Plaintiff entered in her credit card details, under the subheading "PAYMENT INFORMATION." This involved entering her credit card number, expiration, and CVV. Next, under "BILLING INFORMATION," she was prompted to fill in her first name; last name; billing address; apartment, floor, or suite number; city; state; zip code; country; and phone number. Just below "BILLING INFORMATION" section appeared a button reading "PLACE ORDER."

CLASS ACTION COMPLAINT

111.    Reading the "Payment Information" page from left-to-right, Plaintiff then noticed, just below a second "PLACE ORDER" button, an updated "ORDER SUMMARY." Here, she was first confronted with the Surprise Fee of $19.99. Plaintiff was not expecting this fee, as it was not disclosed at any stage prior in the FTD Purchase Flow that such a fee would apply. Furthermore, when browsing Defendant's website, Plaintiff saw no mention of a fee schedule or explanation that additional Surprise Fees may be added to FTD orders.

112.    At this point, Plaintiff gave in to the fee, despite her frustration. Plaintiff was under time pressure to get the floral arrangement to her friend, and after seeing that 1-800-Flowers appeared to be more expensive than Defendant, she was apprehensive that she could quickly find a better deal elsewhere. Due to the time sensitive nature of her order, Plaintiff simply felt that it would take too much time and energy to identify an alternative floral display.  Had she known that she would be saddled with the service fee, Plaintiff would have looked elsewhere for a floral arrangement for her friend's birthday. Had Defendant priced the bouquet with full transparency, listing the true and full price of the bouquet, Plaintiff would have declined the purchase altogether, or would have identified a lower cost alternative.

## VI.    CLASS ALLEGATIONS

113.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

114.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this action individually and on behalf of the following Class and Subclass:

> **Class**: All individuals in the United States who purchased a floral arrangement and/or other gift delivery from Defendant within the applicable statute of limitations
>
> **California Subclass**: All class members who resided in California at the time of their purchase.

115.    Plaintiff represents, and is a member of, this Class and the California Subclass.

116.    Excluded from the Class are the Defendant, and any entities in which the Defendant has a controlling interest, the Defendant's employees, any Judge to whom this action is assigned

and any member of such Judge's staff and immediate family, as well as claims for personal injury or wrongful death.

117.     Plaintiff reserves the right to amend or modify the Class and Subclass definitions after having an opportunity to conduct discovery.

118.     The Class and Subclass meet the criteria for certification under Rule 23(a), (b)(2), (b)(3), and (c)(4). Plaintiff and all members of the Class have been harmed by the acts of the Defendant. Class-wide adjudication of Plaintiff's claims is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

119.     **Numerosity. Fed. R. Civ. P 23(a)(1).** The members of the Class and Subclass are so numerous that individual joinder of all class members is impracticable. Although the exact number of members is unknown at this time, it can readily be determined from the internal business records of Defendant, and Class members may be notified of the pendency of this action by published and/or mail/emailed notice. Plaintiff reasonably estimates that there are hundreds of thousands of members of the Class.

120.     **Commonality and Predominance. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Common questions of law and fact exist as to all members of the putative class that will drive the litigation and predominate over any questions affecting only individual Class members. Common questions include, but are not limited to:

a)   Whether Defendant's pricing practices were and are likely to mislead consumers;

b)   Whether Defendant's representations in the floral delivery prices displayed on Defendant's website were and are misleading;

c)   Whether Defendant knew or should have known that its pricing practices were and are likely to mislead consumers;

d)   Whether Defendant knew or should have known that the floral delivery prices displayed on Defendant's website were and are false and/or misleading;

CLASS ACTION COMPLAINT

e) Whether the facts Defendant failed and continued to fail to disclose in Defendant's advertising were and are material;

f) Whether Defendant's acts alleged herein were unlawful;

g) Whether consumers suffered and continue to suffer damage as a result of Defendant's acts alleged herein;

h) The extent of the damage suffered by consumers as a result of Defendant's acts alleged herein;

i) Whether Defendant's acts alleged herein were and are unfair;

j) Whether Defendant should be enjoined from continuing to advertise as alleged herein;

k) Whether Defendant has been unjustly enriched;

l) Whether Plaintiff and the Class members are entitled to damages and restitution, including for the value of the purchase price, and the proper measure of Plaintiff's and the Class Members' losses.

121. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative Class member and are based on the same facts and legal theories as each of the Class members. Plaintiff, like all members of the Class, purchased one of Defendant's Floral Arrangements from Defendant's website. Plaintiff, like all Class members, were thus subject to Defendant's bait-and-switch pricing scheme. Plaintiff is entitled to relief under the same causes of action as the other members of the putative class.

122. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is adequate representatives of the putative Class and Subclass because their interests coincide with, and are not antagonistic to, the interests of the members of the Class that they seek to represent. Plaintiff has retained counsel competent and highly experienced in complex consumer class action litigation, who intend to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the members of the Class.

CLASS ACTION COMPLAINT

123.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof. Plaintiff is not aware of any other current pending litigation against Defendant to which any Class member is a party involving the subject matter of this suit, and the Action presents no difficulties that will impede its management by the Court as a class action.

124.    **Injunctive Relief Appropriate for the Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendant has acted on grounds generally applicable to the entire Class, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to Plaintiff and putative Class members. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that could establish incompatible standards of conduct for Defendant. Injunctive relief is necessary to prevent further fraudulent and unfair business practices by Defendant including Defendant's continued use of private consumer data collected from consumers without the exchange of consideration, as well as the potential that Defendant will redesign their website so that all floral arrangement listings initially advertise the entire price that will ultimately be charged for the floral delivery, exclusive of taxes or reasonably incurred shipping charges.

## VII.   CLAIMS FOR RELIEF

125.   Based on the foregoing allegations, Plaintiff's claims for relief include the following:

### COUNT I
**Violations of the Consumer Protection Acts of 50 States**
*(On Behalf of Plaintiff and the Class)*

126.   Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

127.   On behalf of the Class, Plaintiff brings these statutory consumer protection claims pursuant to the substantially similar "Consumer Protection Acts" identified below, all of which were enacted and designed to protect consumers against unlawful, fraudulent, and/or unfair business acts and practices.

128.   Together with the violations of California's CLRA (Count II), California's False Advertising Law (Count III), and California's Unfair Competition Law (Count IV), the following consumer protection acts are collectively referred to herein as the "Consumer Protection Acts":

1) ALA. CODE § 8-19-1 et seq. (Alabama);

2) ALASKA STAT. ANN. § 45.50.471 et seq. (Alaska);

3) ARIZ. REV. STAT. ANN. § 44-1521 et seq. (Arizona);

4) ARK. CODE ANN. § 4-88-101 et seq. (Arkansas);

5) COLO. REV. STAT. ANN. § 6-1-101 et seq. (Colorado);

6) CONN. GEN. STAT. ANN. § 42-110a et seq. (Connecticut);

7) DEL. CODE ANN. tit. 6, § 2511 et seq. (Delaware);

8) D.C. CODE ANN. § 28-3901 et seq. (District of Columbia);

9) FLA. STAT. ANN. § 501.201 et seq.; FLA. STAT. ANN. § 817.06 and §§ 817.41 et seq. (Florida);

10) GA. CODE ANN. § 10-1-370 et seq. and GA. CODE ANN. § 101-390 et seq. (Georgia);

11) HAW. REV. STAT. ANN. § 480-1 et seq. and HAW. REV. STAT. ANN. § 481A-1 et seq. (Hawaii);

12) IDAHO CODE ANN. § 48-601 et seq. (Idaho);

13) 815 ILCS 505/1 et seq.; 815 ILCS §§ 510/1-510/7 (Illinois);

14) IND. CODE ANN. § 24-5-0.5-1 et seq. (Indiana);

15) IOWA CODE 714H.1, et seq. (Iowa);

16) KAN. STAT. ANN. § 50-623 et seq. (Kansas);

17) KY. REV. STAT. ANN. § 367.110 et seq. (Kentucky);

18) LA. STAT. ANN. § 51:1401 et seq. (Louisiana);

19) ME. REV. STAT. tit. 5, § 205-A et seq.; 10 M.R.S.A. §§ 1211-1216 (Maine);

20) MD. CODE ANN., COM. LAW § 13-101 et seq. (Maryland);

21) MASS. GEN. LAWS Ch. 93A §2 et seq. (Massachusetts)

22) MICH. COMP. LAWS ANN. § 445.901 et seq. (Michigan);

23) MINN. STAT. ANN. § 325F.68 et seq., MINN. STAT. ANN. § 325D.09 et seq., MINN. STAT. ANN. § 325D.43 et seq., and MINN. STAT. ANN. § 325F.67 (Minnesota);

24) MISS. CODE ANN. § 75-24-1 et seq. (Mississippi);

25) MO. ANN. STAT. § 407.010 et seq. (Missouri);

26) MONT. CODE ANN. § 30-14-101 et seq. (Montana);

27) NEB. REV. STAT. ANN. § 59-1601 et seq.; NEB. REV. STAT. ANN. § 87-301 through 87-306 (Nebraska);

28) NEV. REV. STAT. ANN. § 41.600 and NEV. REV. STAT. ANN. §598.0903 et seq. (Nevada);

29) N.H. REV. STAT. ANN. § 358-A:1 et seq. (New Hampshire);

30) N.J. STAT. ANN. § 56:8-1 et seq. (New Jersey);

31) N.M. STAT. ANN. § 57-12-1 et seq. (New Mexico);

32) N.C. GEN. STAT. ANN. § 75-1 et seq. (North Carolina);

33) N.D. CENT. CODE ANN. § 51-15-01 et seq.; N.D. CENT. CODE ANN. § 51-12-08 (North Dakota);

34) OHIO REV. CODE ANN. § 1345.01 et seq.; OHIO REV. CODE ANN. § 4165.01 et seq. (Ohio);

35) OKLA. STAT. ANN. tit. 15, § 751 et seq.; OKLA. STAT. ANN. tit. 78 § 51 et seq. (Oklahoma);

36) OR. REV. STAT. ANN. § 646.605 et seq. (Oregon);

37) 73 PA. STAT. ANN. § 201-1 et seq. (Pennsylvania);

38) R.I. GEN. LAWS ANN. § 6-13.1-1 et seq. (Rhode Island);

39) S.C. CODE ANN. § 39-5-10 et seq. (South Carolina);

40) S.D. CODIFIED LAWS § 37-24-1 et seq. (South Dakota);

41) TENN. CODE ANN. § 47-18-101 et seq. (Tennessee);

42) TEX. BUS. & COMM. CODE §§ 17.41-17.63 (Texas);

43) UTAH CODE ANN. § 13-11-1 et seq. (Utah);

44) VT. STAT. ANN. tit. 9, § 2451 et seq. (Vermont);

45) VA. CODE ANN. § 59.1-196 et seq. (Virginia);

46) WASH. REV. CODE ANN. § 19.86.010 et seq. (Washington);

47) W.VA. CODE ANN. § 46A-6-101 et seq. (West Virginia);

48) WIS. STAT. ANN. § 100.18; WIS. STAT. ANN. § 100.20 (Wisconsin); and

49) WYO. STAT. ANN. § 40-12-101 et seq. (Wyoming).

129.     Plaintiff and the Class members have standing to assert claims under the above-listed Consumer Protection Acts because they are consumers within the meaning of the Consumer Protection Acts; the floral arrangements were purchased for personal and household use and are consumer transactions; and Defendant's practices were addressed to the market generally and otherwise implicate consumer protection concerns. At all relevant times, Defendant conducted "trade" and "commerce" within the meaning of the Consumer Protection Acts.

130.    Defendant has committed fraudulent, deceptive and/or unfair business acts and practices by engaging in the acts and practices alleged herein. These actions had the capacity to, were likely to, and did in fact, mislead consumers into purchasing the floral arrangement deliveries at higher than advertised prices.

131.    Plaintiff reiterates the specific circumstances surrounding Defendant's deceptive, fraudulent, and unfair business acts, including their advertising:

a)    *Who:* Defendant made (or caused to be made) the material misrepresentations and omissions described herein. From a date unknown to the present, Defendant directed and controlled the marketing for each of its floral arrangements and made these representations and omissions. Since the creation of Defendant's website, www.ftd.com, Defendant has directed and controlled the marketing for the floral arrangements, directly through its website, and/or assumed responsibility for actions and representations it has made on its website.

b)    *What:* Defendant's long-term, common false advertising scheme has misled consumers about Defendant's Surprise Fee of $19.99, and the impact this Fee has on the prices they pay for Defendant's floral arrangements. Defendant's long term coordinated scheme was comprised of material misrepresentations, false statements of fact, and omissions, which appear on Defendant's website, and are introduced, reiterated and reinforced in Google search results, and include misrepresentations, falsehoods, and omissions that are designed to lead consumers to believe that the floral arrangements are $19.99 cheaper than they will actually cost. In particular, the practices that violate the Consumer Protection Acts include those detailed in Paragraphs 39–81 generally as to the Class, as well as Paragraphs 100–12 specifically as to Plaintiff. In particular, throughout the Class Period, Defendant used an intentionally lengthy and confusing Purchase Flow to obscure the true cost of the floral arrangements to trick Plaintiff and the Class into paying a $19.99 more than advertised price,

CLASS ACTION COMPLAINT

including but not limited to the design of the Purchase Flow with the following deceptive patterns:

i.   During the first several stages of the Purchase Flow, including the Browsing Stage (Paragraphs 39–42), Product Evaluation Stage (Paragraphs 43–48), Purchase Initiation Stage (Paragraphs 49–51), and the Delivery Information Stage (52–61), Defendant displayed a partial cost for the products without any qualifier or warning to consumers of the Surprise Fee of $19.99 that would be added before purchasing;

ii.  During the first several stages of the Purchase Flow, including the Browsing Stage (Paragraphs 39–42), Product Evaluation Stage (Paragraphs 43–48), Purchase Initiation Stage (Paragraphs 49–51), and the Delivery Information Stage (52–61), Defendant omitted any reference to its policies on fees, including any Surprise Fee of $19.99;

iii. Throughout the Purchase Flow, at various stages before the final stage in which Defendant first disclosed the Surprise Fees and displayed the full price of the product in an inconspicuous way, Defendant included additional tasks and choices to overburden consumers, increase decision-fatigue and their sunk costs, such as prompting consumers on two separate stages in the Purchase Flow to tip delivery workers and to enter the delivery date, as well as prompting for payment and drafting notes to the recipient.

c) *Where:* The false advertising occurred on Defendant's website, www.ftd.com, as well as in Google search results. And the false advertising scheme was transmitted, distributed, displayed, and occurred to Class members residing throughout the country, including California; and displayed to Plaintiff in California.

d) *When:* Upon information and belief, Defendant engaged in the false advertising continuously during the Class Period and continues to do so. Plaintiff

CLASS ACTION COMPLAINT

encountered the representations and omissions described herein on the date of her purchase on October 15, 2024.

e) ***Why:*** Defendant engaged in the material misrepresentations, false statements of fact, and omissions described herein with the intent to induce Plaintiff and the Class to rely upon them in purchasing Defendant's floral arrangements.

132. As a result of Defendant's unfair and deceptive acts, omissions, and misrepresentations, Plaintiff, the Class, and Subclass were unfairly and deceptively led to purchase the floral arrangements at a price $19.99 higher than originally listed.

133. Defendant's unfair and deceptive acts, omissions, and misrepresentations injured Plaintiff, the Class, and the Subclass. As a result of Defendant's violations Plaintiff and the members of the California Subclass suffered ascertainable monetary losses in the form of the full purchase price of the products purchased from Defendant, or at a minimum, the $19.99 Surprise Fee that was not disclosed until later stages in the Purchase Flow, which they would not have incurred but for Defendant's unlawful practices.

134. Defendant knew and intended that Plaintiff, the Class, and Subclass would be deceived and rely on the deceptive, fraudulent, and unfair business acts and practices alleged herein.

135. Defendant's actions, which were willful and wanton, constitute intentional violations of the Consumer Protection Acts.

136. Defendant's deceptive, fraudulent, and/or unfair business acts and practices described herein are continuing in nature. Plaintiff and the members of the Class and Subclass have been damaged as a proximate result of Defendant's course of conduct and their violations of the Consumer Protection Acts for all of the reasons set forth above.

137. Plaintiff, the Class, and Subclass members respectfully request damages, equitable monetary relief, injunctive relief, declaratory relief, and attorneys' fees, costs, and expenses to be assessed against Defendant, within the limits set forth by applicable law.

**COUNT II**
**Violation of California Consumers Legal Remedies Act,**
**California Civil Code 1750, et seq.**
*(On Behalf of Plaintiff and the California Subclass)*

138.     Plaintiff repeats and re-alleges the allegations of the previous paragraphs and incorporates the same as if set forth herein at length.

139.     Plaintiff brings this cause of action pursuant to Civil Code Section 1750, et seq., the Consumers Legal Remedies Act ("CLRA"), on her own behalf and on behalf of all other persons similarly situated.

140.     At all relevant times, Plaintiff was a "consumer" as defined by California Civil Code section 1761(d).

141.     At all relevant times, Defendant's floral arrangements constituted "goods" as defined by California Civil Code section 1761(a).

142.     At all relevant times, Defendant constituted a "person" as defined by California Civil Code section l 76l(c).

143.     At all relevant times, Plaintiff and each of the class member's purchases of Defendant's goods constituted a "transaction" as defined by California Civil Code section 1761(e).

144.     The CLRA provides that it is unlawful to:

a)   advertise goods or services with the intent not to sell them as advertised, §
     1770(a)(9);

b)   advertise, display, or offer a price for a good or service that does not include all
     mandatory fees or charges other than either (a) taxes or fees imposed by a
     government on the transaction, or (b) postage or carriage charges that will be
     reasonably and actually incurred to ship the physical good to the consumer, §
     1770(a)(29);

c)   represent that a transaction confers or involves rights, remedies, or obligations
     which it does not have or involve, or which are prohibited by law. §1770(a)(14).

145.     The practices engaged in by Defendant that violate the CLRA include those detailed in Paragraphs 39–81 generally as to the California subclass, as well as Paragraphs 100–12 specifically as to Plaintiff.  In particular, throughout the Class Period, Defendant engaged in the specific circumstances set forth in Paragraph 135 to unfairly and deceptively lead Plaintiff and the California Subclass into paying $19.99 more than the advertised price for floral arrangements. As a result of Defendant's violations, Plaintiff and the members of the California Subclass suffered ascertainable monetary losses in the form of the full purchase price of the products purchased from Defendant, or at a minimum, the Surprise Fees that were not disclosed until later stages in the Purchase Flow, which they would not have incurred but for Defendant's unlawful practices.

146.     **CLRA § 1782 NOTICE**. Irrespective of any representations to the contrary in this Class Action Complaint, Plaintiff specifically disclaims, at this time, any request for damages under any provision of the CLRA. Pursuant to Civil Code § 1782, on January 29, 2025, the date of the filing of this Complaint, Plaintiff is sending via certified mail, return receipt requested, a written notice to Defendant's principal places of business, setting forth the particular violations of § 1770. In that letter, Plaintiff's demand that Defendant rectify the actions described above by providing monetary relief, agreeing to be bound by its legal obligations, and giving notice to all affected customers of their intent to do so within thirty (30) days. Defendant's failure to do so will result in Plaintiff amending this Class Action Complaint to seek, pursuant to California Civil Code § 1780(a)(3), on behalf of herself and those similarly situated class members, compensatory damages, punitive damages and restitution of any ill-gotten gains due to Defendants' acts and practices.

147.     Pursuant to Section 1780(a) of the CLRA, Plaintiff seeks all equitable remedies as the Court may award, including restitution, and injunctive relief in the form of an order enjoining the above-described wrongful acts and practices of Defendant, including, but not limited to, an order enjoining Defendant from continuing to engage, use, or employ its practice of unfair, deceptive, and unlawful advertising of its floral arrangement deliveries, including an order of this Court enjoining Defendant from continuing to engage, use, or employ its unfair practice of using

a misleading Purchase Flow to obscure the full and true price of its floral deliveries and to require Defendant to cease charging any Surprise Fees that are not conspicuously disclosed at the preliminary stages of the Purchase Flow. Plaintiff shall be irreparably harmed if such an order is not granted.

**COUNT III**
**Violation of California False Advertising Law**
**Business & Professions Code 17500, et seq.**
***(On Behalf of Plaintiff and the California Subclass)***

148.    Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs and incorporates the same as if set forth herein at length. Defendant's business acts and practices violate California Business and Professions Code section 17500. The practices engaged in by Defendant that violate the FAL include those detailed in Paragraphs 39–81 generally as to the California subclass, as well as Paragraphs 100–12 specifically as to Plaintiff. In particular, throughout the Class Period, Defendant engaged in the specific circumstances set forth in Paragraph 135 to unfairly and deceptively lead Plaintiff and the California Subclass into paying a price $19.99 higher than advertised price for floral arrangements.

149.    Defendant acted knowingly, recklessly, and in conscious disregard of the true facts in perpetuating its deceptive advertising scheme and causing injuries to Plaintiff and the Class.

150.    Plaintiff and the California Subclass have suffered injury in fact and have lost money as a result of Defendant's unfair, fraudulent, and unlawful conduct. Plaintiff would not have purchased the floral arrangement had she known that the product was going to be $19.99 more expensive than initially listed. Plaintiff and the California Subclass have been misled and unfairly induced to enter into transactions and to overpay for products. As a result of Defendant's unfair, fraudulent, and unlawful practices, misrepresentations, and omissions, Plaintiff and the California Subclass have been injured in the form of the full purchase price of the products purchased from Defendant, or at a minimum, any Surprise Fees that were not disclosed until later stages in the Purchase Flow, which they would not have incurred but for Defendant's unlawful practices. The full amount of losses has not yet been ascertained, but which are believed to exceed the hundreds

of thousands, or possibly millions, of dollars in the aggregate. These amounts have been paid to Defendant by Plaintiff and the Class and should be restored to them.

## COUNT IV
### Violation of California Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200, et. seq.
### *(On Behalf of Plaintiff and the California Subclass)*

151.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

152.    Throughout the class period and continuing to the present, Defendant has and continues to engage in business acts or practices that constitute unfair competition as defined in the Unfair Competition Law, Business and Professions Code § 17200 et seq., in that such business acts and practices are unfair, fraudulent, and unlawful within the meaning of that statute. The business acts and practices engaged in by Defendant that violate the unfair, fraudulent, and unlawful prongs of the Unfair Competition Law include those detailed in Paragraphs 39–81 generally as to the California subclass, as well as Paragraphs 100–12 specifically as to Plaintiff. In particular, throughout the Class Period, Defendant engaged in the specific circumstances set forth in Paragraph 135 to unfairly and deceptively lead Plaintiff and the California Subclass into paying a price $19.99 higher than advertised price for floral arrangements.

### "Unfair" Prong

153.    Under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et. seq., a challenged activity is "unfair" when "any injury it causes outweighs any benefits provided to consumers and the injury is one that the consumers themselves could not reasonably avoid." *Camacho v. Auto Club of Southern California*, 142 Cal. App. 4th 1394, 1403 (2006).

154.    Defendant's aforementioned actions, including those detailed in Paragraphs 39–81, are unfair.

155.    Defendant knew or should have known of its unfair conduct.

156.     Defendant's unfair actions of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements cause injuries to consumers.

157.     Consumers cannot avoid any of the injuries caused by Defendant's false and misleading advertising of the floral arrangements.

158.     Some courts conduct a balancing test to decide if a challenged activity amounts to unfair conduct under California Business and Professions Code Section 17200. In doing so, the courts "weigh the utility of the Defendant's conduct against the gravity of the harm alleged to the victim." *Davis v. HSBC Bank Nevada, N.A.*, 691 F. 3d 1152, 1169 (9th Cir. 2012).

159.     Defendant's unfair actions of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements results in financial harm to consumers. Thus, the utility of Defendant's conduct is vastly outweighed by the gravity of its harm.

160.     Some courts require the "unfairness must be tethered to some legislative declared policy or proof of some actual or threatened impact on competition." *Lozano v. AT&T Wireless Servs. Inc.*, 504 F. 3d 718, 735 (9th Cir. 2007).

161.     Defendant's unfair practice of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements constitutes an unfair business practice within the meaning of California Business & Professions Code Section 17200.

## **"Fraudulent" Prong**

162.     California Business and Professions Code Section 17200, et seq., considers conduct fraudulent and prohibits said conduct if it is likely to deceive members of the public. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1267 (1992).

163.     Defendant's fraudulent actions of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements is likely to deceive members of the public.

164.     Defendant's actions, as alleged in the preceding paragraphs, including Paragraphs 39–81, are false, deceptive, misleading, and unreasonable and constitutes fraudulent conduct.

165.     Defendant knew or should have known of its fraudulent conduct.

166. Defendant's fraudulent practice of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements, including making the material misrepresentations and omissions by Defendant detailed in paragraph 135 constitute a fraudulent business practice within the meaning of California Business & Professions Code Section 17200.

### "Unlawful" Prong

167. California Business and Professions Code Section 17200, et seq., identifies violations of other laws as "unlawful practices that the unfair competition law makes independently actionable." *Velazquez v. GMAC Mortg. Corp.*, 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

168. As alleged in Counts I, II, and III, Defendant's advertising of its floral arrangement deliveries as alleged in the preceding paragraphs, including those in Paragraphs 39–81 violates the CLRA, Cal. Civil Code Section 1750, et seq., and California FAL, Business and Professions Code Section 17500, et seq.

169. Defendant knew or should have known of its unlawful conduct.

170. Defendant's unlawful practice of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements in violation of the CLRA and FAL constitute an unlawful business practice within the meaning of California Business & Professions Code Section 17200.

171. Relief Should Be Granted for Defendant's Violations of All Three Prongs.

172. There were reasonably available alternatives to further Defendant's legitimate business interests. Defendant could have truthfully advertised the true and full price of its floral arrangement delivery upfront, including the $19.99 Surprise Fee in this total. Defendant could have marketed the floral without making any false statements about the ultimate price consumers must pay for the floral arrangements, and without omitting the disclosure that the listed purchase price will be subject to additional an Surprise Fee of $19.99.

173.    All of the conduct alleged herein occurred and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

174.    There were reasonably available alternatives to further Defendant's legitimate business interests other than the conduct described herein.

175.    All of the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on tens of thousands of occasions daily (if not more).

176.    Plaintiff and the California Subclass have suffered injury in fact and have lost money as a result of Defendant's unfair, fraudulent, and unlawful conduct. Plaintiff would not have purchased the floral arrangement had she known that the product was going to be more expensive than initially listed. Plaintiff and the California Subclass have been misled and unfairly induced to enter into transactions and to overpay for products. As a result of Defendant's unfair, fraudulent, and unlawful practices, misrepresentations, and omissions, Plaintiff and the California Subclass have been injured in the form of the full purchase price of the products purchased from Defendant, or at a minimum, any Surprise Fees that were not disclosed until later stages in the Purchase Flow, which they would not have incurred but for Defendant's unlawful practices. The full amount of losses has not yet been ascertained, but which are believed to exceed the hundreds of thousands, or possibly millions, of dollars in the aggregate. These amounts have been paid to Defendant by Plaintiff and the Class and should be restored to them.

177.    Pursuant to Business and Professions Code Section 17203, Plaintiff and the California Subclass seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of unfair, deceptive, and unlawful advertising of its floral arrangement deliveries, including an order of this Court enjoining Defendant from continuing to engage, use, or employ its unfair practice of using a misleading Purchase Flow to obscure the full and true price of its floral deliveries and to require Defendant to cease charging any Surprise Fees that are not conspicuously disclosed at the preliminary stages of the Purchase Flow, and additionally request

CLASS ACTION COMPLAINT

an order awarding Plaintiff restitution of the money wrongfully acquired by Defendant in an amount to be determined at trial.

## VIII. <u>PRAYER FOR RELIEF</u>

178. WHEREFORE, Plaintiff, individually and on behalf of the Class defined herein, pray for judgment and relief on all Causes of Action as follows:

a) **Certification**: For an order certifying this action as a class action, appointing Plaintiff as the Class Representative, and appointing Plaintiff's Counsel as Class Counsel;

b) **Declaratory Relief**: For an order declaring that Defendant's conduct violates the statutes and laws which underpin this action;

c) **Injunction**: For an order requiring Defendant to immediately cease and desist from selling the unlawful Products in violation of law; enjoining Defendant from continuing to market, advertise, distribute, and sell the Products in the unlawful manner described herein; requiring Defendant to engage in an affirmative advertising campaign to dispel the public misperception of the Products resulting from Defendant's unlawful conduct; and requiring all further and just corrective action, consistent with permissible law and pursuant to only those causes of action so permitted;

d) **Damages/Restitution/Disgorgement**: For an order awarding monetary compensation in the form of damages, restitution, and/or disgorgement to Plaintiff and the Class, consistent with permissible law and pursuant to only those causes of action so permitted;

e) **Attorneys' Fees and Costs**: For an order awarding attorneys' fees and costs, consistent with permissible law and pursuant to only those causes of action so permitted;

f) **Pre/Post-Judgment Interest**: For an order awarding pre-judgment and post-judgment interest, consistent with permissible law and pursuant to only those causes of action so permitted; and

g) **All Just and Proper Relief**: For such other and further relief as the Court deems just and proper.

## IX.   <u>JURY TRIAL DEMANDED</u>

179.   Plaintiff demands a jury trial on all triable issues.

DATED: January 29, 2025                    **CLARKSON LAW FIRM, P.C.**

                                        */s/ Bryan Paul Thompson*
                                        Bryan Paul Thompson (IARDC # 6310322)
                                        *bthompson@clarksonlawfirm.com*
                                        22525 Pacific Coast Highway
                                        Malibu, CA 90265
                                        Tel: (213) 788-4050
                                        Fax: (213) 788-4070

                                        Kristen Simplicio (*pro hac vice* forthcoming)
                                        *ksimplicio@clarksonlawfirm.com*
                                        1050 Connecticut Ave NW, Ste 500
                                        Washington, DC 20036
                                        Tel.: (202) 688-2105
                                        Fax: (213) 788-4070

                                        *Attorneys for Plaintiff*

CLASS ACTION COMPLAINT