**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MAYO INOUE a/k/a MAIO INOUE, TAYLOR PULBROOK, ALYSSA SCHAFFER, CAROLINE THOMAS, LAURA VINCENZI, and ANDREA CIAMPI, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No. 1:25-cv-01016 |
| v. | |
| FTD, LLC, | |
| Defendant. | |

**<u>CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT</u>**

## TABLE OF CONTENTS

**Page No.**

I.    INTRODUCTION ................................................................................................. 1

II.   PARTIES .......................................................................................................... 4

III.  JURISDICTION ................................................................................................ 4

IV.   VENUE ............................................................................................................ 5

V.    FACTUAL BACKGROUND ............................................................................ 5

    A.    Companies Use Bait-and-Switch "Drip Pricing" to Manipulate Consumers ......... 5

    B.    Defendant's Bait-and-Switch Tactics ................................................................. 12

        1.    Defendant's Home Page: ......................................................................... 13

        2.    The Browsing Stage ................................................................................ 14

        3.    The Product Evaluation Stage: ................................................................ 15

        4.    Purchase Initiation Stage: ........................................................................ 19

        5.    Delivery Information Stage: ..................................................................... 19

        6.    Payment Information Stage: ..................................................................... 21

    C.    Defendant's Website Fails to Bind Users to Any Terms of Service ..................... 27

    D.    Other Companies Do Not Rely on Drip Pricing to Drive Their Sales ................. 28

    E.    Defendant's Drip Pricing Runs Afoul of Federal and State Law ......................... 28

    F.    California Prohibits Bait-and-Switch Pricing and Drip Pricing Schemes ........... 30

    G.    Many Other States Prohibit Bait and Switch Advertising and Drip Pricing
        Schemes ................................................................................................. 32

VI.   PLAINTIFFS' CLAIMS ................................................................................ 33

    A.    Plaintiff Maio Inoue ............................................................................... 33

    B.    Plaintiff Taylor Pulbrook ........................................................................ 36

    C.    Plaintiff Alyssa Schaffer ......................................................................... 39

    D.    Plaintiff Caroline Thomas ....................................................................... 41

    E.    Plaintiff Laura Vincenzi .......................................................................... 43

F.       Plaintiff Andrea Ciampi ................................................................... 47

VII.   CLASS ALLEGATIONS ..................................................................... 50

VIII.  CLAIMS FOR RELIEF ....................................................................... 54

       COUNT I ............................................................................................. 54

       COUNT II ............................................................................................ 61

       COUNT III ........................................................................................... 64

       COUNT IV............................................................................................ 65

              "Unfair" Prong ............................................................................ 66

              "Fraudulent" Prong ...................................................................... 67

              "Unlawful" Prong ......................................................................... 67

              Relief Should Be Granted for Defendant's Violations of All Three Prongs. ........ 68

       COUNT V ............................................................................................ 69

       COUNT VI............................................................................................ 72

       COUNT VII .......................................................................................... 75

       COUNT VIII ........................................................................................ 76

       COUNT XI............................................................................................ 80

IX.    PRAYER FOR RELIEF ....................................................................... 83

X.     JURY TRIAL DEMANDED ................................................................ 84

CLASS ACTION COMPLAINT

## I.    INTRODUCTION

1.     Defendant FTD, LLC ("Defendant") systematically cheats consumers out of millions of dollars annually by employing a deceptive and illegal bait-and-switch pricing scheme.

2.     Rather than transparently disclosing the full cost of the same-day floral arrangement and gift item delivery offered through its two e-commerce platforms (FTD and ProFlowers), Defendant uses a confusing drip-pricing scheme to slowly increase the total cost of the product beyond what consumers reasonably expect at the time they begin browsing for products, and again, as they go through the complicated and lengthy ordering process.

3.     To carry out the scheme, Defendant markets its products in a way that leads consumers to believe that the advertised price is the total price. Because what consumers are purchasing is the delivery of floral arrangements and related gifts from Defendant's network of florists, consumers have no reason to expect additional delivery charges beyond the price of the product, and Defendant's marketing is designed to reinforce that expectation. It consistently omits information about delivery costs from the home pages and product information pages on the websites where it markets products. It regularly advertises that its distinguishing feature is its ability to deliver floral arrangements on the same day consumers order them, touting this same-day benefit on its home pages and elsewhere on its websites. In so doing, FTD reinforces consumers' reasonable belief that the advertised prices are the full price, including not just delivery, but even expedited, same-day delivery.

4.     Once consumers believe they have found a good deal, they begin moving their way through the lengthy and confusing purchase order process. Defendant designed this multi-step process, which requires numerous decisions and inputs from the consumer, to exhaust and confuse the already committed consumer, so that when Defendant surprises consumers with extra fees, the consumer is less likely to walk away from the purchase. These "Surprise Fees" include a same-day delivery fee (typically $2.99) (the "Same-Day Fee"), an expedited delivery fee (typically $9.99) (the "Expedited Fee"), a fee associated with delivery on a holiday (the "Holiday Fee"), and a weekend delivery fee (typically $4.99) (the "Weekend Fee") (collectively "Special Delivery

CLASS ACTION COMPLAINT

Fees"), which consumers can decline (and thus, not receive the full advertised benefits of the product), and a mandatory fee assessed on all consumers (typically $19.99), designated as a service and handling fee ("Mandatory Fee"). Because many floral arrangements are advertised at less than $50, these Surprise Fees can increase the cost of the product by more than 50% than advertised.

5.     Defendant's lengthy ordering process includes: (a) selecting a particular arrangement at its advertised price (that does not include fees); (b) evaluating the intended arrangement and determining whether they would prefer the Standard, Deluxe, Deluxe with Chocolate, Premium, Exquisite, or Deluxe with Chocolate and Candle version; (c) entering the recipient's zip code; (d) selecting a delivery date from a pop-up menu ; (e) considering whether they would like to include an optional add-on in their order, such as a mylar balloon, greeting card, plush bear, or box of chocolates; (f) considering whether they would like to create an FTD account to associate with the order, and if so, selecting their password; (g) entering the recipient's information, such as their first and last name and address; (h) inputting a phone number for the order; (i) selecting a note type for inclusion in the order; (j) inputting who the note should be from; (k) inputting a custom message for the note; (l) indicating whether they would like an automated reminder email of this purchase next year; (m) entering payment details for the order, and (n) adding any special promotion to the order, such as a discount code. The Mandatory Fee only appears at the very end. Typically, the other three Special Delivery Fees also appear at the very end, though in limited circumstances, may be displayed to a small portion of consumers mid-way through. Defendant designed this process to burn through consumer time and hassle them into acquiescing to the Surprise Fees.

6.     These Surprise Fees—also commonly called "Junk Fees," including by the Federal Trade Commission ("FTC")[1]—have recently been the subject of national media attention,

---

[1] As defined by the FTC, "Junk Fees" are "unfair or deceptive fees that are charged for goods or services that have little or no added value to the consumer" or fees that are "hidden," such as those disclosed only at a later stage in the consumer's purchasing process or not at all. *Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011*, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (to be codified at 16 C.F.R. pt. 464), *available at*

including during President Biden's 2023 State of the Union Address. As President Biden explained, "too many companies" are charging "hidden surcharges … to make you pay more. [J]unk fees may not matter to the very wealthy, but they matter to most other folks in homes like the one I grew up in, like many of you did. They add up to hundreds of dollars a month. They make it harder for you to pay your bills[.]"[2]

7.      Junk Fee practices—like Defendant's Surprise Fees – are not just deceptive. They are illegal.

8.      As a result of Defendant's false advertising that their floral arrangement and/or gift item deliveries include same-day delivery, Plaintiff and the proposed class have suffered damages. They purchased floral arrangements they would not otherwise have bought and paid $19.99 or more than they would not otherwise have paid had they not been drawn in by Defendant's deceptively low prices.

9.      Junk Fees violate FTC Rules and Guidance, as well as state consumer protection statutes, which require businesses to sell goods and services for their advertised prices. Defendant's misleadingly advertised floral delivery prices, a bait-and-switch scheme, constitutes false and misleading advertising in violation of the Consumer Protection Acts of the 50 states and the District of Columbia, including California's Consumer Legal Remedies Act (the "CLRA") (Cal. Civ. Code §§ 1750 et seq.); California's False Advertising Law (the "FAL") (Cal. Bus & Prof. Code § 17500); California's Unfair Competition Law (the "UCL") (Cal. Bus. & Prof. Code § 17200); Illinois' Consumer Fraud and Deceptive Business Practices Act (the "ICFA") (815 I.L.C.S. 505/1 et seq); New York's Consumer Protection From Deceptive Acts ("NYGBL") (G.B.L. § 349 et seq.); Florida's Deceptive and Unfair Trade Practices Act (the "FDUTPA") (Fla. Stat. Ann. § 501.201 et

---

https://www.federalregister.gov/documents/2022/11/08/2022-24326/unfair-or-deceptive-feestrade-regulation-rule-commission-matter-no-r207011 (cleaned up).

[2] *President Biden's State of the Union Address,* White House, https://www.whitehouse.gov/stateof-the-union-2023/ (last visited Jan. 4, 2025).

CLASS ACTION COMPLAINT

seq.); and Florida's Misleading Advertising Law (the "FMAL") (Fla. Stat. Ann. § 817.06 and §§ 817.41 et seq.) (Florida); *inter alia*.

10.     Plaintiffs bring this action under the UCL, FAL, CLRA, ICFA, NYGBL, FDUTPA, FMAL, and common law claims of unjust enrichment, to stop Defendant from falsely advertising the price of its floral arrangements as significantly less than they actually cost throughout the 50 states and the District of Columbia and to residents of the United States and force Defendant to pay back the tens of millions of dollars in unlawful Surprise Fee revenues it has taken from consumers together with statutory penalties and punitive damages.

## II.     PARTIES

11.     **Plaintiff Mayo Inoue** a/k/a Maio Inoue is domiciled in Los Angeles, California.

12.     **Plaintiff Taylor Pulbrook** is domiciled in San Jose, California.

13.     **Plaintiff Alyssa Schaffer** is domiciled in Los Angeles, California.

14.     **Plaintiff Caroline Thomas** is domiciled in Chicago, Illinois.

15.     **Plaintiff Laura Vincenzi** is domiciled in Carmel, New York.

16.     **Plaintiff Andrea Ciampi** is domiciled in Palm Beach Gardens, Florida.

17.     **Defendant FTD** is a limited liability company incorporated in Illinois, with its principal place of business at 200 N. LaSalle Street, Suite 2550, Chicago, Illinois 60601. Defendant is a citizen of Illinois. Defendant's sole member, or manager, as ascertained by the Illinois Secretary of State Business Entity Search, is Gateway Mercury Holdings, LLC, located at 200 N. Lasalle Street, Suite 2550, in Chicago, IL 60601. Thus, Defendant's sole member is a citizen of Chicago, Illinois and thus located in Northern District of Illinois.

## III.     JURISDICTION

18.     This court has original jurisdiction over the action pursuant the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## IV.  **VENUE**

19.     Venue is proper in this District under 28 U.S.C. § 1391 because some or all of the events giving rise to this action occurred in this District, and because Defendant is headquartered in the Northern District of Illinois. Additionally, jurisdiction is proper as Defendant has marketed, advertised, and sold the Products within this District.

## V.  **FACTUAL BACKGROUND**

### A.  **Companies Use Bait-and-Switch "Drip Pricing" to Manipulate Consumers**

20.     Large, sophisticated corporations—like Defendant—with their large, sophisticated marketing teams, know that "drip pricing" is an effective method of tricking price-sensitive consumers into paying higher prices.

21.     Drip pricing is a tactic employed by e-commerce corporations to psychologically manipulate consumers into paying more than they otherwise would. It is a form of "partitioned pricing," a pricing technique that divides the price of a product into multiple components, such as a base price and additional fees.

22.     The FTC informally defines "drip pricing" as a "technique in which firms advertise only part of a product's price and reveal other charges later as the customer goes through the buying process. The additional charges can be mandatory charges [] or fees for optional upgrades and add-ons."[3]

23.     The drip pricing process starts with a seller (or, the "drip pricer") listing an item at an attractively low, "bait" price. The bait price will look to the consumer to be the full price of the item.

24.     Lured in, the consumer will then manifest their intent to transact at the advertised price. With a click, the consumer will initiate the multi-step, multi-page online check-out process. The consumer will be directed through a series of pages, being presented with various add-on items, then prompted to enter information relevant to the transaction, such as the delivery address

---

[3] *The Economics of Drip Pricing*, FED. TRADE COMM'N (May 21, 2012), https://www.ftc.gov/news-events/events/2012/05/economics-drip-pricing.

for the item, whether the item is a gift and whether the consumer would like to include an optional gift message to the recipient, the consumer's billing address, and their credit card information.

25.     Only after the consumer has directed significant time and attention to completing the transaction at the initial bait price will they then be confronted with a secondary drip price, a mandatory surcharge that they must pay to secure the item. The drip price, often labeled as a "service fee," "convenience fee," "handling fee," or "delivery fee," will surprise the consumer, as it appears only after the consumer has spent their time and energy attempting to secure the item at the initially advertised price, and at the last possible point in the check-out process.

26.     At this point, the seller has the consumer in hand. The consumer is "locked in"[4] and will thus acquiesce to the "switch" price, (the sum of the bait price plus the drip price).

27.     When purchasing any product online, consumers will experience a "Purchase Flow," i.e., the multi-step process by which a consumer completes all the tasks needed to make a purchase, such as browsing, adding items to cart, adding payment information, and ultimately buying the items. Sellers can design straightforward Purchase Flows that make pricing and fees transparent throughout and that uses web design that centers the shopper's experience. For example, sellers can transparently post their delivery cost policy in easy-to-see locations early on during the consumer's navigation through the Purchase Flow. On the other hand, online sellers can manipulate reasonable consumers through the design of a Purchase Flow that induces them to pay more for products than they would otherwise. Successful drip pricing campaigns depend on confusing and lengthy Purchase Flows that confuse and exhaust consumers through the following mechanisms and psychological tactics:

28.     **Usurping Consumer Time**: Drip pricers develop a lengthy Purchase Flow process, from browsing through check-out, which bait the consumer to click through a series of pages that prompt the user to expend significant time filling out information related to the purchase. By

---

[4] "Customer Lock In" is an economic scenario, where a consumer is dependent on a particular vendor for products, unable to use another vendor without being saddled with substantial switching costs.

CLASS ACTION COMPLAINT

sequentially partitioning the check-out process, and only confronting the consumer with the full price after the consumer has invested time and energy inputting information, the drip pricer burns through the consumer's time.[5] This has the effect of "locking in" the consumer, who does not want to continue burning through their time reserves in order to evaluate alternative products and sellers. When consumers are buying time-sensitive items, such as gifts for important occasions, consumers may not even have the time to start the process anew.

29.     **Sunken Cost Fallacy**. Drip pricers weaponize the psychological phenomenon of "sunken cost fallacy," depending on consumers to display this irrational "tendency to continue an endeavor once an investment in money, effort, or time has been made," rooted in the maladaptive "desire not to appear wasteful."[6] Drip pricers structure the lengthy check-out process to feel to the consumer like an expenditure of energy that they will be loath to "undo" by restarting the search for a different item after being presented with the mandatory surcharge.

30.     **Mistaken Assumptions That Switching Will Be Futile**. The drip pricer relies on the consumer's mistaken assumption that competing sellers all engage in similar tactics. Because the drip pricer is frequently a large, highly profitable e-commerce corporation, the consumer will perceive the corporation as engaging in, or perhaps even setting the standard for, industry-wide pricing tactics. Thus, the consumer will mistakenly assume that all other competitors are also engaging in this deception, and that transacting with a competitor will not spare them from paying an inflated "switch" price.[7] A 2020 Marketing Science study confirms this: after being exposed to drip pricing, the participants in the study cited seeing "little value" in returning to the search process after being confronted with the dripped surcharge because they believed that "all [corporations] charge similar extra fees."[8]

---

[5] David Adam Friedman, *Regulating Drip Pricing*, 31 STAN. L. & POL'Y REV. 51, 76 (2020).

[6] Hal R. Arkes & Catherine Blumer*, The Psychology of Sunk Cost,* 35 ORG. BEHAV. & HUM. DECISION PROCESSES 124, 124–25 (1985).

[7] Shelle Santana et al., *Consumer Reactions to Drip Pricing*, 39 MKTG. SCI. 188, 197 (2020), https://doi.org/10.1287/mksc.2019.1207.

[8] *Id.*

CLASS ACTION COMPLAINT

31.     **Anchoring and Adjustment Heuristic**. Trailblazing psychologists Amos Taversky and Daniel Kaneman coined the "anchoring and adjustment heuristic," which refers to a cognitive bias where people make decisions by using an initial piece of information as a starting point ("anchor"). People use this anchor as a mental benchmark, or starting point, for estimating value. In the case of drip pricing, the consumer "anchors on the piece of information he or she considers 'most important,' (e.g., the [bait] price), and then adjusts insufficiently for one or more items (e.g., the surcharge), thus underestimating the total price."[9] This cognitive bias has a very real effect on the consumer: those exposed to drip pricing tend to ultimately transact for an item with a lower listed bait price but a higher total switch price due to distortions caused by "anchoring" and resultant mistakes in calculating the item's actual, overall cost.[10] Said another way, consumers underestimate the total price when presented with drip or partition pricing, as they often entirely disregard the Junk Fee because of the cognitive costs and effort involved in adding the partitioned prices. Due to "anchoring", as companies that engage in Junk Fee practices are well aware, consumers choose a product or service based on the advertised bait price, and not based on the drip price or partitioned price, especially when the Junk Fee is not adequately disclosed.[11]

32.     **Decision Fatigue**. E-commerce platforms that engage in drip pricing present the Surprise Fee at the latest possible moment during the check-out process, after the consumer has purposefully been steered through a series of cognitively taxing decisions. These decisions may include: what model, color, and size of a particular item the consumer may want; how and when they consumer may wish to have the item delivered to them; whether or not the consumer would like to upgrade to a premium version of the product; and whether the consumer would like to add

---

[9] *See* Gorkan Ahmetoglu et al*., Pricing Practices: A Critical Review of their Effects on Consumer Perceptions and Behavior,* 21 J. RETAILING & CONSUMER SERV. 696, 696 (2014), https://doi.org/10.1016/j.jretconser.2014.04.013.

[10] Shelle Santana et al., *Consumer Reactions to Drip Pricing*, 39 MKTG. SCI. 188, 188 (2020), https://doi.org/10.1287/mksc.2019.1207.

[11] Alexander Rasch et al., *Drip Pricing and its Regulation: Experimental Evidence*, 176 J. ECON. BEHAVIOR & ORG. 353 (2020), https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189 ("buyers [] based their purchase decision exclusively on the base price").

CLASS ACTION COMPLAINT

on accessories to the purchase for an additional fee. "Making decisions over extended periods of time is cognitively taxing and can lead to decision fatigue, which is linked to a preference for the 'default' option, namely whatever decision involves relatively little cognitive effort."[12] "Such effects have been demonstrated across a number of applied settings, including forensic and clinical contexts."[13] E-commerce platforms purposefully cognitively tax consumers before presenting them with dripped prices, knowing that the consumer is more likely to succumb to the drip price because stomaching it will involve less cognitive effort than restarting their search for a suitable good in the online marketplace.

33.     **Difficulty in Price Comparison**. When a Junk Fee is hidden and/or partitioned, consumers cannot reasonably compare the cost of a product or service across available options within a company or across companies. Consumers might have to follow multi-step Purchase Flow on multiple sellers' websites to figure out the true price of the products. Further complicating price comparisons is the way in which Google search displays obscure the true cost of some products. Many consumers will often run searches on Google as an initial first step in buying a product, and in response, Google often displays an assortment of products and their associated sellers and prices. Typically only the base price is displayed, so sellers can entice consumers to visit their website by artificially reducing the base price by partitioning more of it into mandatory fees that get disclosed later in the process.

34.     In 2021, the University of California, Berkeley, ran an experiment on StubHub Users to better understand the mechanics of drip pricing.[14] The large-scale field experiment involved tracking individual-level click-stream behavior of millions of consumers: with roughly

---

[12] Tobias Baer & Simone Schnall, *Quantifying the Cost of Decision Fatigue: Suboptimal Risk Decisions In Finance*, 8 Royal Soc'y Open Sci. 5, 5 (2020) https://pmc.ncbi.nlm.nih.gov/articles/PMC8097195/.

[13] Tobias Baer & Simone Schnall, *Quantifying the Cost of Decision Fatigue: Suboptimal Risk Decisions In Finance*, 8 Royal Soc'y Open Sci. 5, 5 (2020) https://pmc.ncbi.nlm.nih.gov/articles/PMC8097195/.

[14] Tom Blake et al., *Price Salience and Product Choice*, 40 MKTG. SCI. 619, 619 (2021), https://doi.org/10.1287/mksc.2020.1261.

CLASS ACTION COMPLAINT

50% of them being exposed to dripped prices, and 50% of them being presented the full price, up front.[15] The users that were presented dripped prices more frequently left the check-out process to revisit other listings.[16] They often repeated this behavior multiple times, before purchasing more expensive and higher quality tickets.[17] From this, the study extrapolated that these users struggled with price comparison—misinformation driving them to purchase more expensive goods in higher quantities.[18] Said another way: consumers strongly and systematically underestimate the total price under drip pricing and make mistakes when searching for the best deal, leading them to make purchasing decisions that benefit the seller.[19]

35.     Law Professor David Adam Friedman puts it best: "Serious deception concerns emerge where sellers advertise a price for an offering, but buyers cannot attain the offering after starting the transaction without paying a secondary charge."[20] And this serious deception has very real consequences for consumers and for competition in the market. Accordingly, "buyers may be hurt" because "[w]hen there is uncertainty over possible drip sizes . . . consumers more frequently fail to identify the cheapest offer."[21] This outcome is inevitable because consumers exposed to drip pricing "are significantly more likely to 1) initially select the option with the lower base price, 2) make a financial mistake by ultimately selecting the option that has a higher total price than the alternative option, given the add-ons chosen, and 3) be relatively dissatisfied with their choice."[22]

36.     Drip pricing results in the following consequences, among others:

---

[15] *Id.* at 620.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] Alexander Rasch et al., *Drip Pricing and its Regulation: Experimental Evidence*, 176 J. ECON. BEHAVIOR & ORG. 353 (2020), https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189.

[20] David Adam Friedman, *Regulating Drip Pricing*, 31 STAN. L. & POL'Y REV. 51, 53 (2020).

[21] Rasch et al. *Drip Pricing and its Regulation: Experimental Evidence*, supra note 11.

[22] Santana et al., *Consumer Reactions to Drip Pricing*, supra note 7, at 188.

CLASS ACTION COMPLAINT

a) "'[Consumers] end up making purchases that in hindsight they would not have made;'"[23]

b) Consumers typically spend more than they would have otherwise (one study estimated 21% more);[24]

c) Consumers feel deceived by those they transact with;[25]

d) Large e-commerce platforms unjustly enrich themselves by charging consumers fees that do not give consumers additional value. For example, in 2017 alone, the Junk Fee revenue of the U.S. airline and U.S hotel industries was approximately $57 billion and $2.7 billion, respectively;[26]

e) As former FTC Chair Lina Kahn puts it: "Firms that are clear with customers about the total price upfront tend to lose out to deceptive firms that initially show a low price but then charge a much higher one[;]"[27]

f) Consumer data is gathered under false pretenses and used to later enrich the drip pricer. Under the false pretense of a sale at the bait price, the seller can collect valuable data from the consumer, to build out their lead database and drive future business from consumers even when they did not complete the ultimate purchase. For instance, mere hours after a consumer has abandoned their cart, they will begin to receive marketing content from the drip pricer.

---

[23] Morgan Foy, *Buyer Beware: Massive Experiment Shows Why Ticket Sellers Hit You With Last-Second Fees,* BERKELEY HAAS NEWS (Feb. 9, 2021), https://newsroom.haas.berkeley.edu/research/buyer-beware-massive-experiment-shows-why-ticket-sellers-hit-you-with-hidden-fees-drip-pricing/.

[24] *Id.*

[25] Thomas Robbert, *Feeling Nickeled and Dimed - Consequence of Drip Pricing,* 25 J. SERVICE THEORY & PRACTICE 621, 623 (2015).

[26] Shelle Santana et al., *Consumer Reactions to Drip Pricing*, 39 MKTG. SCI. 188, 189 (2020), https://doi.org/10.1287/mksc.2019.1207.

[27] *Remarks of Chair Lina M. Khan Regarding the White House Announcement of New Actions to Protect Consumers from Hidden Junk Fees,* FED. TRADE COMM'N (Oct. 10, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/khan-remarks-regarding-junk-fees.pdf.

CLASS ACTION COMPLAINT

B. **Defendant's Bait-and-Switch Tactics**

37.     Defendant is also known at Florists' Transworld Delivery, and is a privately held floral wire service, retailer, and wholesaler.

38.     Defendant was founded as Florists' Telegraph Delivery in 1910.[28]

39.     Defendant's corporate website boasts that "FTD has been a leader in the floral industry for over a century. We are a private equity-backed company with one of the largest florist networks in the world, supported by the iconic Mercury Man© logo displayed in over 30,000 floral shops in more than 125 countries."[29] Defendant is one of the largest privately held floral wire services in the world, and over the years, has acquired smaller companies. In particular, in 2014, Defendant acquired the company ProFlowers. Today, Defendant sells floral delivery services under two separate brand names, FTD and ProFlowers ("Defendant's Brands" or "Brands").[30]

40.     Defendant solely controls all the marketing for its Brands, including owning and operating both the FTD and the ProFlowers websites, www.ftd.com and www.proflowers.com (the "Websites"). Defendant employed a uniform bait-and-switch pricing scheme across both of its Brands' Websites. Using these Websites, a significant portion of Defendant's revenue is driven by Defendant's use of drip pricing,[31] a deceptive bait-and-switch tactic meant to trick users into purchasing products at a higher price point than they otherwise would have.

41.     Using the drip pricing method, Defendant systematically hassles both FTD and ProFlowers customers out of their hard-earned money using a complicated and materially identical Purchase Flow process that hides the Surprise Fees until after a consumer has invested significant amount of time in the purchase. For all consumers, this means the Mandatory Fee, typically around

[28] *FTD Celebrates 100th Anniversary in 2010*, FTD MERCURY MESSENGER (Oct. 2009) at 9, https://www.ftdi.com/newsletter/October2009.pdf.

[29] *Our History*, FTD, https://www.ftdcompanies.com/ (last accessed Jan. 28, 2025).

[30] FTD Companies Website: *Our Brands*, https://www.ftdcompanies.com/ (last accessed April 9, 2025).

[31] The discovery process will illuminate the exact dollar figure Defendant annually derives from its drip pricing scheme.

$19.99, and for many consumers, Defendant also tacks on a previously undisclosed Special Delivery Fees, typically $2.99 to $9.99, after the consumer decides to purchase the product, often at the final stage of the process.

42.     Screenshots of the entire FTD purchase order process ("Purchase Flow") are attached as Exhibit A, which serves as a model of the general Purchase Flow characteristic of both the FTD and ProFlowers brands. Because FTD controls and operates both Websites, the two Brands used materially similar marketing and Purchase Flows that were materially identical to one another and to Exhibit A.

43.     A consumer who makes a purchase on either of Defendant's Websites will experience a complicated Purchase Flow along the lines of Exhibit A, and be subject to the drip-pricing scheme as follows.

### 1.     Defendant's Home Page:

44.     Consumers start by navigating to the homepage on a Website for one of Defendant's two Brands. There, Defendant typically prominently displayed a banner across the top of the site reading "Same Day Delivery: Send Fresh Flowers," as seen below and in Figure 1A, Exhibit A. The consumer will also encounter text reading "SAME DAY DELIVERY," underneath each listed floral arrangement and/or gift item, as seen below and in Figure 1A, Exhibit A. Because both of Defendant's Brands sell floral delivery services, consumers reasonably expect delivery costs to be included in the price of the product, especially in the absence of prominently displayed delivery charges. And when the prices are paired with capitalized text just below the price range listed for each item, reasonable consumers' beliefs about delivery being included are not only reinforced, but they are led to expect that Defendant's distinguishing, competitive characteristic is its ability to deliver orders on the same day that the consumer orders them. Moreover, the placement of "SAME DAY DELIVERY" under the listed price ranges induce the consumer expectation that same-day delivery is built into these listed prices.





### 2. The Browsing Stage

45.    The Browsing Stage is the part of the process where the consumer compares products and makes their selections.

46.    When the consumer visits one of Defendant's Websites, there are two general things the consumer does to find a suitable floral arrangement to purchase.

47.    First, as can be seen in Figure 1A, Exhibit A, when visiting Defendant's Websites, consumers can browse Defendant's website to select a category of arrangement "occasions" from the menu toward the top of the homepage. For instance, the consumer may select "Birthday." On the homepage, consumers are also prompted to input delivery details to browse for available products in a specific zip code for a specific date.

CLASS ACTION COMPLAINT

48.     Second, as can be seen in Figure 1B, Exhibit A, once the consumer is on the landing page for a particular category of arrangements (here, "Birthday Flowers") on either of Defendant's Websites, the consumer is presented with an array of floral arrangements, where Defendant advertises a price for each one. For instance, after browsing, a consumer will select the "You're Precious Bouquet", lured in by its advertised price of $55- $116. This price is misleading to consumers, who at this stage in the Purchase Flow receive no notice nor indication that this price range does not reflect the any of the Surprise Fees that will be added to each arrangement and/ or gift item purchased. Just under this listed price range is text reading "SAME DAY DELIVERY" leading consumers to believe that this is a benefit baked into the listed price range.

49.     During the Browsing Stage of the process, when consumers are the homepage for one of Defendant's Websites and then, when consumers visit any of the landing pages for the various themes and occasions appearing on those Websites, Defendant omits any information to alert a consumer that an additional Surprise Fees will be added to the price of the product. Nor does Defendant include on these pages any easy-to-locate links where a consumer can learn more about the delivery costs or other fees. The price ranges listed are not for the various delivery options, but for different sizes of the same bouquet. In short, the price range listed for each arrangement advertised on Defendant's Websites is not accurate. The *actual* cost for flower delivery is the listed subtotal *plus* the Mandatory Fee and for some orders the Special Delivery Fees that Defendant deceptively adds late in the ordering process when consumers place orders on either of Defendant's Websites.

### 3.     The Product Evaluation Stage:

50.     During the "Product Evaluation Stage," the consumer will click on the image of a particular arrangement that appeals to them, to evaluate the item for potential purchase. For instance, as can be seen in Figure 2, Exhibit A, in this example, the consumer has selected "You're So Precious" arrangement.

51.     After selecting a product, on both of Defendant's Websites, the consumer will be directed to a page specific to the product. For example, while on the "You're So Precious" Product

Page, the consumer can first investigate the specifications of the arrangement, by: (a) reading the arrangement description; (b) reading the arrangement "DETAILS" and "BLOOM DETAILS"; (c) viewing and comparing the available arrangement size: Standard ($55), Deluxe ($70), Deluxe with Chocolate ($95), Premium ($95), Exquisite ($115), and Deluxe with Chocolate and Candle ($116). During the "Product Evaluation" stage, the consumer will be prompted to select the size of the arrangement by clicking the square associated with the desired size. On this page, the "Deluxe" size ($70) will be pre-selected for the consumer. Thus, the consumer will need to change their selection back to "Standard" to attempt to transact at the item's lowest initially listed price of $55.

52.     In the delivery date fields on the Websites, FTD tricks consumers into paying Special Delivery Fees. While FTD auto populates the date field with that day's date, it is only if a consumer wishes to change the date and choose something further out is the consumer shown some of the days on which FTD will assess Special Delivery Fees. In that instance, the consumer will then be prompted to select a delivery date from a pop-up calendar window, showing some Special Delivery Fees (here, Holiday Fees associated with Valentine's Day delivery dates):



---

CLASS ACTION COMPLAINT

53.     While at times, this pop-up calendar displays, for the first time, that certain delivery dates will require an additional fee, as shown above, Defendant does not consistently show the same day fee. Even when they do, anyone electing same day delivery is unlikely to see it given that they do not need to select a date. And even for those consumers who do view the pop up window, the additional fees incurred on various dates upends consumer expectations that Defendant's initially listed price range built in the cost of same-day delivery. Moreover, even consumers who elect a different day with a Special Delivery Fee are unlikely to see these charges at this stage. That is because FTD also prompts consumers to input the delivery details (i.e., delivery zip code and delivery date) on the Websites' homepages before they begin browsing for available products and making selections, and when they do that, the delivery details will be prepopulated on the specific product page and a consumer may proceed to checkout without ever seeing the additional fees for certain deliveries.

54.     Once the consumer has clicked "CONFIRM DELIVERY DATE," they will then click "ADD TO CART" and enter the next phase in the Purchase Flow. Notably, on the Product Page itself on both of its Websites, Defendant does not include any information about delivery costs or other fees. Nowhere during this stage of the Purchase Flow does Defendant disclose that any Surprise Fee will be added to each floral arrangement purchased by the consumer. For a limited portion of consumers arranging for a Same-Day or Weekend Delivery, this menu displays for the first time that they will be assessed an extra charge for electing those services, typically of $2.99 and $4.99, respectively. While Defendant's Websites both prominently advertise that it provides "Same Day Delivery," Defendant fails to disclose until this Stage that consumers will have to pay any extra Special Delivery Fees. Typically, however, these Special Delivery Fees are not disclosed until the final stage of the Purchase Flow.

55.     What's more is that on the webpage for any given product advertised on either of Defendant's Websites, Defendant further obscures the cost for delivery. For example, on the FTD Website, on the webpage for the product "You're So Precious," under the advertised price and below the "ADD TO CART" button, Defendant includes the following "Delivery Information":

**DELIVERY INFORMATION**

This item will be delivered by a local florist. We provide a 7-day fresh flower guarantee. See <u>Delivery Details</u>

The photos here are examples of our florist original style. The exact design and flowers in your custom bouquet will vary based on availability and the florist's interpretation of this arrangement. See <u>Substitution Policy</u>

ITEM: #SYM-6022E

56.     This statement, which appears on both of Defendants' Websites, fails to notify consumers of any additional fees for delivery. Consumers who click on "Delivery Details" hyperlink in the graphic above are directed to a pop-up window that does not contain any information about fees charged.  Only if consumers click the hyperlink labeled "Delivery Details" buried at the very bottom of the Product Page, it reveals a pop-up of Defendant's "Delivery Policy" which states among other things, that "shipping and delivery charges start as low as $19.99 though prices may vary by delivery location, shipping time, or calendar day." This statement fails to expressly mention anything about the Special Delivery Fees.

57.     Defendant strategically buries their delivery price in a hyperlink at the bottom of the page and in small font to conceal this material information from consumers and to misrepresent the true cost of ordering from either of its Websites.

58.     Reasonable consumers are not expected to ferret out material information, such as Mandatory Fees, Special Delivery Fees, or the true price of a product or service, by scouring every hyperlink on a website.

59.     By assessing additional fees for delivery to all floral arrangement orders placed on Defendant's Websites, the advertised price for any specific floral arrangement for delivery is false.

60. In short, the disclosed item cost of the "You're So Precious" arrangement on Defendant's FTD Website, like all the prices for all arrangements on both Websites, is not accurate. The *actual* cost for flower delivery is the listed subtotal *plus* the Mandatory Fee and for some orders the Special Delivery Fees that Defendant deceptively adds later in the Purchase Flow.

### 4. Purchase Initiation Stage:

61. Once the consumer has made the decision of which size bouquet they desire, entered the recipient's zip code, and selected the desired delivery date, the consumer will click "ADD TO CART" entering the "Purchase Initiation Stage," as pictured in Figure 3, Exhibit A. At this point in the Purchase Flow on both of Defendant's Websites, the consumer will receive a visual confirmation that their "item [was] added successfully" to their shopping cart. Just below this message, the consumer will be prompted to "Make [Their] Gift Extra Special" and consider adding optional merchandise to their order for an added fee. The consumer will be prompted to indicate whether they would like to add a "Festive Mylar Balloon" for $5.99; a "Greeting Card" for $6.99; an "Adorable Plush Bear" for $21.99; or a "Delicious Box of Chocolates" for $19.99.

62. Once the consumer has either accepted or declined these optional add-ons, they will click "CHECKOUT" at the bottom right of the page, as seen in Figure 3, Exhibit A.

63. During this stage of the Purchase Flow, Defendant omits any information to alert a consumer that additional charges may be added to the price of the product, nor does it include any adequately displayed links to its delivery and fee schedules. Notably, this step in the Purchase Flow omits the Surprise Fee(s) Defendant deceptively adds later in the Purchase Flow that the user must pay to buy this floral arrangement.

### 5. Delivery Information Stage:

64. Next, on both Websites, the consumer will be brought to the "Delivery Information" Stage, as can be seen in Figure 4, Exhibit A, where they will be prompted to fill in a great deal of information and make several choices:

65. First, the consumer will be prompted to "sign in to access [their] account or sign up" for an FTD account to associate with their purchase and provide their email address.

66.     Then, scrolling down, the consumer will be prompted to "DELIVERY INFORMATION". For the intended recipient of the floral delivery, the consumer must enter the location type, recipient first name, recipient last name, delivery address (including street address, apartment number, city, state, postal code, country), and a phone number for the order.

67.     Then, the consumer will be prompted to add a "MESSAGE & SIGNATURE." From a drop-down menu, the consumer will first select the occasion from the following 24 options: Valentine's Day, Birthday, Funeral/ Sympathy, Get Well, Galentine's Day, Winter, Lunar New Year, Love, Anniversary, Just Because, Thank You, Business & Corporate Gifts, Cheer Someone Up, Congratulations, Engagement/ Wedding, Good Luck, Housewarming, I'm Sorry, Miss You, New Baby, New Job, Retirement, Thinking of You, and Other. Then, the consumer may input an optional Gift Message & Signature. If they choose to do so, they must take care to keep the message within 230 characters.

68.     Just below the "MESSAGE & SIGNATURE" box, the consumer is given the option to click a checkbox to opt into an annual reminder email for this delivery.

69.     On the right-hand side of the Delivery Information Page, the consumer will be prompted to enter an optional Promo Code or Gift Card Number.

70.     Just below this, the consumer will be displayed an "ORDER SUMMARY." This summary includes three entries: (1) The Order Subtotal (which includes only the $55 base price of the merchandise and omits the Surprise Fee of $19.99); (2) Tax (which merely serves as a placeholder and reads: "Calculated at next step); and (3) Estimated Subtotal ($55, which again includes only the base price of the merchandise and omits the Surprise Fee of $19.99). Notably, there is no placeholder for the typically $19.99 Mandatory Fee that will be added to each floral arrangement ordered and that will appear in the final stage of the Purchase Flow, or any of the Special Delivery Fees that may also be added to the subtotal.

71.     Below this, under "CART," the page reads "You're So Precious Bouquet- Deluxe- $55: Florist Crafted and Delivered."

72.     At just this point in the Purchase Flow on either Website, the consumer has been displayed only the base price of the merchandise in their cart ($55)—in three places. Through repetition of the $55 base price, Defendant reinforces the anchoring heuristic, engraining in the consumer's mind that they are paying only the listed bait price of $55, and conditioning them to disregard the Surprise Fee(s) they will soon be confronted with when completing their purchase.

73.     Next, the consumer will continue through the Purchase Flow by clicking "CONTINUE TO PAYMENT."

### 6.     Payment Information Stage:

74.     Clicking "CONTINUE TO PAYMENT" on either of the Websites will bring the consumer to the page pictured in Figure 5A, Exhibit A (if the consumer is accessing the site from a maximized browser), or Figure 5B, Exhibit A (if the consumer is accessing the site from a minimized browser, tablet, or smartphone).

75.     During this stage, the consumer will again be prompted to "sign in to access [their] account or sign up" for an account to associate with their purchase.

76.     When reading from left-to-right, just below this, under the "PAYMENT INFORMATION" heading, the consumer will be prompted to enter their credit card number, expiration, and CVV.

77.     Alternatively, the consumer is given the choice to pay using PayPal.

78.     Next, the consumer will be prompted to fill in information under the "BILLING INFORMATION" heading, including: indicating whether the consumer would like to use the information as the delivery address, or whether they would like to use a different billing address. If the user would like to use a different address than the delivery address, they will then need to input the following information: the billing first and last name; the billing address; the billing apartment, floor, or suite; the billing city, state, zip code, and country; and the billing phone number. Just beneath "BILLING INFORMATION," the button "PLACE ORDER" appears, with Defendant betting that some consumers will not look at the right side of the page and notice the

various Surprise Fees, including the Mandatory Fee of typically $19.99 and, in some instances, the Special Delivery Fees, before placing their order.

79.     If the consumer does look at the right-hand side of the Payment Information Page, they will again be prompted to enter a promo code or a gift card to the order.

80.     Just below this, an updated "ORDER SUMMARY" will appear, with four entries: (a) the order subtotal of $55; (b) the Mandatory and/or Special Delivery Fees typically starting at $19.99; (c) the tax total; and (d) the total for the order, this time including the tax and the Surprise Fees.

81.     On both of Defendant's Websites, this is the first stage in the significantly involved, six stage Purchase Flow that the consumer is confronted with the Mandatory Fee. For some orders, only at this point are consumers finally informed of the additional Special Delivery Fees in the final subtotal, despite being required to enter the delivery zip and date before Defendant's Websites allowed the product to be added to the shopping cart.

82.     Troublingly, if the consumer is viewing the Payment Information Page from a minimized window on their computer or accessing the page from a tablet or smart phone, as pictured in Figure 5B, Exhibit A, there is a significant chance that the consumer will never see the Surprise Fees and will unwittingly consent to it by clicking "PLACE ORDER." If viewing this way, the consumer will be prompted to enter their payment details before being displayed the Surprise Fees. The consumer would need to scroll to the bottom of the payment information, past the "PLACE ORDER" button, to see the Surprise Fees. It is quite likely that the consumer will overlook the Surprise Fees, as they will not know to look for them. Defendant designed its Websites to make it so that a user on these pages may not know to look for this charge and may instinctively hit the "PLACE ORDER" button prior to scrolling to the bottom of the page and catching this sudden, dripped price.

83.     On both Websites, only after clicking through a series of six pages and entering all the details associated with the order, will the consumer be presented with Defendant's drippriced Surprise Fees, including the Mandatory Delivery Fee, and the true total cost of the product.

CLASS ACTION COMPLAINT

84.     Defendant's Surprise Fees are a hidden cost that surprises the consumer at the very last step of the check-out process, after they have spent significant time and energy attempting to transact at the "bait" price of $55. In the example in Exhibit A, Defendant charges the Surprise Fee of $19.99, ostensibly for "delivery," though at times during the Class Period, Defendant may have charged other rates. Defendant does not disclose this "delivery" fee, any sort of fee schedule, nor any other Surprise Fee, at any earlier stage.

85.     **Defendant does not disclose its fee policies in any conspicuous location on either of its Websites.** Most retailers who assess shipping and delivery charges maintain a link on their home page where consumers can view the exact fees for shipping and delivery, to allow them to understand what they will be charged and what the circumstances are that will cause these costs to increase or decrease. In the absence of any obvious information or disclosures about fees for shipping and delivery, consumers will reasonably understand any price to be inclusive of the cost of shipping and delivery. And for a small portion of consumers, that belief will be reinforced when presented mid-way through purchase, when these consumers are given an option to pay an additional fee to expedite the delivery, without simultaneously being provided information about the base delivery cost.

86.     **The Surprise Fees are not truly a "delivery fee" or a shipping cost.** The Surprise Fees are the hidden cost of every listed FTD and ProFlowers item, a hidden portion of the charge the consumer must pay to purchase the product. The fees are for general service, not a pass-through delivery charge. In fact, Defendant's products are typically prepared and hand-delivered by Defendant's partners, who are paid both for preparing the floral arrangement and for delivering them. Thus, unlike many retail transactions, where the retailer stocks the product and uses a third-party shipper such as the Post Office or FedEx, and the consumer pays a pass-through shipping cost or some fee reasonably calibrated to align with the retailer's out of pocket costs, Defendant outsources everything – providing the product and delivering the product – to a single third party. Despite paying one entity to perform both services, Defendant partitions the consumer's cost into multiple parts. And while florists might vary in the price they charge to Defendant for both

services, Defendant does not price the floral arrangements themselves off the location. For instance, Defendant applies a standard Mandatory Fee to each arrangement that does not typically turn on arrangement size or recipient location. If a consumer orders two arrangements, the total Mandatory Fees will be for $39.98. For three arrangements, a consumer will be charged a Mandatory Fee of $59.97. The same is also true for Special Delivery Fees that a consumer might be subjected to, depending on their desired delivery date.

87.     In the example in Exhibit A, Defendant never intended to sell flowers and same day delivery at the "bait" price of $55.00. Instead, Defendant intended to sell a product at the entirely different price of a minimum of $74.99 (plus sales tax) for delayed delivery, and more for same-day delivery. Though the prices fluctuate between different floral arrangements listed on Defendant's e-commerce site, each involves a hidden surcharge that can significantly increase the cost of the product.

88.     As detailed herein, this pricing scheme is an illegal bait-and-switch scheme designed to hassle the user into clicking "PLACE ORDER" rather than confront the alternative of losing more valuable time and energy searching for another option from a different competitor or a differently priced listing from Defendant's offerings. Defendant bets on the consumer giving in the "sunken cost fallacy," as well as "anchoring" on the "bait" price of $55.00, knowing that its deceptive pricing tactic will hassle the consumer into clicking "PLACE ORDER." The consumer will be loath to undo the considerable time and effort they have expended thus far in the transaction.

89.     Moreover, the check-out process is designed such that it induces "decision fatigue" in the buyer, who has had to make a slew of approximately 13 decisions and perform various tasks during the Purchase Flow prior to being confronted with the full and final price of the product.

90.     Indeed, the risks of sunken cost fallacy and decision fatigue are high in the context of purchasing flowers. Many people who buy flowers from Defendant are doing so to send them to someone else as a gift or to send condolences. Given that, many consumers may need the product to arrive by a certain date and may not have time to continue shopping for cheaper options. And

because many consumers are buying flowers to send to someone else, the Purchase Flow includes steps such as locating the recipient's address and writing an appropriate message, that add to the time it takes to place the order.

91. After making the following series of choices on either of Defendant's Websites, the buyer is likely to acquiesce to the Surprise Fees (if they were even noticed), as this will require less cognitive effort than starting from scratch, which would require re-entering the marketplace, and initiating the purchase flow with a competitor:

(1) The buyer must select the desired arrangement from hundreds of listings;

(2) The buyer must select which size arrangement they would like to order: Standard ($55), Deluxe ($70), Deluxe with Chocolate ($95), Premium ($95), Exquisite ($115), or Deluxe with Chocolate and Candle ($116);

(3) The buyer must evaluate whether they would like to add-on a "Festive Mylar Balloon" to their purchase, for an additional charge of $5.99;

(4) The buyer must decide whether they would like to add-on a "Greeting Card" to their purchase, for an additional charge of $6.99;

(5) The buyer must consider whether they would like to add-on an "Adorable Plush Bear" to their purchase, for an additional charge of $21.99;

(6) The buyer must evaluate whether they would like to add-on a "Delicious Box of Chocolates" to their purchase, for an additional charge of $19.99;

(7) The buyer must decide which delivery address is most appropriate for their intended recipient, and have it on hand;

(8) The buyer must decide what date is best for the delivery;

(9) The buyer must decide whether they would like to associate this purchase with an existing account through one of Defendant's Brands, or if they would like to create a new account to accompany this transaction, and what their password should be;

(10)     The buyer must decide whether they would like the wire company to remind them to make a similar purchase next year;

(11)     The buyer must consider whether they would like to add a custom note to the delivery, and if so, what it should say; and they must take care to keep this note within the character limit;

(12)     The buyer must consider what method of payment they would like to bill the delivery to, whether via credit card or PayPal; and

(13)     The buyer must consider whether they would like to input a promotional code or gift card number and apply this toward the purchase.

92.     In sum, Defendant confronts the consumer with the drip price in the amount of the Surprise Fees only after the user has: (a) anchored on the listed, lower "bait" price, (b) devoted considerable time, energy, and focus to the purchase flow which they will perceive as sunken cost, and (c) have accumulated "decision fatigue" such that they would rather acquiesce to the default drip price rather than seek a competitor's product or a cheaper offering from Defendant.

93.     The fact that Defendant operates this same scheme through two Brands only increases the chances that a consumer will be ensnared by Defendant's deceptive pricing. A consumer who walks away from an FTD purchase after viewing the final price with all Surprise Fees added will likely search for another alternative. In that instance, they risk landing on the ProFlowers Website, and being subject to the same deceptive pricing scheme all over again, and this time, may give up and acquiesce to the higher price.

94.     Moreover, given consolidation in the floral industry,[32] FTD could acquire more brands. For instance, in May 2023, FTD merged with From You Flowers, LLC, one of the largest

---

[32] *Consolidation Continues to Drive Growth in Floriculture Sector, M&A Developments, Floriculture*, OAKLINS (2019), https://d21buns5ku92am.cloudfront.net/68800/documents/41163-Oaklins%20report_Consilidation%20Floriculture-a233a0.pdf.

CLASS ACTION COMPLAINT

US floral ecommerce companies.[33] From You Flowers, LLC, is also facing litigation spurred by its drip-pricing scheme.[34] Given this merger and its prior acquisition of ProFlowers, it is highly likely that FTD will continue to consolidate with and/or acquire other competing brands and flower wire services, and reinstitute its drip pricing scheme under its alter egos and newly acquired brands. Plaintiffs, as well as the public, will attempt to transact from these acquired brands and companies, hoping to avoid drip pricing schemes, not realizing that they will be prey to Defendant's drip pricing tactics yet again.

95.    Accordingly, Defendant has misled class members around the country, tricking them into purchasing flowers using a low bait price, and then switching the price through drip pricing at the end. In so doing, Defendant has been unjustly enriched by tens of millions (if not more) annually. Discovery will uncover the definite amount of revenue Defendant clears using this bait-and-switch scheme.

### C.    Defendant's Website Fails to Bind Users to Any Terms of Service

96.    When a consumer selects an item for purchase on the FTD or ProFlowers Websites, she then enters into a multi-step Purchase Flow in which she is shown screens that, in order:  (1) show her shopping cart reflecting a subtotal (without the added delivery fees or applicable tax) and require entry of contact and delivery information; and (2) require entry of payment information.

97.    Across these two stages, consumers are never provided with Defendant's Terms of Service; are never required to view such terms of service; and are never required to affirmatively consent to terms of service.

98.    Additionally, Defendant fails to hyperlink its Terms of Service on any of the mentioned screens shown to users.

---

[33] Press Release, Tenth Avenue Holdings, *From You Flowers and FTD Announce Merger to Create a New Global Platform in the Floral and Gifting Industry* (May 24, 2023), https://www.prnewswire.com/news-releases/from-you-flowers-and-ftd-announce-merger-to-create-a-new-global-platform-in-the-floral-and-gifting-industry-301832871.html.

[34] *See Walterlakes et al. v. From You Flowers, LLC*, Case No. 1:25-cv-00867, ECF 1 (S.D.N.Y. Jan. 29, 2025).

**D.**     <u>**Other Companies Do Not Rely on Drip Pricing to Drive Their Sales**</u>

99.     It is commercially viable for Defendant to cease their drip pricing scheme, as their competitor 1-800-Flowers.com, Inc. does not engage in this tactic. As pictured below, the 1-800-Flowers.com, Inc. list price for each item on their website includes its service fee. This is disclosed up front, during the "Browsing Stage." Each list price includes the disclaimer that the price "Includes service fee & delivery by a local florist." 1-800-Flowers.com, Inc. does not spring a sudden, drip price on consumer at any point during its consumer purchase flow.

Floral Embrace™ with Happy Birthday Banner

4 options available

# From $72.98

Includes service fee & delivery by a local florist

*Screengrab of the 1-800-Flowers.com, Inc. website*

**E.**     <u>**Defendant's Drip Pricing Runs Afoul of Federal and State Law**</u>

100.     Defendant's drip pricing scheme is illegal as it is a form of bait-and-switch advertising, which has long been prohibited by the FTC and by many states through their statutory prohibitions on unfair and deceptive practices.

101.     **FTC's Prohibition on Bait-and-Switch Schemes**. With respect to bait-and-switch prohibitions, the FTC warns that "[n]o advertisement containing an offer to sell a product should be published when the offer is not a bona fide effort to sell the advertised product." 16 C.F.R. § 238.1 (2019). The FTC's guidance on bait-and-switch advertising states that "[n]o statement . . . should be used in any advertisement which creates a false impression of the . . . value . . . of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, the purchaser may be switched from the advertised product to another." 16 C.F.R. § 238.2(a).

102.    If the first contact with a consumer is secured by the deceptive bait advertisement (or a "bait price"), it is a violation of law even if the true facts are subsequently made known to the buyer. 16 C.F.R. § 238.2(b). Through drip and/or partitioned pricing, companies induce consumers to choose a product or service based on an advertised price (i.e., the "bait"), despite ultimately charging a different and higher price than advertised (the "switch").

103.    In spite of FTC's long prohibition on bait-and-switch advertising, Defendant lures consumers with an initial "bait," an insincere initial offer that Defendant has no intention of actually selling the floral delivery for. Instead, only after the consumer expends time and energy, and manifests intent to contract for a floral delivery at the initial price, are they then confronted with the much higher, total cost (the "bait" price plus the "switch," or drip price.)

104.    **FTC Guidance on Online Advertising and Sales**. Additionally, Defendant's drip pricing scheme does not comport with FTC guidance on online advertising and sales, further demonstrating that Defendant's pricing practice is deceptive and unfair.

105.    In its 2013 publication ".com Disclosures: How to Make Effective Disclosures in Digital Advertising,"[35] the FTC makes clear that when advertising and selling are combined on a website or mobile application, and the consumer will be completing the transaction online, disclosures should be provided before the consumer makes the decision to buy—for example, before the consumer "add[s] to shopping cart."

106.    In Defendant's case, according to this guidance, the additional "service" fee should be disclosed before the customer has to click "Add to Cart." Instead, the fees are not disclosed until the very end of the transaction, after the customer has already provided his or her credit card information and made the decision to buy.

107.    The FTC also states that required disclosures must be clear and conspicuous. Defendant does not disclose its additional fees in a clear or conspicuous manner. Instead, it hides

---

[35] .com Disclosures: How to Make Effective Disclosures in Digital Advertising, FED. TRADE COMM'N (March 2013), https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-staff-revises-online-advertising-disclosure-guidelines/130312dotcomdisclosures.pdf.

CLASS ACTION COMPLAINT

fees from consumers until the very end of the transaction, displaying them alongside the "BOUQUET(S)" and "TAX" entries.

### F.       Califomia Prohibits Bait-and-Switch Pricing and Drip Pricing Schemes

108.     California law has long prohibited bait-and-switch pricing. See, e.g., *Stearns v. Ticketmaster Corp.,* 655 F.3d 1013, 1021 n.13 (9th Cir. 2011) ("One might even say that, in effect, California has created what amounts to a conclusive presumption that when a defendant puts out tainted bait and a person sees it and bites, the defendant has caused an injury; restitution is the remedy."); *Veera v. Banana Republic*, LLC, 6 Cal. App. 5th 907, 918 (2016) (holding that California's Unfair Competition Law, False Advertising Law, and Consumer Legal Remedies Act "are designed in part to protect consumers such as plaintiffs by requiring businesses to disclose the actual prices of items offered for sale, and prohibiting businesses from using false and deceptive advertising to lure consumers to shop").

109.     In addition, California has recently gone one step further, adding additional express prohibitions on drip pricing to better protect consumers.  Specifically, on July 1, 2024, California Senate Bill 478 went into effect, prohibiting drip pricing. California Senate Bill No. 478, S.B. 478, 2023-2024 Leg., Reg. Sess. (Cal. 2023).

110.     The California legislature specified that SB 478 "is intended to specifically prohibit drip pricing, which involves advertising a price that is less than the actual price that a consumer will have to pay for a good or service." The legislature also clarified that this amendment is not meant to promulgate an entirely new rule, but instead that, "this practice [drip pricing], like other forms of bait and switch advertising, is prohibited by existing statutes, including the Unfair Competition Law (Chapter 5 (commencing with Section 17200) of Part 2 of Division 7 of the Business and Professions Code) and the False Advertising Law (Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code)." The language of the Bill clarified that "drip pricing" is a form of "bait and switch" advertising, guiding the courts to consider this new pricing trend a violation of existing FTC rules.

111.     Amended by SB 478, Cal. Civ. Code § 1770 lists as unlawful: "Advertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges other than either of the following: (i) Taxes or fees imposed by a government on the transaction[;] (ii)  Postage or carriage charges that will be reasonably and actually incurred to ship the physical good to the consumer."

112.     When formulating the bill's parameters, and choosing to exclude postage or carriage fees, the legislature was presented the following opposition's concerns: "shipping costs vary based on the size of the item, expediency of the shipping options, and geographic locations. Shipping might technically be mandatory when purchasing an online product, and therefore would fall within the bill's scope, but the variability described does not lend itself to the 'all-in' advertised price mandate of SB 478."[36]

113.     For this reason, the legislature carved out an exception for these types of fees, as long as they are reasonably and actually incurred. As detailed in the legislative history for SB 478, "The qualifier 'will be reasonably and actually incurred' is critical to the functioning of this amendment." Assembly Committee on Privacy and Consumer Protection, Jesse Gabriel, Chair, SB 478 (Dodd)- As Amended May 18th, 2023 (Date of Hearing: July 11, 2023).The qualifier "will be reasonably and actually incurred" "is meant to ensure that later-disclosed shipping charges reflect the actual cost of shipping the product. Without this qualifier, this exemption might open a loophole for new junk fees. An online retailer might lure a shopper in (particularly if the shopper relies on third-party websites allowing price comparison) by showing a product at a price much lower than any of its competitors, and then, just before payment, display an inflated shipping charge that brings the total cost to buy the product in line with the retailer's competitors. This would be a new form of junk fee, but because of the phrase "will be reasonably and actually incurred," this practice would be prohibited under this amendment." *Id.*

---

[36] *Consumers Legal Remedies Act: Advertisements: SB 478 (Dodd) – As Amended May 18, 2023: Synopsis of Hearing Before the Comm. on Judiciary*, 2023-24 Ca. State Assembly (2023).

CLASS ACTION COMPLAINT

114.     Though a business can exclude shipping charges from its advertised price, it cannot exclude "handling charges." "Like any other mandatory fee or charge, a handling charge must be included in the advertised price."[37] Additionally, a company may not exclude a "delivery fee" that is not "reasonably and actually incurred." Defendant's "Surprise Fee," often labeled as a "service fee," is notably not a postage or carriage fee, reasonably incurred. In is merely a secondary, junk fee payment. In fact, the Surprise Fee is a static fee of $19.99 per arrangement: it does not fluctuate with arrangement size nor with recipient location. Even if it were to be seen in the most generous of light, Defendant's "service fee" is a handling fee of $19.99. The California Legislature and Attorney General Rob Bonta are crystal clear in advising such mandatory fees must be disclosed up front.

## G.     Many Other States Prohibit Bait and Switch Advertising and Drip Pricing Schemes

115.     First, when considering whether a practice is deceptive or unfair, many states' statutes expressly require courts to look to the FTC for guidance on what constitutes deceptive and unfair conduct. *See, e.g.*, Mass. Ann. Laws ch. 93A, § 2(b); Fla. Stat. Ann. § 501.204(b); 815 Ill. Comp. Stat. Ann. 505/2. Thus, because the practice violates FTC rules, it also violates many state laws.

116.     In addition, many states' unfair and deceptive practices statutes have been interpreted to prohibit drip pricing and other forms of bait-and-switch advertising. See, e.g., *Luca v. Wyndham Worldwide Corp.*, No. 2:16-cv-00746, 2019 WL 211098 (W.D. Penn. Jan. 16, 2019); *Pecznick v. Amazon.com, Inc.*, No. 2:22-cv-00743-TL, No. 2:22-cv-00783-TL, 2022 WL 4483123 (W.D. Wash. Sept. 27, 2022).

---

[37] *SB 478, Hidden Fees,* Rob Bonta, Attorney General, https://oag.ca.gov/hiddenfees# (last accessed Jan. 5, 2025).

CLASS ACTION COMPLAINT

## VI.     PLAINTIFFS' CLAIMS

### A.      Plaintiff Maio Inoue

117.    Plaintiff Inoue has used Defendant to purchase the delivery of a floral arrangement on at least one occasion.

118.    On Tuesday, October 15, 2024, Plaintiff Inoue searched online for a floral arrangement to deliver to her friend for their birthday. Plaintiff Inoue first browsed the 1-800-Flowers website but found that their initially advertised prices exceeded the list prices on the FTD Website. Concerned with making sure she secured a bargain, Plaintiff Inoue selected FTD because the homepage and product listing page on that Website led her to believe that delivery was included in the cost of the arrangement, and thus, it appeared cheaper than 1-800-Flowers when comparing the list price of similar arrangements.

119.    After scanning through Defendant's offerings on the FTD Website, Plaintiff Inoue selected Defendant's "Pastel Traditions- A Florist Original" ("Pastel Traditions") arrangement. The Pastel Traditions arrangement was listed at a price range of $45-$90 dollars. Plaintiff Inoue intended to secure the delivery of this bouquet at its lower listed price of $45, plus applicable tax.

120.    Plaintiff Inoue clicked on the item, which brought her to the Pastel Traditions Product Page. She selected the "Standard" size of the bouquet, once again listed at a price of $45.

121.    The Pastel Traditions Product Page did not indicate that the $45 was merely a base price and that Defendant would add any Surprise Fees, such as an additional, mandatory "delivery fee" to the purchase.

122.    Relying on the listed price, Plaintiff Inoue then entered her friend's zip code of 93933. She then selected the delivery date of October 16, 2024.

123.    After clicking "ADD TO CART," Plaintiff Inoue was brought to a page which confirmed that the Pastel Traditions arrangement had been "added successfully" to her cart. Just below this confirmation page, Plaintiff Inoue was prompted by Defendant to "Make [Her] Gift Extra Special" and to select an optional add on such as a "Festive Mylar Balloon," "Greeting Card," "Adorable Plush Bear," or "Delicious Box of Chocolates." Plaintiff Inoue abstained from

adding any additional merchandise to her order. Plaintiff Inoue then clicked "CHECKOUT" at the bottom of this page.

124. Plaintiff Inoue was then taken to the Delivery Information Stage in the Purchase Flow. This stage required that Plaintiff Inoue spend considerable time and energy. Here, Plaintiff Inoue was prompted to enter "DELIVERY INFORMATION" for her order, including location type; recipient's first name; recipient's last name; delivery address; apartment, floor, or suite number; city; state; zip code; country; and delivery phone number. Next, under "MESSAGE & SIGNATURE," Plaintiff Inoue was prompted to select an "Occasion" from a drop-down menu of 24 options. Next, she was prompted to add a "Gift Message & Signature." Just below this, Plaintiff Inoue was prompted to indicate if she would like Defendant to send her an annual reminder email for this purchase. Plaintiff Inoue declined to check this box.

125. On the right side of the "Delivery Information" page, Plaintiff Inoue was given an order summary. Here, the "Order Subtotal" displayed a price of $45.00. Just below this, there was a placeholder for tax, which read: "Calculated at next step." Underneath these two entries was an "Estimated Subtotal," in larger, conspicuous text. The subtotal read $45.00.

126. Just below this, under the subheading "CART," Plaintiff Inoue was shown an image and description of the item, "Pastel Traditions- A Florist Original- Standard $45.00." Having seen the advertised price of $45.00 on the "Delivery Information" page alone, Plaintiff Inoue was led to believe that her purchase would be $45.00 plus applicable tax. On this page, Plaintiff Inoue was shown a subtotal for her order, but this subtotal did not include tax nor the Mandatory Fee that Plaintiff Inoue would need to pay to secure the delivery. Due to the omission on the "Delivery Info" page of the Mandatory Fee, Plaintiff Inoue was not expecting to be charged an $19.99 Surprise Fee.

127. Next, Plaintiff Inoue clicked "CONTINUE TO PAYMENT" at the bottom of this page and was next taken to the "Payment Info" Page. Here, Plaintiff Inoue entered in her credit card details, under the subheading "PAYMENT INFORMATION." This involved entering her credit card number, expiration, and CVV. Next, under "BILLING INFORMATION," she was

prompted to fill in her first name; last name; billing address; apartment, floor, or suite number; city; state; zip code; country; and phone number. Just below "BILLING INFORMATION" section appeared a button reading "PLACE ORDER."

128.    Reading the "Payment Information" page from left-to-right, Plaintiff Inoue then noticed, just below a second "PLACE ORDER" button, an updated "ORDER SUMMARY." Here, she was first confronted with the Mandatory Fee of $19.99. Plaintiff Inoue was not expecting this fee, as it was not disclosed at any stage prior in the Defendant's Purchase Flow that such a fee would apply. Furthermore, when browsing the FTD website, Plaintiff Inoue saw no mention of a fee schedule or explanation that additional Surprise Fees may be added to FTD orders.

129.    At this point, Plaintiff Inoue gave in to the fee, despite her frustration. Plaintiff Inoue was under time pressure to get the floral arrangement to her friend, and after seeing that 1-800-Flowers appeared to be more expensive than Defendant, she was apprehensive that she could quickly find a better deal elsewhere. Due to the time sensitive nature of her order, Plaintiff Inoue simply felt that it would take too much time and energy to identify an alternative floral display. Had she known that she would be saddled with the Mandatory Fee, Plaintiff Inoue would have looked elsewhere for a floral arrangement for her friend's birthday. Had Defendant priced the bouquet with full transparency, listing the true and full price of the bouquet, Plaintiff Inoue would have declined the purchase altogether, or would have identified a lower cost alternative.

130.    Plaintiff Inoue continues to desire to purchase floral arrangements and/or gift item deliveries generally, and from Defendant, who controls a sizable portion of the floral market. Without resolving to carry out the labor-intensive and confusing Purchase Flow through to its final stage, Plaintiff Inoue will be unable to determine if Defendant has ceased its drip pricing tactics. Plaintiff Inoue understands that the Purchase Flow may change over time or that Defendant may respond to pressure from litigation. But as long as Defendant may use deceptive advertising and unfair pricing tactics, when presented with Defendant's offerings, Plaintiff Inoue cannot know whether the Defendant's advertising and pricing practices have been reformed unless they devote substantial time engaging in the Purchase Flow. Thus, Plaintiff Inoue is likely to be repeatedly

presented with false or misleading information when shopping for floral arrangement and/or gift item deliveries and is likely to be unable to make informed decisions about whether to purchase from FTD, ProFlowers, or their competitors.

131.    Moreover, as discussed in Paragraph 94, Defendant owns other brands, including ProFlowers, and may continue to acquire more. Even if Defendant ceased its drip pricing on the FTD Website, it may replicate those same deceptive practices under other brand names or under the names of other subsidiary companies.  Plaintiff Inoue thus is at risk of being subjected to Defendant's drip-pricing practices without realizing it any time she seeks to purchase floral deliveries.

132.    Finally, while Defendant has begun changing its Purchase Flow in response to this lawsuit, Defendant may try to introduce new deceptive advertising and drip pricing methods, which may cause further confusion and uncertainty for Plaintiff Inoue. Thus, Plaintiff Inoue is likely to further be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to utilize accurate and truthful advertising and abstain from drip pricing its Surprise Fees across its Brands and subsidiaries.

     **B.**       <u>**Plaintiff Taylor Pulbrook**</u>

133.    Plaintiff Pulbrook has used Defendant to purchase the delivery of a floral arrangement on at least one occasion.

134.    On Wednesday, January 24, 2025, Plaintiff Pulbrook searched online for a floral arrangement.

135.    After scanning through Defendant's offerings using Defendant's FTD Website, Plaintiff Pulbrook selected Defendant's "Classic Ivory – A Florist Original - Standard" ("Classic Ivory") arrangement. The Classic Ivory arrangement was listed at a price range of $45-$90 dollars. Plaintiff Pulbrook intended to secure the delivery of this bouquet at its lower listed price of $45, plus applicable tax.

136.    Plaintiff Pulbrook clicked on the item, which brought her to the Classic Ivory Product Page. She selected the "Standard" size of the bouquet, once again listed at a price of $45.

137.   The Classic Ivory Product Page did not indicate that the $45 was merely a base price and that Defendant would add any Surprise Fees, such as an additional, Mandatory Fee of $19.99 to the purchase.

138.   Relying on the listed price, Plaintiff Pulbrook then entered the delivery zip code of 94061. She then selected the delivery date of January 28, 2025.

139.   After clicking "ADD TO CART," Plaintiff Pulbrook was brought to a page which confirmed that the Classic Ivory arrangement had been "added successfully" to her cart. Just below this confirmation page, Plaintiff Pulbrook was prompted by Defendant to "Make [Her] Gift Extra Special" and to select an optional add on such as a "Festive Mylar Balloon," "Greeting Card," "Adorable Plush Bear," or "Delicious Box of Chocolates." Plaintiff Pulbrook abstained from adding any additional merchandise to her order. Plaintiff Pulbrook then clicked "CHECKOUT" at the bottom of this page.

140.   Plaintiff Pulbrook was then taken to the Delivery Information Stage in the Purchase Flow. This stage required that Plaintiff Pulbrook spend considerable time and energy. Here, Plaintiff Pulbrook was prompted to enter "DELIVERY INFORMATION" for her order, including location type; recipient's first name; recipient's last name; delivery address; apartment, floor, or suite number; city; state; zip code; country; and delivery phone number. Next, under "MESSAGE & SIGNATURE," Plaintiff Pulbrook was prompted to select an "Occasion" from a drop-down menu of 24 options. Next, she was prompted to add a "Gift Message & Signature." Just below this, Plaintiff Pulbrook was prompted to indicate if she would like Defendant to send her an annual reminder email for this purchase.

141.   On the right side of the "Delivery Information" page, Plaintiff Pulbrook was given an order summary. Here, the "Order Subtotal" displayed a price of $45.00. Just below this, there was a placeholder for tax, which read: "Calculated at next step." Underneath these two entries was an "Estimated Subtotal," in larger, conspicuous text. The subtotal read $45.00.

142.   Just below this, under the subheading "CART," Plaintiff Pulbrook was shown an image and description of the item, "Classic Ivory – A Florist Original – Standard $45.00." Having

seen the advertised price of $45.00 on the "Delivery Information" page alone, Plaintiff Pulbrook was led to believe that her purchase would be $45.00 plus applicable tax. On this page, Plaintiff Pulbrook was shown a subtotal for her order, but this subtotal did not include tax nor the Mandatory Fee that Plaintiff Pulbrook would need to pay to secure the delivery. Due to the omission on the "Delivery Info" page of the Mandatory Fee, Plaintiff Pulbrook was not expecting to be charged an $19.99 Mandatory Fee.

143.    Next, Plaintiff Pulbrook clicked "CONTINUE TO PAYMENT" at the bottom of this page and was next taken to the "Payment Info" Page. Here, Plaintiff Pulbrook entered in her credit card details, under the subheading "PAYMENT INFORMATION." This involved entering her credit card number, expiration, and CVV. Next, under "BILLING INFORMATION," she was prompted to fill in her first name; last name; billing address; apartment, floor, or suite number; city; state; zip code; country; and phone number. Just below "BILLING INFORMATION" section appeared a button reading "PLACE ORDER."

144.    Reading the "Payment Information" page from left-to-right, Plaintiff Pulbrook then noticed, just below a second "PLACE ORDER" button, an updated "ORDER SUMMARY." Here, she was first confronted with the Mandatory Fee of $19.99. Plaintiff Pulbrook was not expecting this fee, as it was not disclosed at any stage prior in the FTD Purchase Flow that such a fee would apply. Furthermore, when browsing Defendant's website, Plaintiff Pulbrook saw no mention of a fee schedule or explanation that additional Surprise Fees may be added to FTD orders.

145.    Plaintiff Pulbrook would not have made the purchase if she had known that FTD would tack on additional fees. If she had known the true cost of her order, Plaintiff Pulbrook would have chosen another merchant for ordering her floral arrangement. Plaintiff Pulbrook continues to desire to purchase floral arrangements and/or gift item deliveries generally, and from Defendant, who controls a sizable portion of the floral market. Without resolving to carry-out the labor-intensive and confusing Purchase Flow through to its final stage, Plaintiff Pulbrook will be unable to determine if Defendant has ceased its drip pricing tactics. Plaintiff Pulbrook understands that the Purchase Flow may change over time or that Defendant may respond to pressure from

litigation. But as long as Defendant may use deceptive advertising and unfair pricing tactics, when presented with Defendant's offerings, Plaintiff Pulbrook cannot know whether the Defendant's advertising and pricing practices have been reformed unless they devote substantial time engaging in the Purchase Flow. Thus, Plaintiff Pulbrook is likely to be repeatedly presented with false or misleading information when shopping for floral arrangement and/or gift item deliveries and is likely to be unable to make informed decisions about whether to purchase from FTD, ProFlowers, or their competitors.

146.    Moreover, as discussed in Paragraph 94, Defendant owns other brands, including ProFlowers, and may continue to acquire more. Even if Defendant ceased its drip pricing on the FTD Website, it may replicate those same deceptive practices under other brand names or under the names of other subsidiary companies. Plaintiff Pulbrook thus is at risk of being subjected to Defendant's drip-pricing practices without realizing it any time she seeks to purchase floral deliveries.

147.    Finally, while Defendant has begun changing its Purchase Flow in response to this lawsuit, Defendant may try to introduce new deceptive advertising and drip pricing methods, which may cause further confusion and uncertainty for Plaintiff Pulbrook. Thus, Plaintiff Pulbrook is likely to further be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to utilize accurate and truthful advertising and abstain from drip pricing its Surprise Fees across its Brands and subsidiaries.

**C.    Plaintiff Alyssa Schaffer**

148.    Plaintiff Schaffer has used Defendant to purchase the delivery of a floral arrangement on at least one occasion.

149.    On Friday, April 15, 2022, Plaintiff Schaffer searched online for a floral arrangement.

150.    After scanning through Defendant's offerings using Defendant's FTD website, Plaintiff Schaffer selected Defendant's "Beautiful Day Bouquet – Standard" ("Beautiful Day") arrangement. The Beautiful Day arrangement was listed at a price range of $72-$107 dollars.

Under this price range, "SAME DAY DELIVERY" was prominently advertised. Plaintiff Schaffer relied on these advertisements to make her purchase.

151.    Plaintiff Schaffer intended to secure the delivery of this bouquet at its lower listed price of $72, plus applicable tax.

152.    The Beautiful Day Product Page did not indicate that the $72 was merely a base price and that Defendant would add any Surprise Fees, such as an additional, Mandatory Fee of $20.99 or a Same-Day Fee of $4.99.

153.    Relying on the listed price, Plaintiff Schaffer then entered the delivery zip code of 91354. She then selected the delivery date of April 15, 2022. Plaintiff Schaffer was led to believe that Defendant's prominent display of "same-day delivery" meant that the initially listed price included the benefit of same-day delivery.

154.    At the last checkout page, after spending considerable time and energy finalizing her order, Plaintiff Schaffer was first confronted with the Mandatory Fee of $20.99 and the Same-Day Fee of $4.99. Plaintiff Schaffer was not expecting these Surprise Fees, as it was not disclosed at any stage prior in the FTD Purchase Flow that such fees would apply. Furthermore, when browsing Defendant's website, Plaintiff Schaffer saw no mention of a fee schedule or explanation that additional Surprise Fees may be added to FTD orders.

155.    At this point, Plaintiff Schaffer gave in to the fee, despite her frustration. Plaintiff Schaffer was under time pressure to get the floral arrangement to a loved one as they were grieving a recent death. Due to the time sensitive nature of her order, Plaintiff Schaffer simply felt that it would take too much time and energy to identify an alternative floral display.

156.    Plaintiff Schaffer continues to desire to purchase floral arrangements and/or gift item deliveries generally, and from Defendant, who controls a sizable portion of the floral market. Without resolving to carry-out the labor-intensive and confusing Purchase Flow through to its final stage, Plaintiff Schaffer will be unable to determine if Defendant has ceased its drip pricing tactics. Plaintiff Schaffer understands that the Purchase Flow may change over time or that Defendant may respond to pressure from litigation. But as long as Defendant may use deceptive advertising and

CLASS ACTION COMPLAINT

unfair pricing tactics, when presented with Defendant's offerings, Plaintiff Schaffer cannot know whether the Defendant's advertising and pricing practices have been reformed unless they devote substantial time engaging in the Purchase Flow. Thus, Plaintiff Schaffer is likely to be repeatedly presented with false or misleading information when shopping for floral arrangement and/or gift item deliveries and is likely to be unable to make informed decisions about whether to purchase from FTD, ProFlowers, or their competitors.

157. Moreover, as discussed in Paragraph 94, Defendant owns other brands, including ProFlowers, and may continue to acquire more. Even if Defendant ceased its drip pricing on the FTD Website, it may replicate those same deceptive practices under other brand names or under the names of other subsidiary companies. Plaintiff Schaffer thus is at risk of being subjected to Defendant's drip-pricing practices without realizing it any time she seeks to purchase floral deliveries.

158. Finally, while Defendant has begun changing its Purchase Flow in response to this lawsuit, Defendant may try to introduce new deceptive advertising and drip pricing methods, which may cause further confusion and uncertainty for Plaintiff Schaffer. Thus, Plaintiff Schaffer is likely to further be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to utilize accurate and truthful advertising and abstain from drip pricing its Surprise Fees across its Brands and subsidiaries.

**D.    Plaintiff Caroline Thomas**

159. Plaintiff Thomas has used Defendant to purchase the delivery of a floral arrangement on at least one occasion.

160. On Thursday, September 29, 2022, Plaintiff Thomas searched online for a floral arrangement.

161. After scanning through Defendant's offerings using Defendant's FTD website, Plaintiff Thomas selected Defendant's floral arrangement. The floral arrangement was listed at a price range starting at $69.99 dollars. Plaintiff Thomas intended to secure the delivery of this bouquet at its lower listed price of $69.99, plus applicable tax. Under this price range, "SAME

DAY DELIVERY" was prominently advertised. Plaintiff Thomas relied on these advertisements to make her purchase.

162.    The Product Page did not indicate that the $69.99 was merely a base price and that Defendant would add any Surprise Fees, such as an additional Mandatory Fee of $14.99, an Expedited Fee of $9.99, and a "Same-Day/Weekend" Fee of $2.99.

163.    Relying on the listed price, Plaintiff Thomas then entered the delivery zip code of 60607. She then selected the delivery date of September 29, 2022.

164.    At the last checkout page, after spending considerable time and energy finalizing her order, Plaintiff Thomas was first confronted with the Mandatory Fee of $14.99, an Expedited Fee of $9.99, and a "Same Day/ Weekend Fee" of $2.99. In sum, FTD charged Plaintiff an additional $27.97 in hidden fees that she did not bargain for. Plaintiff Thomas was not expecting these Surprise Fees, as it was not disclosed at any stage prior in the FTD Purchase Flow that such fees would apply. Furthermore, when browsing Defendant's website, Plaintiff Thomas saw no mention of a fee schedule or explanation that additional Surprise Fees may be added to FTD orders.

165.    At this point, Plaintiff Thomas gave in to the Surprise Fees, despite her frustration. Plaintiff Thomas was under time pressure to get the floral arrangement to her friend on their birthday. Due to the time sensitive nature of her order, Plaintiff Thomas simply felt that it would take too much time and energy to identify an alternative floral display.

166.    Plaintiff Thomas would not have made the purchase if she had known that FTD would tack on additional fees. If she had known the true cost of her order, Plaintiff Thomas would have chosen another merchant for ordering her floral arrangement.

167.    Plaintiff Thomas continues to desire to purchase floral arrangements and/or gift item deliveries generally, and from Defendant, who controls a sizable portion of the floral market. Without resolving to carry-out the labor-intensive and confusing Purchase Flow through to its final stage, Plaintiff Thomas will be unable to determine if Defendant has ceased its drip pricing tactics. Plaintiff Thomas understands that the Purchase Flow may change over time or that Defendant may respond to pressure from litigation. But as long as Defendant may use deceptive advertising and

CLASS ACTION COMPLAINT

unfair pricing tactics, when presented with Defendant's offerings, Plaintiff Thomas cannot know whether the Defendant's advertising and pricing practices have been reformed unless they devote substantial time engaging in the Purchase Flow. Thus, Plaintiff Thomas is likely to be repeatedly presented with false or misleading information when shopping for floral arrangement and/or gift item deliveries and is likely to be unable to make informed decisions about whether to purchase from FTD, ProFlowers, or their competitors.

168.    Moreover, as discussed in Paragraph 94, Defendant owns other brands, including ProFlowers, and may continue to acquire more. Even if Defendant ceased its drip pricing on the FTD Website, it may replicate those same deceptive practices under other brand names or under the names of other subsidiary companies.  Plaintiff Thomas thus is at risk of being subjected to Defendant's drip-pricing practices without realizing it any time she seeks to purchase floral deliveries.

169.    Finally, while Defendant has begun changing its Purchase Flow in response to this lawsuit, Defendant may try to introduce new deceptive advertising and drip pricing methods, which may cause further confusion and uncertainty for Plaintiff Schaffer. Thus, Plaintiff Schaffer is likely to further be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to utilize accurate and truthful advertising and abstain from drip pricing its Surprise Fees across its Brands and subsidiaries.

**E.**    **Plaintiff Laura Vincenzi**

170.    Plaintiff Vincenzi has used Defendant to purchase the delivery of a floral arrangement on at least one occasion.

171.    On Thursday, August 8, 2024, Plaintiff Vincenzi searched online for a floral arrangement for use in a memorial service.

172.    After scanning through Defendant's offerings using Defendant's FTD Website, Plaintiff Vincenzi selected Defendant's "Eternal Impressions Standing Spray" ("Standing Spray") arrangement. The Standing Spray arrangement was listed at a price of $150 dollars. Plaintiff

Vincenzi intended to secure the delivery of this bouquet at its advertised price of $150.00, plus applicable tax. Plaintiff Vincenzi relied on these advertisements to make her purchase.

173.    Plaintiff Vincenzi clicked on the item, which brought her to the Standing Spray Product Page. Here, the Standing Spray was once again listed at a price of $150.00. The Standing Spray Product Page did not indicate that the $150.00 was merely a base price and that Defendant would add any Surprise Fees, such as an additional Mandatory Fee of $13.49.

174.    Relying on the listed price, Plaintiff Vincenzi then entered the delivery zip code of 10512. She then selected the delivery date of Sunday, August 11, 2024. .

175.    After clicking "ADD TO CART," Plaintiff Vincenzi was brought to a page which confirmed that the Standing Spray arrangement had been "added successfully" to her cart. Just below this confirmation page, Plaintiff Vincenzi was prompted by Defendant to "Make [Her] Gift Extra Special" and to select an optional add on such as a "Festive Mylar Balloon," "Greeting Card," "Adorable Plush Bear," or "Delicious Box of Chocolates." Plaintiff Vincenzi abstained from adding any additional merchandise to her order. Plaintiff Vincenzi then clicked "CHECKOUT" at the bottom of this page.

176.    Plaintiff Vincenzi was then taken to the Delivery Information Stage in the Purchase Flow. This stage required that Plaintiff Vincenzi spend considerable time and energy. Here, Plaintiff Vincenzi was prompted to enter "DELIVERY INFORMATION" for her order, including location type; recipient's first name; recipient's last name; delivery address; apartment, floor, or suite number; city; state; zip code; country; and delivery phone number. Next, under "MESSAGE & SIGNATURE," Plaintiff Vincenzi was prompted to select an "Occasion" from a drop-down menu of 24 options. Next, she was prompted to add a "Gift Message & Signature." Just below this, Plaintiff Vincenzi was prompted to indicate if she would like Defendant to send her an annual reminder email for this purchase.

177.    On the right side of the "Delivery Information" page, Plaintiff Vincenzi was given an order summary. Here, the "Order Subtotal" displayed a price of $150.00 minus a $37.00 discount applied to her order. Just below this, there was a placeholder for tax, which read:

"Calculated at next step." Underneath these two entries was an "Estimated Subtotal," in larger, conspicuous text. The subtotal read $150.00, with a discount applied of -$37.50.

178. Just below this, under the subheading "CART," Plaintiff Vincenzi was shown an image and description of the item, "Eternal Impressions Standing Spray $150.00." Having seen the advertised price of $150.00 on the "Delivery Information" page alone, Plaintiff Vincenzi was led to believe that her purchase would be $150.00, minus the discount applied to her order for $37.50 off, plus applicable tax. On this page, Plaintiff Vincenzi was shown a subtotal for her order, but this subtotal did not include tax nor the Surprise Fee that Plaintiff Vincenzi would need to pay to secure the delivery. Due to the omission on the "Delivery Info" page of the mandatory Surprise Fee, Plaintiff Vincenzi was not expecting to be charged a $13.49 Mandatory Fee.

179. Next, Plaintiff Vincenzi clicked "CONTINUE TO PAYMENT" at the bottom of this page and was next taken to the "Payment Info" Page. Here, Plaintiff Vincenzi entered in her credit card details, under the subheading "PAYMENT INFORMATION." This involved entering her credit card number, expiration, and CVV. Next, under "BILLING INFORMATION," she was prompted to fill in her first name; last name; billing address; apartment, floor, or suite number; city; state; zip code; country; and phone number. Just below "BILLING INFORMATION" section appeared a button reading "PLACE ORDER."

180. Reading the "Payment Information" page from left-to-right, Plaintiff Vincenzi then noticed, just below a second "PLACE ORDER" button, an updated "ORDER SUMMARY." Here, she was first confronted with $13.49 Mandatory Fee. In sum, FTD charged Plaintiff an additional $13.49 in hidden fees that she did not bargain for. Plaintiff Vincenzi was not expecting the Surprise Fee, as it was not disclosed at any stage prior in the FTD Purchase. Furthermore, when browsing Defendant's website, Plaintiff Vincenzi saw no mention of a fee schedule or explanation that additional Surprise Fees may be added to FTD orders.

181. At this point, Plaintiff Vincenzi gave in to the fee, despite her frustration. Plaintiff Vincenzi was under time pressure to get the floral arrangement to a memorial service. Due to the

time sensitive nature of her order, Plaintiff Vincenzi simply felt that it would take too much time and energy to identify an alternative floral display.

182.     Plaintiff Vincenzi would not have made the purchase if she had known that FTD would tack on additional fees. If she had known the true cost of her order, Plaintiff Vincenzi would have chosen another merchant for ordering her floral arrangement.

183.     Plaintiff Vincenzi continues to desire to purchase floral arrangements and/or gift item deliveries generally, and from Defendant, who controls a sizable portion of the floral market. Without resolving to carry-out the labor-intensive and confusing Purchase Flow through to its final stage, Plaintiff Vincenzi will be unable to determine if Defendant has ceased its drip pricing tactics. Plaintiff Vincenzi understands that the Purchase Flow may change over time or that Defendant may respond to pressure from litigation. But as long as Defendant may use deceptive advertising and unfair pricing tactics, when presented with Defendant's offerings, Plaintiff Vincenzi cannot know whether the Defendant's advertising and pricing practices have been reformed unless they devote substantial time engaging in the Purchase Flow. Thus, Plaintiff Vincenzi is likely to be repeatedly presented with false or misleading information when shopping for floral arrangement and/or gift item deliveries and is likely to be unable to make informed decisions about whether to purchase from FTD, ProFlowers, or their competitors.

184.     Moreover, as discussed in Paragraph 94, Defendant owns other brands, including ProFlowers, and may continue to acquire more. Even if Defendant ceased its drip pricing on the FTD Website, it may replicate those same deceptive practices under other brand names or under the names of other subsidiary companies.  Plaintiff Vincenzi thus is at risk of being subjected to Defendant's drip-pricing practices without realizing it any time she seeks to purchase floral deliveries.

185.     Finally, while Defendant has begun changing its Purchase Flow in response to this lawsuit, Defendant may try to introduce new deceptive advertising and drip pricing methods, which may cause further confusion and uncertainty for Plaintiff Vincenzi Thus, Plaintiff Vincenzi is likely to further be repeatedly misled by Defendant's conduct, unless and until Defendant is

compelled to utilize accurate and truthful advertising and abstain from drip pricing its Surprise Fees across its Brands and subsidiaries.

### F. **Plaintiff Andrea Ciampi**

186.    Plaintiff Ciampi has used Defendant's ProFlowers website to purchase the delivery of a floral arrangement on at least one occasion.

187.    On Monday, May 6, 2024, Plaintiff Ciampi searched online for a floral arrangement to give as a gift for her friend's birthday.

188.    After scanning through Defendant's ProFlower offerings using Defendant's ProFlowers Website, Plaintiff Ciampi selected Defendant's "Sunset Serenade Bouquet" ("Sunset Serenade") arrangement. The Sunset Serenade arrangement was listed at a price range of $50-$70 dollars. Plaintiff Ciampi intended to secure the delivery of this bouquet at its lower listed price of $50.00, plus applicable tax.

189.    Plaintiff Ciampi clicked on the item, which brought her to the Sunset Serenade Product Page. She selected the "Standard" size of the bouquet, once again listed at a price of $50.00. The Sunset Serenade Product Page did not indicate that the $50.00 was merely a base price and that Defendant would add any Surprise Fees, such as an additional, mandatory "Delivery Fee" of $19.98.

190.    Relying on the listed price, Plaintiff Ciampi then entered the delivery zip code of 33433. She then selected the delivery date of Monday, May 20, 2024.

191.    After clicking "ADD TO CART," Plaintiff Ciampi was brought to a page which confirmed that the Sunset Serenade arrangement had been "added successfully" to her cart. Just below this confirmation page, Plaintiff Ciampi was prompted by Defendant to "Make [Her] Gift Extra Special" and to select an optional add on such as a "Festive Mylar Balloon," "Greeting Card," "Adorable Plush Bear," or "Delicious Box of Chocolates." Plaintiff Ciampi abstained from adding any additional merchandise to her order. Plaintiff Ciampi then clicked "CHECKOUT" at the bottom of this page.

192.    Plaintiff Ciampi was then taken to the Delivery Information Stage in the Purchase Flow. This stage required that Plaintiff Ciampi spend considerable time and energy. Here, Plaintiff Ciampi was prompted to enter "DELIVERY INFORMATION" for her order, including location type; recipient's first name; recipient's last name; delivery address; apartment, floor, or suite number; city; state; zip code; country; and delivery phone number. Next, under "MESSAGE & SIGNATURE," Plaintiff Ciampi was prompted to select an "Occasion" from a drop-down menu of 24 options. Next, she was prompted to add a "Gift Message & Signature." Just below this, Plaintiff Ciampi was prompted to indicate if she would like Defendant to send her an annual reminder email for this purchase. Plaintiff Ciampi checked this box.

193.    On the right side of the "Delivery Information" page, Plaintiff Ciampi was given an order summary. Here, the "Order Subtotal" displayed a price of $50.00. Just below this, there was a placeholder for tax, which read: "Calculated at next step." Underneath these two entries was an "Estimated Subtotal," in larger, conspicuous text. The subtotal read $50.00.

194.    Just below this, under the subheading "CART," Plaintiff Ciampi was shown an image and description of the item, "Sunset Serenade – $50.00." Having seen the advertised price of $50.00 on the "Delivery Information" page alone, Plaintiff Ciampi was led to believe that her purchase would be $50.00, plus applicable tax. On this page, Plaintiff Ciampi was shown a subtotal for her order, but this subtotal did not include tax nor the Surprise Fee that Plaintiff Ciampi would need to pay to secure the delivery. Due to the omission on the "Delivery Info" page of the mandatory Surprise Fee, Plaintiff Ciampi was not expecting to be charged a $19.98 Mandatory Fee.

195.    Next, Plaintiff Ciampi clicked "CONTINUE TO PAYMENT" at the bottom of this page and was next taken to the "Payment Info" Page. Here, Plaintiff Ciampi entered in her credit card details, under the subheading "PAYMENT INFORMATION." This involved entering her credit card number, expiration, and CVV. Next, under "BILLING INFORMATION," she was prompted to fill in her first name; last name; billing address; apartment, floor, or suite number;

city; state; zip code; country; and phone number. Just below "BILLING INFORMATION" section appeared a button reading "PLACE ORDER."

196.    Reading the "Payment Information" page from left-to-right, Plaintiff Ciampi then noticed, just below a second "PLACE ORDER" button, an updated "ORDER SUMMARY." Here, she was first confronted with $19.98 Mandatory Fee. In sum, ProFlowers charged Plaintiff an additional $19.98 in hidden fees that she did not bargain for. Plaintiff Ciampi was not expecting the Surprise Fee, as it was not disclosed at any stage prior in the ProFlowers Purchase Flow. Furthermore, when browsing Defendant's website, Plaintiff Ciampi saw no mention of a fee schedule or explanation that additional Surprise Fees may be added to ProFlowers orders.

197.    At this point, after investing considerable time and energy, Plaintiff Ciampi gave in to the fee, despite her frustration

198.    Plaintiff Ciampi would not have made the purchase if she had known that Defendant would tack on additional fees. If she had known the true cost of her order, Plaintiff Ciampi would have chosen another merchant for ordering her floral arrangement. Plaintiff Ciampi continues to desire to purchase floral arrangements and/or gift item deliveries generally, and from Defendant, who controls a sizable portion of the floral market. Without resolving to carry-out the labor-intensive and confusing Purchase Flow through to its final stage, Plaintiff Ciampi will be unable to determine if Defendant has ceased its drip pricing tactics. Plaintiff Ciampi understands that the Purchase Flow may change over time or that Defendant may respond to pressure from litigation. But as long as Defendant may use deceptive advertising and unfair pricing tactics, when presented with Defendant's offerings, Plaintiff Ciampi cannot know whether the Defendant's advertising and pricing practices have been reformed unless they devote substantial time engaging in the Purchase Flow. Thus, Plaintiff Ciampi is likely to be repeatedly presented with false or misleading information when shopping for floral arrangement and/or gift item deliveries and is likely to be unable to make informed decisions about whether to purchase from FTD, ProFlowers, or their competitors.

CLASS ACTION COMPLAINT

199.     Moreover, as discussed in Paragraph 94, Defendant owns other brands, including ProFlowers, and may continue to acquire more. Even if Defendant ceased its drip pricing on the ProFlowers Website, it may replicate those same deceptive practices under other brand names or under the names of other subsidiary companies. Plaintiff Ciampi thus is at risk of being subjected to Defendant's drip-pricing practices without realizing it any time she seeks to purchase floral deliveries.

200.     Finally, while Defendant has begun changing its Purchase Flow in response to this lawsuit, Defendant may try to introduce new deceptive advertising and drip pricing methods, which may cause further confusion and uncertainty for Plaintiff Ciampi. Thus, Plaintiff Ciampi is likely to further be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to utilize accurate and truthful advertising and abstain from drip pricing its Surprise Fees across its Brands and subsidiaries.

## VII.     CLASS ALLEGATIONS

201.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

202.     Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring this action individually and on behalf of the following Classes and Subclasses:

> **Nationwide Mandatory Fee Class**: All consumers in the United States who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, ordered floral arrangements and/or other products for delivery from the FTD or ProFlowers Websites, and were assessed a mandatory fee on their purchase, referred to as a "Delivery Fee" or a "Shipping/Handling Fee" or similar.

> **California, New York, Illinois, and Florida Mandatory Fee Subclasses:** All Nationwide Mandatory Fee Class members who resided in California, New York, Illinois, and Florida, respectively, at the time of their purchases.

> **Nationwide Special Delivery Fee Class:** All consumers in the United States who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, ordered floral arrangements and/or other products for delivery from the FTD or ProFlowers Websites, and were assessed a Special

Delivery Fee, including a "Same Day Fee," an "Expedited Fee," a "Weekend Fee," a "Holiday Fee," or similar.

**California and Illinois Special Delivery Fee Subclasses:** All Nationwide Special Delivery Fee Class members who resided in California or Illinois at the time of their purchases.

203.    Plaintiffs Inoue, Pulbrook, Schaffer, Thomas, Vincenzi, and Ciampi represent, and are members of, the Nationwide Mandatory Fee Class. Plaintiffs Inoue, Pulbrook, and Schaffer represent, and are members of, the California Mandatory Fee Subclass. Plaintiff Vincenzi represents, and is a member of, the New York Mandatory Fee Subclass. Plaintiff Thomas represents, and is a member of, the Illinois Mandatory Fee Subclass. Plaintiff Ciampi represents, and is a member of, the Florida Mandatory Fee Subclass.

204.    Plaintiffs Schaffer and Thomas represent, and are members of, the Nationwide Special Delivery Fee Class. Plaintiff Schaffer represents, and is a member of, the California Special Delivery Fee Subclass. Plaintiff Thomas represents, and is a member of, the Illinois Special Delivery Fee Subclass.

205.    Excluded from the Classes and Subclasses are the Defendant, and any entities in which the Defendant has a controlling interest, the Defendant's employees, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family, as well as claims for personal injury or wrongful death.

206.    Plaintiffs reserve the right to amend or modify the Class and Subclass definitions after having an opportunity to conduct discovery.

207.    The Classes and Subclasses meet the criteria for certification under Rule 23(a), (b)(2), (b)(3), and (c)(4). Plaintiffs and all members of the Classes and Subclasses have been harmed by the acts of the Defendant. Class-wide adjudication of Plaintiffs' claims is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

208.    **Numerosity. Fed. R. Civ. P 23(a)(1).** The members of the Classes and Subclasses are so numerous that individual joinder of all class members is impracticable. Although the exact

number of members is unknown at this time, it can readily be determined from the internal business records of Defendant, and Class and Subclass members may be notified of the pendency of this action by published and/or mail/emailed notice. Plaintiff reasonably estimates that there are hundreds of thousands of members of the Classes and Subclasses.

209. **Commonality and Predominance. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Common questions of law and fact exist as to all members of the putative Classes and Subclasses that will drive the litigation and predominate over any questions affecting only individual Class and Subclass members. Common questions include, but are not limited to:

a) Whether Defendant's pricing practices were and are likely to mislead consumers;

b) Whether Defendant's representations in the floral delivery prices displayed on Defendant's Websites were and are misleading;

c) Whether Defendant knew or should have known that its pricing practices were and are likely to mislead consumers;

d) Whether Defendant knew or should have known that the floral delivery prices displayed on Defendant's Websites were and are false and/or misleading;

e) Whether the facts Defendant failed and continued to fail to disclose in Defendant's advertising were and are material;

f) Whether Defendant's acts alleged herein were unlawful;

g) Whether consumers suffered and continue to suffer damage as a result of Defendant's acts alleged herein;

h) The extent of the damage suffered by consumers as a result of Defendant's acts alleged herein;

i) Whether Defendant's acts alleged herein were and are unfair;

j) Whether Defendant should be enjoined from continuing to advertise as alleged herein;

k) Whether Defendant has been unjustly enriched;

l)   Whether Plaintiff and the Class and Subclass members are entitled to damages and restitution, including for the value of the purchase price, and the proper measure of Plaintiff's and the Class Members' losses.

210.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs claims are typical of the claims of each putative Class and Subclass member and are based on the same facts and legal theories as each of the Class and Subclass members. Plaintiffs, like all members of the Classes and Subclasses, purchased one of Defendant's Floral Arrangements and/or gift deliveries from Defendant's website. Plaintiffs, like all Class and Subclass members, were thus subject to Defendant's bait-and-switch pricing scheme. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative Classes and Subclasses

211.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative Classes and Subclasses because their interests coincide with, and are not antagonistic to, the interests of the members of the Classes and Subclasses that they seek to represent. Plaintiffs have retained counsel competent and highly experienced in complex consumer class action litigation, who intend to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Classes and Subclasses.

212.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class and Subclass members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the Classes and Subclasses individually to effectively redress the wrongs done to them. Even if the members of the Classes and Subclasses themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant's conduct. By

contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof. Plaintiffs are not aware of any other current pending litigation against Defendant to which any Class or Subclass member is a party involving the subject matter of this suit, and the Action presents no difficulties that will impede its management by the Court as a class action.

213. **Injunctive Relief Appropriate for the Classes and Subclasses. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendant has acted on grounds generally applicable to the both Classes and all Subclasses, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to Plaintiffs and putative Class and Subclass members. The prosecution of separate actions by individual Class and/or Subclass members would create the risk of inconsistent or varying adjudications with respect to individual members of the Classes and Subclasses that could establish incompatible standards of conduct for Defendant. Injunctive relief is necessary to prevent further fraudulent and unfair business practices by Defendant, as well as the potential that Defendant will redesign their website so that all floral arrangement listings initially advertise the entire price that will ultimately be charged for the floral delivery, exclusive of taxes or reasonably incurred shipping charges.

## VIII.    CLAIMS FOR RELIEF

214. Based on the foregoing allegations, Plaintiffs' claims for relief include the following:

### COUNT I
**Violations of the Consumer Protection Acts of 50 States**
*(On Behalf of all Plaintiffs and the Nationwide Subclasses)*

215. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

216. On behalf of the Classes, Plaintiffs bring these statutory consumer protection claims pursuant to the substantially similar "Consumer Protection Acts" identified below, all of which

were enacted and designed to protect consumers against unlawful, fraudulent, and/or unfair business acts and practices.

217.    Together with the violations of California's CLRA (Count II), California's False Advertising Law (Count III), California's Unfair Competition Law (Count IV), and Illinois Consumer Fraud and Deceptive Business Practices Act (Count V), the following consumer protection acts are collectively referred to herein as the "Consumer Protection Acts":

1)  ALA. CODE § 8-19-1 et seq. (Alabama);

2)  ALASKA STAT. ANN. § 45.50.471 et seq. (Alaska);

3)  ARIZ. REV. STAT. ANN. § 44-1521 et seq. (Arizona);

4)  ARK. CODE ANN. § 4-88-101 et seq. (Arkansas);

5)  COLO. REV. STAT. ANN. § 6-1-101 et seq. (Colorado);

6)  CONN. GEN. STAT. ANN. § 42-110a et seq. (Connecticut);

7)  DEL. CODE ANN. tit. 6, § 2511 et seq. (Delaware);

8)  D.C. CODE ANN. § 28-3901 et seq. (District of Columbia);

10) GA. CODE ANN. § 10-1-370 et seq. and GA. CODE ANN. § 101-390 et seq. (Georgia);

11) HAW. REV. STAT. ANN. § 480-1 et seq. and HAW. REV. STAT. ANN. § 481A-1 et seq. (Hawaii);

12) IDAHO CODE ANN. § 48-601 et seq. (Idaho);

14) IND. CODE ANN. § 24-5-0.5-1 et seq. (Indiana);

15) IOWA CODE 714H.1, et seq. (Iowa);

16) KAN. STAT. ANN. § 50-623 et seq. (Kansas);

17) KY. REV. STAT. ANN. § 367.110 et seq. (Kentucky);

18) LA. STAT. ANN. § 51:1401 et seq. (Louisiana);

19) ME. REV. STAT. tit. 5, § 205-A et seq.; 10 M.R.S.A. §§ 1211-1216 (Maine);

20) MD. CODE ANN., COM. LAW § 13-101 et seq. (Maryland);

21) MASS. GEN. LAWS Ch. 93A §2 et seq. (Massachusetts)

22) MICH. COMP. LAWS ANN. § 445.901 et seq. (Michigan);

23) MINN. STAT. ANN. § 325F.68 et seq., MINN. STAT. ANN. § 325D.09 et seq., MINN. STAT. ANN. § 325D.43 et seq., and MINN. STAT. ANN. § 325F.67 (Minnesota);

24) MISS. CODE ANN. § 75-24-1 et seq. (Mississippi);

25) MO. ANN. STAT. § 407.010 et seq. (Missouri);

26) MONT. CODE ANN. § 30-14-101 et seq. (Montana);

27) NEB. REV. STAT. ANN. § 59-1601 et seq.; NEB. REV. STAT. ANN. § 87-301 through 87-306 (Nebraska);

28) NEV. REV. STAT. ANN. § 41.600 and NEV. REV. STAT. ANN. §598.0903 et seq. (Nevada);

29) N.H. REV. STAT. ANN. § 358-A:1 et seq. (New Hampshire);

30) N.J. STAT. ANN. § 56:8-1 et seq. (New Jersey);

31) N.M. STAT. ANN. § 57-12-1 et seq. (New Mexico);

32) N.C. GEN. STAT. ANN. § 75-1 et seq. (North Carolina);

33) N.D. CENT. CODE ANN. § 51-15-01 et seq.; N.D. CENT. CODE ANN. § 51-12-08 (North Dakota);

34) OHIO REV. CODE ANN. § 1345.01 et seq.; OHIO REV. CODE ANN. § 4165.01 et seq. (Ohio);

35) OKLA. STAT. ANN. tit. 15, § 751 et seq.; OKLA. STAT. ANN. tit. 78 § 51 et seq. (Oklahoma);

36) OR. REV. STAT. ANN. § 646.605 et seq. (Oregon);

37) 73 PA. STAT. ANN. § 201-1 et seq. (Pennsylvania);

38) R.I. GEN. LAWS ANN. § 6-13.1-1 et seq. (Rhode Island);

39) S.C. CODE ANN. § 39-5-10 et seq. (South Carolina);

40) S.D. CODIFIED LAWS § 37-24-1 et seq. (South Dakota);

41) TENN. CODE ANN. § 47-18-101 et seq. (Tennessee);

42) TEX. BUS. & COMM. CODE §§ 17.41-17.63 (Texas);

43) UTAH CODE ANN. § 13-11-1 et seq. (Utah);

44) VT. STAT. ANN. tit. 9, § 2451 et seq. (Vermont);

45) VA. CODE ANN. § 59.1-196 et seq. (Virginia);

46) WASH. REV. CODE ANN. § 19.86.010 et seq. (Washington);

47) W.VA. CODE ANN. § 46A-6-101 et seq. (West Virginia);

48) WIS. STAT. ANN. § 100.18; WIS. STAT. ANN. § 100.20 (Wisconsin); and

49) WYO. STAT. ANN. § 40-12-101 et seq. (Wyoming).

218.     Plaintiffs and the members of both Classes have standing to assert claims under the above-listed Consumer Protection Acts because they are consumers within the meaning of the Consumer Protection Acts; the floral arrangements and/or gift item deliveries were purchased for personal and household use and are consumer transactions; and Defendant's practices were addressed to the market generally and otherwise implicate consumer protection concerns. At all relevant times, Defendant conducted "trade" and "commerce" within the meaning of the Consumer Protection Acts.

219.     Defendant has committed fraudulent, deceptive and/or unfair business acts and practices by engaging in the acts and practices alleged herein. These actions had the capacity to, were likely to, and did in fact, mislead consumers into purchasing the floral arrangement and/or item deliveries at higher than advertised prices.

220.     Plaintiffs reiterate the specific circumstances surrounding Defendant's deceptive, fraudulent, and unfair business acts, including their advertising:

a) ***Who:*** Defendant made (or caused to be made) the material misrepresentations and omissions described herein. From a date unknown to the present, Defendant directed and controlled the FTD and ProFlowers marketing for each of its floral arrangements and made these representations and omissions. Since the creation of Defendant's Websites, www.ftd.com and www.proflowers.com, Defendant has directed and controlled the marketing for the floral arrangements, directly

through its website, and/or assumed responsibility for actions and representations it has made on its website.

b) ***What:*** Defendant's long-term, common false advertising scheme has misled consumers about Defendant's Surprise Fees, and the impact these Fees has on the prices they pay for Defendant's floral arrangements and/or gift item deliveries. Defendant's long term coordinated scheme was comprised of material misrepresentations, false statements of fact, and omissions, which appear on Defendant's website, and are introduced, reiterated and reinforced in Google search results, and include misrepresentations, falsehoods, and omissions that are designed to lead consumers to believe that the floral arrangements are cheaper than they will actually cost. In particular, the practices that violate the Consumer Protection Acts include those detailed in Paragraphs 44-95 generally as to the Classes, as well as Paragraphs 117-32 specifically as to Plaintiff Inoue, Paragraphs 133-47 specifically as to Plaintiff Pulbrook, Paragraphs 148-58 specifically as to Plaintiff Schaffer, Paragraphs 159-69 specifically as to Plaintiff Thomas, Paragraphs 170-85 specifically as to Plaintiff Vincenzi, as well as Paragraphs 186-200 to Plaintiff Ciampi. In particular, during the Class Period, Defendant used an intentionally lengthy and confusing Purchase Flow to obscure the true cost of the floral arrangements to trick Plaintiffs and the Classes into paying substantially more than the advertised price, including but not limited to the design of the Purchase Flow with the following deceptive patterns:

i.   On the FTD and ProFlowers homepage (Paragraph 44), and then throughout the first several stages of the FTD and ProFlowers Purchase Flows, including the Browsing Stage (Paragraphs 45-49), Product Evaluation Stage (Paragraphs 50-60), Purchase Initiation Stage (Paragraphs 61-63), and the Delivery Information Stage (64-73),

Defendant displayed a partial cost for the products without any qualifier or warning to consumers of the Surprise Fees that would be added before purchasing;

ii. On the FTD and ProFlowers homepage (Paragraph 44), and then throughout the first several stages of the FTD and ProFlowers Purchase Flows, including the Browsing Stage (Paragraphs 45-49), Product Evaluation Stage (Paragraphs 50-60), Purchase Initiation Stage (Paragraphs 61-63), and the Delivery Information Stage (64-73), Defendant omitted any reference to its policies on fees, including any Surprise Fees;

iii. Throughout the Purchase Flow, at various stages before the final stage in which Defendant first disclosed the Surprise Fees and displayed the full price of the product in an inconspicuous way, Defendant included additional tasks and choices to overburden consumers, increase decision-fatigue and their sunk costs, such as prompting consumers on two separate stages in the Purchase Flow to tip delivery workers and to enter the delivery date, as well as prompting for payment and drafting notes to the recipient.

c) **Where:** The false advertising occurred on Defendant's Websites, www.ftd.com and www.proflowers.com, as well as in Google search results. And the false advertising scheme was transmitted, distributed, displayed, and occurred to Class members residing throughout the country, including California, Illinois, New York, and Florida; and displayed to Plaintiffs in California, Illinois, New York, and Florida.

d) **When:** Upon information and belief, Defendant engaged in the false advertising during the Class Period and continues to do so. Plaintiff Inoue encountered the representations and omissions described herein on the date of her purchase on October 15, 2024. Plaintiff Pulbrook encountered the representations and

omissions described herein on the date of her purchase on January 24, 2025. Plaintiff Schaffer encountered the representations and omissions described herein on the date of her purchase on April 15, 2022. Plaintiff Thomas encountered the representations and omissions described herein on the date of her purchase on September 29, 2022. Plaintiff Vincenzi encountered the representations and omissions described herein on the date of her purchase on August 8, 2024. Plaintiff Ciampi encountered the representations and omissions described herein on the date of her purchase on May 6, 2024.

e) ***Why:*** Defendant engaged in the material misrepresentations, false statements of fact, and omissions described herein with the intent to induce Plaintiffs and the Classes to rely upon them in purchasing Defendant's floral arrangements and/or gift item deliveries.

221. As a result of Defendant's unfair and deceptive acts, omissions, and misrepresentations, Plaintiffs and the Classes were unfairly and deceptively led to purchase the floral arrangements at a price higher than originally listed.

222. Defendant's unfair and deceptive acts, omissions, and misrepresentations injured Plaintiffs and the Classes. As a result of Defendant's violations Plaintiffs and the members of the Classes suffered ascertainable monetary losses in the form of the full purchase price of the products purchased from Defendant, a price premium, or at a minimum, the Surprise Fees that were not disclosed until later stages in the Purchase Flow, which they would not have incurred but for Defendant's unlawful practices.

223. Defendant knew and intended that Plaintiffs and the Classes would be deceived and rely on the deceptive, fraudulent, and unfair business acts and practices alleged herein.

224. Defendant's actions, which were willful and wanton, constitute intentional violations of the Consumer Protection Acts.

225. Defendant's deceptive, fraudulent, and/or unfair business acts and practices described herein are continuing in nature. Plaintiffs and the members of the Classes have been

damaged as a proximate result of Defendant's course of conduct and their violations of the Consumer Protection Acts for all of the reasons set forth above.

226.     Plaintiffs and the Classes respectfully request damages, equitable monetary relief, injunctive relief, declaratory relief, and attorneys' fees, costs, and expenses to be assessed against Defendant, within the limits set forth by applicable law.

## COUNT II
### Violation of California Consumers Legal Remedies Act,
### California Civil Code 1750, et seq.
### *(On Behalf of Plaintiffs Inoue, Pulbrook, and Schaffer, and the California Subclasses)*

227.     Plaintiffs Inoue, Pulbrook, and Schaffer repeat and re-allege the allegations of the previous paragraphs and incorporates the same as if set forth herein at length.

228.     Plaintiffs Inoue, Pulbrook, and Schaffer bring this cause of action pursuant to Civil Code Section 1750, et seq., the Consumers Legal Remedies Act ("CLRA"), on their own behalf and on behalf of all other persons similarly situated.

229.     At all relevant times, Plaintiffs Inoue, Pulbrook, and Schaffer were "consumer[s]" as defined by California Civil Code section 1761(d).

230.     At all relevant times, Defendant's floral arrangements constituted "goods" as defined by California Civil Code section 1761(a).

231.     At all relevant times, Defendant constituted a "person" as defined by California Civil Code section l 76l(c).

232.     At all relevant times, Plaintiffs Inoue, Pulbrook, and Schaffer and each of the CA Subclasses member's purchases of Defendant's goods constituted a "transaction" as defined by California Civil Code section 1761(e).

233.     The CLRA provides that it is unlawful to:

    a)   advertise goods or services with the intent not to sell them as advertised, § 1770(a)(9);

    b)   advertise, display, or offer a price for a good or service that does not include all mandatory fees or charges other than either (a) taxes or fees imposed by a

government on the transaction, or (b) postage or carriage charges that will be reasonably and actually incurred to ship the physical good to the consumer, § 1770(a)(29);

c) represent that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law. §1770(a)(14).

234. The practices engaged in by Defendant that violate the CLRA include those detailed in Paragraphs 44–95 generally as to the California subclasses, as well as Paragraphs 117–32 specifically as to Plaintiff Inoue, Paragraphs 133–47 specifically as to Plaintiff Pulbrook, and Paragraphs 148-58 specifically as to Plaintiff Schaffer. In particular, throughout the Class Period, Defendant engaged in the specific circumstances set forth in Paragraph 220 to unfairly and deceptively lead Plaintiffs Inoue, Pulbrook, and Schaffer and the California Subclasses into paying substantially more than the advertised price for floral arrangements and/or gift item deliveries. As a result of Defendant's violations, Plaintiffs Inoue, Pulbrook, and Schaffer and the members of the California Subclasses suffered ascertainable monetary losses in the form of the full purchase price of the products purchased from Defendant, a price premium, or at a minimum, the Surprise Fees that were not disclosed until later stages in the Purchase Flow, which they would not have incurred but for Defendant's unlawful practices.

235. Plaintiffs Inoue, Pulbrook, and Schaffer request that this Court enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Defendant is not restrained from engaging in these types of practices in the future, Plaintiffs Inoue, Pulbrook, and Schaffer, and the other members of the California Subclasses will continue *to suffer harm.*

236. In Plaintiff Inoue's original complaint, filed and served more than thirty days prior to the filing of this First Amended Complaint, ECF 1, Plaintiff provided Defendant with notice and demand that Defendant correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. Further, on January 29, 2025, Plaintiff Inoue sent via certified mail a notice and demand that Defendant correct, repair, replace or otherwise rectify

CLASS ACTION COMPLAINT

the unlawful, unfair, false and/or deceptive practices complained of herein. Similarly, on March 5, 2025, Plaintiff Pulbrook sent via certified mail notice and demand that Defendant correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. Despite receiving the aforementioned notices and demands, Defendant failed to do so in that, among other things, they failed to identify similarly situated customers, notify them of their right to correction, repair, replacement or other remedy, and/or to provide that remedy.

237.  Accordingly, Pursuant to Section 1780(a) of the CLRA, Plaintiffs Inoue, Pulbrook, and Schaffer seek damages as well as all equitable remedies as the Court may award, including restitution, and injunctive relief in the form of an order enjoining Defendant from continuing to engage, use, or employ its practice of unfair, deceptive, and unlawful advertising of its floral arrangement and/or gift item deliveries, including an order of this Court enjoining Defendant from continuing to engage, use, or employ its unfair practice of using a misleading Purchase Flow to obscure the full and true price of its floral deliveries and/or gift items and to require Defendant to cease charging any Surprise Fees that are not conspicuously disclosed at the preliminary stages of the Purchase Flow on any floral delivery website it operates or controls, regardless of brand or subsidiary name. Plaintiffs Inoue, Pulbrook, and Schaffer shall be irreparably harmed if such an order is not granted.

238.  Plaintiffs Inoue, Pulbrook, and Schaffer seek, pursuant to California Civil Code § 1780(a)(3), on behalf of themselves and those similarly situated Subclass members, compensatory damages, punitive damages and restitution of any ill-gotten gains due to Defendants' acts and practices.

239.  Plaintiffs Inoue, Pulbrook, and Schaffer also request that this Court award them costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

/ / /

/ / /

/ / /

/ / /

### COUNT III
**Violation of California False Advertising Law**
**Business & Professions Code 17500, et seq.**
***(On Behalf of Plaintiff Inoue, Pulbrook, and Schaffer and the California Subclasses)***

240.    Plaintiffs Inoue, Pulbrook, and Schaffer repeat and re-allege the allegations set forth in the preceding paragraphs and incorporates the same as if set forth herein at length. Defendant's business acts and practices violate California Business and Professions Code section 17500. The practices engaged in by Defendant that violate the FAL include those detailed in Paragraphs 44–95 generally as to the California subclasses, as well as Paragraphs 117–32 specifically as to Plaintiff Inoue, Paragraphs 133–47 specifically as to Plaintiff Pulbrook, and Paragraphs 148-58 specifically as to Plaintiff Schaffer. In particular, throughout the Class Period, Defendant engaged in the specific circumstances set forth in Paragraph 220 to unfairly and deceptively lead Plaintiff and the California Subclasses into paying a price substantially higher than advertised price for floral arrangements and/or gift item deliveries.

241.    To extent it is required, this claim is alleged as an alternative theory of relief in the event that Plaintiffs Inoue, Pulbrook, and Schaffer and the California Subclasses lack an adequate remedy at law.

242.    Defendant acted knowingly, recklessly, and in conscious disregard of the true facts in perpetuating its deceptive advertising scheme and causing injuries to Plaintiffs Inoue, Pulbrook, and Schaffer and the California Sublasses.

243.    Plaintiffs Inoue, Pulbrook, and Schaffer and the California Subclasses have suffered injury in fact and have lost money as a result of Defendant's unfair, fraudulent, and unlawful conduct. Plaintiffs Inoue, Pulbrook, and Schaffer would not have purchased the respective floral arrangements had they known that the product was going to be substantially more expensive than initially listed. Plaintiffs Inoue, Pulbrook, and Schaffer and the California Subclasses have been misled and unfairly induced to enter into transactions and to overpay for products. As a result of Defendant's unfair, fraudulent, and unlawful practices, misrepresentations, and omissions, Plaintiffs Inoue, Pulbrook, and Schaffer and the California Subclasses have been injured in the

form of the full purchase price of the products purchased from Defendant, a price premium, or at a minimum, any Surprise Fees that were not disclosed until later stages in the Purchase Flow, which they would not have incurred but for Defendant's unlawful practices. The full amount of losses has not yet been ascertained, but which are believed to exceed the hundreds of thousands, or possibly millions, of dollars in the aggregate. These amounts have been paid to Defendant by Plaintiffs Inoue, Pulbrook, and Schaffer and the California Subclasses and should be restored to them.

**COUNT IV**
**Violation of California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200, et. seq.**
***(On Behalf of Plaintiff Inoue, Pulbrook, and Schaffer, and the California Subclasses)***

244.   Plaintiffs Inoue, Pulbrook, and Schaffer repeat and re-allege each of the allegations in the preceding paragraphs as if set forth at length herein.

245.   Throughout the class period and continuing to the present, Defendant has and continues to engage in business acts or practices that constitute unfair competition as defined in the Unfair Competition Law, Business and Professions Code § 17200 et seq., in that such business acts and practices are unfair, fraudulent, and unlawful within the meaning of that statute. The business acts and practices engaged in by Defendant that violate the unfair, fraudulent, and unlawful prongs of the Unfair Competition Law include those detailed in Paragraphs 44–95 generally as to the California subclasses, as well as Paragraphs 117–32 specifically as to Plaintiff Inoue, Paragraphs 133–47 specifically as to Plaintiff Pulbrook, and Paragraphs 148-58 specifically as to Plaintiff Schaffer. In particular, throughout the Class Period, Defendant engaged in the specific circumstances set forth in Paragraph 220 to unfairly and deceptively lead Plaintiffs Inoue, Pulbrook, and Schaffer and the California Subclasses into paying a price higher than advertised price for floral arrangements.

246.   To extent it is required, this claim is alleged as an alternative theory of relief in the event that Plaintiffs Inoue, Pulbrook, and Schaffer and the California Subclasses lack an adequate remedy at law.

**CLASS ACTION COMPLAINT**

**"Unfair" Prong**

247.    Under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et. seq., a challenged activity is "unfair" when "any injury it causes outweighs any benefits provided to consumers and the injury is one that the consumers themselves could not reasonably avoid." *Camacho v. Auto Club of Southern California*, 142 Cal. App. 4th 1394, 1403 (2006).

248.    Defendant's aforementioned actions, including those detailed in Paragraphs 44–95 and 220 are unfair.

249.    Defendant knew or should have known of its unfair conduct.

250.    Defendant's unfair actions of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements cause injuries to consumers.

251.    Consumers cannot avoid any of the injuries caused by Defendant's false and misleading advertising of the floral arrangements.

252.    Some courts conduct a balancing test to decide if a challenged activity amounts to unfair conduct under California Business and Professions Code Section 17200. In doing so, the courts "weigh the utility of the Defendant's conduct against the gravity of the harm alleged to the victim." *Davis v. HSBC Bank Nevada, N.A.*, 691 F. 3d 1152, 1169 (9th Cir. 2012).

253.    Defendant's unfair actions of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements results in financial harm to consumers. Thus, the utility of Defendant's conduct is vastly outweighed by the gravity of its harm.

254.    Some courts require the "unfairness must be tethered to some legislative declared policy or proof of some actual or threatened impact on competition." *Lozano v. AT&T Wireless Servs. Inc.*, 504 F. 3d 718, 735 (9th Cir. 2007).

255.    Defendant's unfair practice of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements constitutes an unfair business practice within the meaning of California Business & Professions Code Section 17200.

**"Fraudulent" Prong**

256.     California Business and Professions Code Section 17200, et seq., considers conduct fraudulent and prohibits said conduct if it is likely to deceive members of the public. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1267 (1992).

257.     Defendant's fraudulent actions of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements is likely to deceive members of the public.

258.     Defendant's actions, as alleged in the preceding paragraphs, including Paragraphs 44–95 and 220 are false, deceptive, misleading, and unreasonable and constitutes fraudulent conduct.

259.     Defendant knew or should have known of its fraudulent conduct.

260.     Defendant's fraudulent practice of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements, including making the material misrepresentations and omissions detailed in paragraph 220 constitute a fraudulent business practice within the meaning of California Business & Professions Code Section 17200.

**"Unlawful" Prong**

261.     California Business and Professions Code Section 17200, et seq., identifies violations of other laws as "unlawful practices that the unfair competition law makes independently actionable." *Velazquez v. GMAC Mortg. Corp.*, 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

262.     As alleged in Counts I, II, and III, Defendant's advertising of its floral arrangement deliveries as alleged in the preceding paragraphs, including the advertising detailed in Paragraphs 44–95 and 220, violates the CLRA, Cal. Civil Code Section 1750, et seq., and California FAL, Business and Professions Code Section 17500, et seq.

263.     Defendant knew or should have known of its unlawful conduct.

264.     Defendant's unlawful practice of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements in violation of the CLRA and FAL constitute an

unlawful business practice within the meaning of California Business & Professions Code Section 17200.

### Relief Should Be Granted for Defendant's Violations of All Three Prongs.

265.    There were reasonably available alternatives to further Defendant's legitimate business interests. Defendant could have truthfully advertised the true and full price of its floral arrangements and/or gift item deliveries upfront, including the Surprise Fees in this total. Defendant could have marketed the floral without making any false statements about the ultimate price consumers must pay for the floral arrangements, and without omitting the disclosure that the listed purchase price will be subject to additional Surprise Fees.

266.    All of the conduct alleged herein occurred and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

267.    There were reasonably available alternatives to further Defendant's legitimate business interests other than the conduct described herein.

268.    All of the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on tens of thousands of occasions daily (if not more).

269.    Plaintiffs Inoue, Pulbrook, and Schaffer and the California Subclasses have suffered injury in fact and have lost money as a result of Defendant's unfair, fraudulent, and unlawful conduct. Plaintiffs Inoue, Pulbrook, and Schaffer would not have purchased the respective floral arrangements had they known that the product was going to be more expensive than initially listed. Plaintiffs Inoue, Pulbrook, and Schaffer and the California Subclasses have been misled and unfairly induced to enter into transactions and to overpay for products. As a result of Defendant's unfair, fraudulent, and unlawful practices, misrepresentations, and omissions, Plaintiffs Inoue, Pulbrook, and Schaffer and the California Subclasses have been injured in the form of the full purchase price of the products purchased from Defendant, a price premium, or at a minimum, any Surprise Fees that were not disclosed until later stages in the Purchase Flow, which they would not

have incurred but for Defendant's unlawful practices. The full amount of losses has not yet been ascertained, but which are believed to exceed the hundreds of thousands, or possibly millions, of dollars in the aggregate. These amounts have been paid to Defendant by Plaintiffs Inoue, Pulbrook, and Schaffer and the Subclasses and should be restored to them.

270.     Pursuant to Business and Professions Code Section 17203, Plaintiffs Inoue, Pulbrook, and Schaffer and the California Subclasses seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of unfair, deceptive, and unlawful advertising of its floral arrangement deliveries, including an order of this Court enjoining Defendant from continuing to engage, use, or employ its unfair practice of using a misleading Purchase Flow to obscure the full and true price of its floral deliveries and to require Defendant to cease charging any Surprise Fees that are not conspicuously disclosed at the preliminary stages of the Purchase Flow, and additionally request an order awarding Plaintiffs Inoue, Pulbrook, and Schaffer and the Subclasses restitution of the money wrongfully acquired by Defendant in an amount to be determined at trial.

## COUNT V
**Violation of Illinois Consumer Fraud and Deceptive Business Practices Act,**
**§ 815 ILCS 505, *et seq.***
*(On Behalf of Plaintiff Thomas and the Illinois Subclasses)*

271.     Plaintiff Thomas restates each of the allegations in the preceding paragraphs as if set forth at length herein.

272.     Plaintiff Thomas brings this claim against Defendant under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505, *et seq.*, on behalf of herself and the Illinois Subclass.

273.     In construing 815 ILCS§ 505/2, consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

274.     FTD, LLC is a "person" as defined by 815 ILCS § 505/1(c).

275.     Plaintiff Thomas, as well as each member of the Illinois Subclasses, is a "person" as defined by 815 ILCS § 505/1(c) as well as actual or potential "consumer" of the products and services offered by Defendant, or are successors in interest to actual persons or consumers as defined by 815 ILCS § 505/1.

276.     The circumstances that relate to the transactions giving rise to this claim occurred primarily and substantially in Illinois because Defendant caused to be disseminated throughout the state of Illinois through advertising, marketing, and other publications, statements that were deceptive and misleading, and which it knew were untrue and misleading.

277.     Defendant's course of conduct involved trade or commerce, as its actions were taken in the course of its business in Illinois.

278.     Defendant's deceptive and unfair acts include those detailed in Paragraphs 44–95 and 220 generally as to the Illinois Subclasses, as well as Paragraphs 159-69 specifically as to Plaintiff Thomas.

279.     With respect to unfairness under the Illinois Consumer Fraud and Deceptive Business Practices Act**,** courts look to the FTC and the factors set forth *in Federal Trade Comm'n v. Sperry & Hutchinson Co*., 405 U.S. 233 (1972) to determine what conduct constitutes unfairness: (1) whether the practice offends public policy, (2) whether it is immoral, unethical, oppressive, or unscrupulous, and (3) whether it causes substantial injury to consumers. As alleged *infra* in ¶ 220, Defendant's conduct was in violation of Illinois law, thus unlawful. Additionally, the unfair and deceptive practices detailed in Paragraphs 44–95 and 220 generally as to the Illinois Subclasses, as well as Paragraphs 159-69 specifically as to Plaintiff Thomas were immoral, unethical, oppressive, and unscrupulous. Finally, under the third *Sperry* prong, these acts caused substantial injury to Plaintiff Thomas and the Illinois Subclass that they could not reasonably avoid. Plaintiff Thomas demonstrates Defendant's unfairness by alleging all three Sperry factors.

280.     Defendant's conduct was unfair and deceptive in that Defendant used and employed deception, fraud, false promises, and misrepresentations about the nature of its promotions.

281.    Defendant's conduct was also unfair and deceptive in that Defendant used and employed concealment, suppression, and omission of material facts as to the nature of their promotion.

282.    Defendant's conduct was unlawful. Defendant's conduct violated Illinois law because its advertisements represent that its promotion contains characteristics that it does not have. Defendant misrepresented the price of floral and/or gift deliveries advertised on their website.

283.    Defendant advertised its products with the intent not to sell its services as advertised.

284.    Defendant's advertisements created a likelihood of confusion and misunderstanding among consumers.

285.    Defendant's misrepresentations were material because they were likely to deceive reasonable consumers about the true price of its delivery service, inducing them into spending money and place orders for floral arrangements and/or gift deliveries on its website. These misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.

286.    Defendant intended to mislead Plaintiff Thomas and the other Illinois Subclass members and induced them to rely on its misrepresentations and omissions.

287.    Had Plaintiff Thomas and the other Illinois Subclass members known the truth about Defendant's offer terms, they would not have purchased floral arrangements on Defendant's Websites, or at a minimum, paid less.

288.    As a direct and proximate result of Defendant's unfair and deceptive practices, suffered injuries in the form of monetary losses when they improperly charged fees for orders they placed in reliance on Defendant's advertised price offerings.

289.    As a result of Defendant's unfair and deceptive practices, misrepresentations, and omissions, Plaintiff Thomas and the Illinois Subclasses have been injured in the form of the full purchase price of the products purchased from Defendant, a price premium, or at a minimum, any

Surprise Fees that were not disclosed until later stages in the Purchase Flow, which they would not have incurred but for Defendant's unlawful practices. The full amount of losses has not yet been ascertained, but which are believed to exceed the hundreds of thousands, or possibly millions, of dollars in the aggregate. These amounts have been paid to Defendant by Plaintiffs and the Illinois Subclasses and should be restored to them.

290.    Defendant knew or should have known that its misrepresentations and omissions would deceive Plaintiff Thomas and the Illinois Subclasses. Defendant's actions in engaging in the above-named unfair practices and deceptive acts were willful, intention, and/or done with reckless indifference with respect to the rights of Plaintiff Thomas and the Illinois Subclasses.

291.    Defendant's conduct has caused and is causing immediate and irreparable injury to Plaintiff Thomas and the Illinois Subclasses and will continue to both damage Plaintiff Thomas and the Illinois Subclasses and deceive the public unless enjoined by this Court.

292.    Plaintiff and the Illinois Subclasses seek relief under the Illinois Consumer Protection and Deceptive Business Practices Act, including (but not limited to) actual damages, compensatory damages, statutory damages, restitution, penalties, injunctive relief, punitive damages, and/or attorney's fees and costs.

**COUNT VI**
**Violation of New York Deceptive and Unfair Trade Practices Act,**
**N.Y.G.B.L. § 349**
***(On Behalf of Plaintiff Vincenzi and the New York Subclass)***

293.    Plaintiff Vincenzi restates each of the allegations in the preceding paragraphs as if set forth at length herein.

294.    This cause of action is brought pursuant to New York's Gen. Bus. Law section 349, et seq., on behalf of Plaintiff Vincenzi and the New York Subclass who purchased Defendant's floral arrangements within the applicable statute of limitations.

295.    The legislative purpose in enacting New York Gen. Bus. Law, section 349, was to follow in the steps of the Federal Trade Commission with respect to the interpretation of deceptive acts and practices outlawed by § 5 of the Federal Trade Commission Act. *State by Lefkowitz v*

**CLASS ACTION COMPLAINT**

*Colorado State Christian College of Church of Inner Power, Inc.*, 346 N.Y.S.2d  (N.Y. Sup. Ct. 1973).

296.    New York Gen. Bus. Law, section 349, et seq., prohibits the "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in th[e] state."

297.    Defendant's deceptive acts include those detailed in Paragraphs 44–95 and 220 generally as to the New York subclass, as well as Paragraphs 170–85 specifically as to Plaintiff Vincenzi. In particular, throughout the Class Period, Defendant engaged in the specific circumstances set forth in Paragraph 220 to unfairly and deceptively lead Plaintiff Vincenzi and the New York Subclass into paying a higher than advertised price for floral arrangements.

298.    Defendant's aforementioned actions, including those detailed in Paragraphs 44–95 and 220, led to, and continues to lead to, consumers paying a higher price for the floral arrangement and/or gift item delivery than they would have purchased if not for the misleading Purchase Flow which obscured the true and full price of the arrangement. Plaintiff Vincenzi would not have purchased the floral arrangement had she known that the product was going to be more expensive than initially listed. Defendant's unfair actions of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements is likely to deceive consumers into purchasing the floral arrangements because the listed "bait" price is material to the average, ordinary, and reasonable consumer.  Defendant knew consumers would purchase the Products once they have "anchored" on the falsely listed "bait" price.  By advertising so prominently only the "bait" price, Defendant has demonstrated that the "bait" price is material to consumers. As a result of their deceptive acts and practices, Defendant has sold tens of thousands (or more) of floral arrangements to unsuspecting consumers across New York. If Defendant had advertised its floral arrangements truthfully and in a non-misleading fashion, Plaintiff Vincenzi, and the New York Subclass Members, would not have purchased the floral arrangements at all, or would not have paid as much.

CLASS ACTION COMPLAINT

299.    Plaintiff Vincenzi and the New York Subclass reasonably and detrimentally relied on the material and falsely listed "bait" price, in that they purchased the floral arrangements.

300.    Plaintiff Vincenzi has standing to pursue this claim because Plaintiff Vincenzi has suffered an injury-in-fact and has lost money or property as a result of Defendant's deceptive acts and practices. Specifically, Plaintiff Vincenzi purchased a product for her own personal use. In doing so, Plaintiff Vincenzi relied upon Defendant's false, misleading, and deceptive representations of the "bait" price.  Plaintiff Vincenzi spent money in the transaction that she otherwise would not have spent had she known the true and full price of Defendant's floral arrangements.

301.    Plaintiff Vincenzi and the New York Subclass have suffered injury in fact and have lost money as a result of Defendant's unfair, fraudulent, and unlawful conduct. Plaintiff Vincenzi would not have purchased the floral arrangement had she known that the product was going to be more expensive than initially listed. Plaintiff Vincenzi and the New York Subclass have been misled and unfairly induced to enter into transactions and to overpay for products. As a result of Defendant's unfair, fraudulent, and unlawful practices, misrepresentations, and omissions, Plaintiff Vincenzi and the New York Subclass have been injured in the form of the full purchase price of the products purchased from Defendant, a price premium, or at a minimum, any Surprise Fees that were not disclosed until later stages in the Purchase Flow, which they would not have incurred but for Defendant's unlawful practices. The full amount of losses has not yet been ascertained, but which are believed to exceed the hundreds of thousands, or possibly millions, of dollars in the aggregate. These amounts have been paid to Defendant by Plaintiffs and the New York Subclass and should be restored to them.

302.    Accordingly, Plaintiff Vincenzi seeks to enjoin Defendant's unlawful acts and practices and to recover her actual damages or fifty (50) dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

/ / /

/ / /

**CLASS ACTION COMPLAINT**

### COUNT VII
**Violation of False Advertising of the New York Deceptive Acts and Practices Act**
**N.Y.G.B.L. § 350**
***(On Behalf of Plaintiff Vincenzi and the New York Subclass)***

303.    Plaintiff Vincenzi re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

304.    Plaintiff Vincenzi brings this claim individually and on behalf of the New York Subclass who purchased Defendant's floral arrangements within the applicable statute of limitations.

305.    The New York False Advertising Law, codified at Gen. Bus. Law section 350, et seq., prohibits advertising that "is misleading in a material respect."

306.    Defendant's business acts and practices in violation of section 350 include those detailed in Paragraphs 44-95 and 220 generally as to the New York subclass, as well as Paragraphs 170-85 specifically as to Plaintiff Vincenzi. In particular, throughout the Class Period, Defendant engaged in the specific circumstances set forth in Paragraph 220 to unfairly and deceptively lead Plaintiff Vincenzi and the New York Subclass into paying a higher than advertised price for floral arrangements.

307.    Defendant's unfair actions of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements were false because the floral arrangement's true and full price is inflated by a hidden Surprise Fee. The representation made throughout the course of conduct detailed in Paragraphs 44–95 and 220 were material because they are likely to mislead a reasonable consumer into purchasing the floral arrangements.

308.    In making and disseminating the false representations alleged herein, Defendant knew or should have known that the representations were untrue or misleading.

309.    Defendant's misleading Purchase Flow obscured the full and true price of its floral arrangements and was specifically designed to induce reasonable consumers, like Plaintiff Vincenzi and the New York Subclass, to purchase the floral arrangements.

310.    Plaintiff Vincenzi and the New York Subclass have suffered injury in fact and have lost money as a result of Defendant's unfair, fraudulent, and unlawful conduct. Plaintiff Vincenzi would not have purchased the floral arrangement had she known that the product was going to be more expensive than initially listed. Plaintiff Vincenzi and the New York Subclass have been misled and unfairly induced to enter into transactions and to overpay for products. As a result of Defendant's unfair, fraudulent, and unlawful practices, misrepresentations, and omissions, Plaintiff Vincenzi and the New York Subclass have been injured in the form of the full purchase price of the products purchased from Defendant, a price premium, or at a minimum, any Surprise Fees that were not disclosed until later stages in the Purchase Flow, which they would not have incurred but for Defendant's unlawful practices. The full amount of losses has not yet been ascertained, but which are believed to exceed the hundreds of thousands, or possibly millions, of dollars in the aggregate. These amounts have been paid to Defendant by Plaintiff Vincenzi and the New York Subclass and should be restored to them.

311.    As a direct and proximate result of Defendant's misconduct, Plaintiff Vincenzi and the New York Subclass were injured in that they: (1) paid money for the floral arrangements that were not priced what they were originally listed for; (2) and were deprived of the benefit of the bargain because the arrangements they purchased were differently priced than what Defendant advertised. Accordingly, on behalf of Plaintiff Vincenzi and the Members of the New York Subclass, Plaintiff Vincenzi seeks to enjoin Defendant's unlawful acts and practices and recover their actual damages or five hundred (500) dollars per violation, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## COUNT VIII
### Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")
### Fla. Stat. § 501.201, et seq.
### *(On Behalf of Plaintiff Ciampi and Florida Subclass)*

312.    Plaintiff Ciampi re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

313.     Plaintiff Ciampi brings this claim against Defendant under Florida's Deceptive and Unfair Trade Practices Act § 501.201, et seq ("FDUTPA").

314.     In construing the FDUTPA, consideration shall be given to the interpretations of the Federal Trade Commission. Fla. Stat. § 501.203(3)(b).

315.     The FDUTPA was established to protect the consuming public and business enterprises from "those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of trade or commerce". Fla. Stat. § 501.202(2). In determining whether particular conduct violates the Florida DTPA, Fla. Stat. § 501.201 at seq., a court should consider whether the FTC and federal courts deem such conduct to be an unfair method of competition or an unconscionable, unfair or deceptive act or practice under federal law. *Mack v. Bristol-Myers Squibb Co.,* 673 So. 2d 100, (Dist. Ct. App. 1996).

316.     Fla Stat. § 501.204 provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful."

317.     Plaintiff Ciampi and the Florida Subclass are "consumers" and "interested persons" as defined in Fla. Stat. § 501.203(6)-(7).

318.     Defendant's floral arrangements are "things of value" within the meaning of the FDUTPA.

319.     Defendant is engaged in "trade or commerce" within the meaning of Fla. Stat. Ann. § 501.201.

320.     Defendant's unfair business acts and practices in violation of the FDUTPA include those detailed in Paragraphs 44–95 and 220 generally as to the Florida subclass, as well as Paragraphs 186-200 specifically as to Plaintiff Ciampi. In particular, throughout the Class Period, Defendant engaged in the specific circumstances set forth in Paragraph 220 to unfairly and deceptively lead Plaintiff Ciampi and the Florida Subclass into paying a higher than advertised price for floral arrangements and/or gift item deliveries.

321.     Defendant aforementioned actions, including those detailed in Paragraphs 44-95 and 220, led to, and continues to lead to, consumers paying a higher price for the floral arrangement and/or gift item delivery than they would have purchased if not for the misleading Purchase Flow which obscured the true and full price of the arrangement. Plaintiff Ciampi would not have purchased the floral arrangement had she known that the product was going to be more expensive than initially listed. Defendant's unfair actions of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements is likely to deceive consumers into purchasing the floral arrangements because the listed "bait" price is material to the average, ordinary, and reasonable consumer.  Defendant knew consumers would purchase the Products once they have "anchored" on the falsely listed "bait" price.  By advertising so prominently only the "bait" price, Defendant has demonstrated that the "bait" price is material to consumers. As a result of their deceptive acts and practices, Defendant has sold tens of thousands (or more) of floral arrangements to unsuspecting consumers across Florida. If Defendant had advertised its floral arrangements truthfully and in a non-misleading fashion, Plaintiff Ciampi, and the Florida Subclass Members, would not have purchased the floral arrangements at all, or would not have paid as much

322.     Defendant's actions regarding its products and delivery, as described herein, are deceptive acts or practices in the conduct of business trade or commerce. Defendant's actions are unfair and deceptive because Defendant deceived customers into believing their floral arrangements would cost a certain amount, and using a drip-pricing scheme, surreptitiously added Surprise Fees and a Mandatory Fee later in the checkout process.

323.     This scheme is unfair because it gives Defendant a disproportionate advantage over other competitors in the industry that do not employ the same illegal practices. Additionally, Defendant has an unfair advantage over Plaintiff Ciampi and the Florida Subclass as well, as they were not fully informed of the details of the transaction until the time of payment.

324.     Defendant knows and understands that waiting to add extra fees in the final steps of transactions ensures that consumers are more likely to succumb to the purchase instead of restarting their shopping process all over again.

CLASS ACTION COMPLAINT

325.     Although not required by Florida law, Plaintiff Ciampi and the Florida Subclass members reasonably relied on Defendant's material misrepresentations, omissions, and deceptive policies and practices, and would not have purchased floral arrangements from Defendant, or would not have paid as much for said floral arrangements, had they known the truth about Defendant's policies and practices. *See Bechor v. Simcenter, Inc.*, 394 So. 3d 666, 669 (Fla. Dist. Ct. App. 2024) ("[U]nlike fraud, a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue.").

326.     Defendant knowingly and willingly committed these deceptive acts and practices for their own profit and for the profit of their shareholders.

327.     The deceptive acts or practices and the delivery of floral arrangements took place in this State because Defendant operates in this State and because the floral arrangement transaction and delivery took place in this State when Defendant fulfilled Plaintiff Ciampi and the Florida Subclass' floral arrangement orders placed on Defendant's e-commerce platforms.   In short, the underlying nature of the deceptive transactions occurred in Florida.

328.     Defendant's unfair and deceptive conduct occurred, and continues to occur, in the course of Defendant's business.

329.     Defendant's conduct including their misrepresentations, concealments, omissions, and suppression of material facts, as alleged herein, is likely to deceive a consumer acting reasonably under the circumstances, to the consumer's detriment.

330.     Defendant's actions were the direct, foreseeable, and proximate cause of the damages that Plaintiff and the Florida Subclass members have sustained from having paid for and consumed Defendants' services.

331.     As a direct and proximate result of Defendant's misconduct and violations of the FDUTPA, Plaintiff Ciampi and the Florida Subclass were injured and suffered actual damages. They purchased floral arrangements they would not otherwise have bought and paid Surprise Fees they would not otherwise have paid had they not been drawn in by Defendant's deceptively advertised prices. Plaintiff Ciampi and the Florida Subclass members are also entitled to an

injunction to halt Defendant's unlawful deceptive practices and to initiate a program to provide refunds and/or restitution to Plaintiff Ciampi and the Florida Subclass members. Plaintiff Ciampi is also entitled to reasonable attorneys' fees from Defendant. Fla. Stat. Ann. § 501.211.

## COUNT XI
### Florida's Misleading Advertising Law (the "FMAL")
### Fla. Stat. Ann. §§ 817.41 et seq.
### *(On Behalf of Plaintiff Ciampi and Florida Subclass)*

332.     Plaintiff Ciampi re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

333.     Plaintiff Ciampi brings this claim individually and on behalf of the Florida Subclass who purchased Defendant's floral arrangements within the applicable statute of limitations.

334.     FMAL makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the general public of the state, or any portion thereof, any misleading advertisement." Fla. Stat. § 817.41(1).

335.     Florida Statutes Section § 817.40(5) defines misleading advertisements as:

> [A]ny statements made, or disseminated, in oral, written, or printed form or otherwise, to or before the public, or any portion thereof, which are known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be untrue or misleading, and which are or were so made or disseminated with the intent or purpose, either directly or indirectly, of selling or disposing of real or personal property, services of any nature whatever, professional or otherwise, or to induce the public to enter into any obligation relating to such property or services.

336.     As alleged herein, Defendant violated the FMAL by knowingly disseminating misleading advertisements to the public containing misrepresentations and omissions of material facts regarding the true costs of its floral arrangements and their delivery.

337.     Defendant's misleading advertisements containing misrepresentations and omissions of material facts in violation of the FMAL include those detailed in Paragraphs 44–95 and 220 generally as to the Florida subclass, as well as Paragraphs 186-200 specifically as to Plaintiff Ciampi. In particular, throughout the Class Period, Defendant engaged in the specific

circumstances set forth in Paragraph 220 to mislead Plaintiff Ciampi and the Florida Subclass into paying a higher than advertised price for floral arrangements and/or gift item deliveries.

338.    Defendant's misleading advertisements, including its misrepresentations, concealments, omissions, and suppression of material facts, as alleged herein, had a tendency or capacity to mislead and create a false impression in consumers' minds, and were likely to and, in fact, did deceive reasonable consumers, including Plaintiff Ciampi and the Florida Subclass members, about the true cost of Defendant's floral arrangements and their delivery.

339.    Defendant knows and understands that prominently advertising a low "bait price" on its e-commerce platforms, and waiting to add extra fees related to this delivery in the final steps of transactions ensures that consumers are more likely to succumb to the purchase instead of restarting their shopping process all over again.

340.    The facts that Defendant knowingly and intentionally misrepresented and concealed, including the true costs of its floral arrangements and their delivery, would be considered material by a reasonable consumer. In fact, these facts are material to Plaintiff Ciampi and the Florida Subclass members, who consider such facts to be important to their decision to purchase floral arrangements they believed to cost a certain amount as advertised by Defendant.

341.    Defendant owed Plaintiff Ciampi and the Florida Subclass members a duty to not create an unfair, false, deceptive, or misleading impression concerning the cost of its floral arrangements and their delivery. Defendant possessed exclusive knowledge of the true facts, but intentionally concealed those facts from Plaintiff Ciampi and the Florida Subclass, and/or it made misrepresentations that were rendered misleading because they were contradicted by undisclosed facts.

342.    Plaintiff Ciampi and the Florida Subclass members were aggrieved by Defendant's violations of the FMAL because they suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's knowing and intentional misrepresentations, omissions, concealments, and failures to disclose material facts, as alleged herein.

343.     Plaintiff Ciampi and the Florida Subclass members purchased Defendant's floral arrangements and paid for delivery in reliance on Defendant's misrepresentations, omissions, concealments, and/or failures to disclose material facts, as alleged herein.

344.     But for Defendant's misleading advertising practices alleged herein, Plaintiff Ciampi and the Florida Subclass members would not have purchased Defendant's products, or they would not have paid as much for such products and, thus, they did not receive the benefit of the bargain, and they suffered out-of-pocket loss.

345.     Pursuant to Fla. Stat. § 817.41(6), Plaintiff Ciampi and the Florida Subclass seek an award of actual damages, punitive damages, attorneys' fees, and costs.

## <u>COUNT IX</u>
### Quasi-Contract Claim for Restitution/Unjust Enrichment under the Common Law of the 50 States and the District of Columbia
#### *(On Behalf of All Plaintiffs, and the Nationwide Classes)*

346.     Plaintiffs repeat, reallege, and incorporate the allegations in in the preceding paragraphs as if fully set forth herein.

347.     To the detriment of Plaintiffs and the Classes, Defendant has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein.

348.     Plaintiffs and the Classes conferred a benefit on Defendant when they paid Defendant the Surprise Fees which they did not agree to and could not reasonably avoid.

349.     Defendant unfairly, deceptively, unjustly, and/or unlawfully accepted said benefits, which under the circumstances, would be unjust to allow Defendant to retain.

350.     Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

351.     Plaintiffs and the Classes therefore, seek disgorgement of all wrongfully obtained fees received by Defendant as a result of its inequitable conduct as more fully stated herein.

352.     To extent it is required, this claim is alleged as an alternative theory of relief in the event that Plaintiffs and the Classes lack an adequate remedy at law.

## IX.    PRAYER FOR RELIEF

353.    WHEREFORE, Plaintiffs, individually and on behalf of the Classes and Subclasses defined herein, pray for judgment and relief on all Causes of Action as follows:

a) **Certification**: For an order certifying this action as a class action, appointing each Plaintiff as the appropriate Class and Subclass Representative, and appointing Plaintiffs' Counsel as Class Counsel;

b) **Declaratory Relief**: For an order declaring that Defendant's conduct violates the statutes and laws which underpin this action;

c) **Injunction**: For an order requiring Defendant to immediately cease and desist from selling the unlawful products in violation of law; enjoining Defendant from continuing to market, advertise, distribute, and sell the products in the unlawful manner described herein; requiring Defendant to engage in an affirmative advertising campaign to dispel the public misperception of the products resulting from Defendant's unlawful conduct; and requiring all further and just corrective action, consistent with permissible law and pursuant to only those causes of action so permitted;

d) **Damages/Restitution/Disgorgement**: For an order awarding monetary compensation in the form of damages, restitution, and/or disgorgement to Plaintiffs, the Class, and Subclasses, consistent with permissible law and pursuant to only those causes of action so permitted;

e) **Attorneys' Fees and Costs**: For an order awarding attorneys' fees and costs, consistent with permissible law and pursuant to only those causes of action so permitted;

f) **Pre/Post-Judgment Interest**: For an order awarding pre-judgment and post-judgment interest, consistent with permissible law and pursuant to only those causes of action so permitted; and

g) **All Just and Proper Relief**: For such other and further relief as the Court deems

just and proper.

## X. <u>JURY TRIAL DEMANDED</u>

354. Plaintiffs demand a jury trial on all triable issues.


DATED: April 11, 2025 **CLARKSON LAW FIRM, P.C.**

*/s/ Kristen Simplicio*
Bryan Paul Thompson (IARDC # 6310322)
*bthompson@clarksonlawfirm.com*
Cody Laux (*pro hac vice*)
*claux@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
Fax: (213) 788-4070

Kristen Simplicio (*pro hac vice*)
*ksimplicio@clarksonlawfirm.com*
1050 Connecticut Ave NW, Ste 500
Washington, DC 20036
Tel.: (202) 688-2105
Fax: (213) 788-4070

*Attorneys for Plaintiff Mayo Inoue*

**SHAMIS & GENTILE, P.A.**
Andrew J. Shamis (SBN 6337427)
Edwin E. Elliott
14 NE 1st Avenue, Suite 705
Miami, Florida 33132
Phone: 305-479-2299
*ashamis@shamisgentile.com*
*edwine@shamisgentile.com*

**EDELSBERG LAW, P.A.**
Scott Edelsberg
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
Phone: 786-289-9471
*scott@edelsberglaw.com*

**KALIEL GOLD PLLC**
Jeffrey D. Kaliel
*jkaliel@kalielpllc.com*
1100 15th Street NW, 4th Floor
Washington, D.C. 20005

Telephone: (202) 350-4783

Sophia Goren Gold
490 43rd Street, No. 122
Oakland, California 94609
Telephone: (202) 350-4783
*sgold@kalielgold.com*

*Attorneys for Plaintiffs Taylor Pulbrook,
Alyssa Schaffer, and Caroline Thomas*